1

```
 1                  UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF MISSOURI
 2                         EASTERN DIVISION

 3

 4   FREDERICK P. DAVIS,          )
                                  )
 5        Plaintiff,              )
                                  )
 6        v.                      )No. 4:13-CV-01638 HEA
                                  )
 7   TIMOTHY R. LANCASTER, et     )
     al.,                         )
 8                                )
          Defendants.             )
 9

10                              JURY TRIAL

11                              Volume 2

12            BEFORE THE HONORABLE HENRY E. AUTREY
                 UNITED STATES DISTRICT JUDGE
13
                          MAY 22, 2018
14

15   APPEARANCES:

16   For Plaintiff:        Anthony G. Simon, Esq.
                           Brian Sableman, Esq.
17                         THE SIMON LAW FIRM, P.C.
                           800 Market Street, Suite 1700
18                         St. Louis, MO  63101

19   For Defendants:       Andrew D. Kinghorn, Esq.
                           Denise Garrison McElvein, Esq.
20                         ATTORNEY GENERAL OF MISSOURI
                           P.O. Box 861
21                         St. Louis, MO  63188

22   REPORTED BY:          ANGELA K. DALEY, CSR, RMR, FCRR, CRR
                           Official Court Reporter
23                         United States District Court
                           111 South Tenth Street, Third Floor
24                         St. Louis, MO  63102
                           (314) 244-7978
25      PRODUCED BY COURT REPORTER COMPUTER-AIDED TRANSCRIPTION
```

1                              INDEX

2       WITNESSES:                                    Page

3       TIMOTHY LANCASTER                               3
            Cross Examination By Mr. Kinghorn           3
4           Redirect Examination By Mr. Sableman       33

5       SHERI SHAWVER                                  52
            Direct Examination By Mr. Sableman         53
6
        STANLEY PRUETT                                 67
7           Direct Examination By Mr. Sableman         67
            Cross Examination By Mr. Kinghorn          71
8           Redirect Examination By Mr. Sableman       75

9       DANIEL BRYAN                                   76
            Direct Examination By Mr. Simon            76
10          Cross Examination By Mr. Kinghorn          92
            Redirect Examination By Mr. Simon         100
11          Recross Examination By Mr. Kinghorn       103

12      FREDERICK DAVIS                               105
            Direct Examination By Mr. Simon           109
13          Cross Examination By Mr. Kinghorn         135
            Redirect Examination By Mr. Simon         139
14
        TROY STEELE                                   140
15          Direct Examination By Mr. Sableman        141
            Cross Examination By Mr. Kinghorn         166

16

17

18

19

20

21

22

23

24

25

3

1    **(PROCEEDINGS STARTED AT 9:45 A.M.)**

2    **(The Following Proceedings Were Held Within the Hearing and**

3    **Presence of the Jury.)**

4    THE COURT:  Good morning, all.  Counsel, are you

5    ready to proceed?

6    MR. KINGHORN:  Yes, Your Honor.

7    THE COURT:  I think you were making inquiry of the

8    witness?

9    MR. KINGHORN:  Yes, of Timothy Lancaster.

10    THE COURT:  Mr. Lancaster, come on up, sir.  And

11    since we recessed for the evening, I am going to have the

12    clerk swear you in again, okay?

13    **TIMOTHY LANCASTER,**

14    **Having Been First Duly Sworn, Was Examined and Testified As**

15    **Follows:**

16    THE COURT:  Proceed.

17    MR. KINGHORN:  Thank you, Your Honor.

18    CROSS EXAMINATION

19    BY MR. KINGHORN:

20    Q    Mr. Lancaster, can you hear me okay?

21    A    Yes.

22    Q    I would like to begin by asking you a little bit about

23    your background.  Where are you currently employed?

24    A    Potosi Correctional Center.

25    Q    Okay.  And where were you employed back in October of

4

1  2012?

2  A    Potosi.

3  Q    All right.  What was your job title back in 2012?

4  A    It was administrative inquiry officer.

5  Q    Okay.  And what duties did you have primarily as the

6  administrative inquiry officer?

7  A    I worked primarily for the warden conducting inquiries

8  into offender complaints, staff complaints, pre-allegations,

9  etc.

10 Q    How many investigations would you say that you worked on

11 per month at that time?

12 A    It varies, but it could be anywhere from 15 to 30.

13 Q    Okay.  And so you were the administrative inquiry

14 officer.  Has your job position changed at all since then?

15 A    Yes, sir.

16 Q    Okay.  And what are you now?

17 A    Institutional investigator.

18 Q    Okay.  Have your duties actually changed or just the

19 title?

20 A    They have basically doubled, but I do more complex

21 investigations now.

22 Q    Okay.  Essentially it's the same or similar job though?

23 A    Yes, sir.

24 Q    And how long have you been the investigator or

25 administrative inquiry officer at Potosi?

<u>Volume 2</u>

5

```
 1   A     Since 2008.

 2   Q     Okay.  Let's talk about your authority as the

 3   administrative inquiry officer back in October of 2012.  Did

 4   you have any authority at that time to assign inmates to

 5   administrative segregation?

 6   A     No, sir.

 7   Q     Did you have any authority at that time to release

 8   inmates from administrative segregation?

 9   A     No, sir.

10   Q     Did you have any authority to assign inmates to

11   disciplinary segregation?

12   A     No, sir.

13   Q     And did you have any authority to release inmates from

14   disciplinary segregation?

15   A     No, sir.

16   Q     Whose responsibility was it to assign and release inmates

17   from segregation?

18   A     That would be the ad-seg committee.

19   Q     Okay.  And is that the classification committee that we

20   heard about yesterday?

21   A     It's comprised of the classification team, yes.

22   Q     In October 2012, did you have anything to do with the

23   classification staff?

24   A     No, sir.

25   Q     In October 2012, did you play any part in classification
```

6

1    hearings?

2    A    No, sir.

3    Q    Or ad-seg hearings?

4    A    No, sir.

5    Q    All right.  The lawsuit that Mr. Davis had against you

6    and other prison personnel in October of 2012, has that case

7    been dismissed?

8    A    To my knowledge it has.

9    Q    And is it common or uncommon in your experience for

10   inmates to have lawsuits against prison staff?

11   A    It's very common.

12   Q    With regards to that prior lawsuit, the Davis versus Webb

13   lawsuit that we heard about yesterday, did you have an

14   attorney representing you in that case?

15   A    Yes, sir.

16   Q    And you were asked yesterday about a case management

17   order.  Do you know what a case management order is?

18   A    No, sir.

19   Q    Do you have any idea whether a case management order was

20   entered in Mr. Davis's prior lawsuit against you -- or in

21   October of 2012, did you have any knowledge of that?

22   A    No, sir.

23   Q    Now Court orders that would have been entered in that

24   case, would those have gone directly to you or would they have

25   gone to your attorney?

1    A    I'm assuming the attorney because I never saw any of

2    those.

3    Q    In October 2012, do you recall having any knowledge about

4    any of the orders that the Court entered in the Davis versus

5    Webb case?

6    A    No, sir.

7    Q    Do you yourself -- did you yourself draft any motions in

8    that case?

9    A    No, sir.

10   Q    And who drafted motions for you?

11   A    That would have been the attorney representing us.

12   Q    Do you recall having any knowledge about the motions your

13   attorney filed in that lawsuit?

14   A    No, sir.

15   Q    Do you recall having any knowledge about how the Court

16   ruled or may have ruled on any of those motions that your

17   attorney filed?

18   A    No, sir.

19   Q    All right.  So what was your role in the investigation

20   regarding the knife that we're here about today?

21   A    I was assigned to the case to attempt to find out who

22   manufactured the weapon, may have placed it in the housing

23   unit, what it was to be used for.

24   Q    All right.  And did you choose that responsibility or was

25   it assigned to you?

1   A    All my cases are assigned.

2   Q    Who assigned this case?

3   A    The warden assigns my cases.

4   Q    And were you told to do the investigation on

5   October 26th, the day when the knife was found, or at some

6   other time?

7   A    I believe it was three to four days later.

8   Q    Do you recall how many days -- you think it was three to

9   four?

10  A    I believe that it was found on a Friday or a Thursday

11  night into Friday, and I believe it was assigned to me on

12  Monday.

13  Q    Was Mr. Davis already in administrative segregation when

14  it was assigned to you?

15  A    He was.

16  Q    Along with one other offender; correct?

17  A    Yes.

18  Q    Now you did not place either of those offenders in

19  administrative segregation?

20  A    No, sir.

21  Q    All right.  What if anything did you say to Troy Steele

22  when he told you to do the investigation?

23  A    Well, he called me to come over to his office.  He

24  explained to me that he was assigning the case to me, and I

25  said okay, that's fine, but it was my understanding that

9

1   Offender Davis was attempting to get a case into the courts

2   concerning a prior violation he had received or something like

3   that.

4   Q    So you told him about Davis's case against you?

5   A    Yes.

6   Q    All right.  Then what happened?

7   A    Mr. Steele told me that I would be doing the

8   investigation because I'm the only one that worked for him,

9   and I said that's fine, I'm just letting you know.

10  Q    What did you do first as part of your investigation?

11  A    I tried to look at, you know, where the weapon was found,

12  reviewed some video showing the officer finding the weapon,

13  tried to, you know, see who all worked in the MVE factory as

14  that's, you know, where the weapon was probably made due to

15  the manufacturing of it, find out where everybody is at to

16  locate them to interview them, find any information at all

17  that was already known and compile that.

18  Q    And did you inspect the knife?

19  A    Yes.

20       MR. KINGHORN:  And, Your Honor, Exhibit B has already

21  been admitted, so I request permission to publish it to the

22  jury.

23       THE COURT:  Very well.

24  Q    (By Mr. Kinghorn) Okay.  Is this the knife that was found

25  in the shower in housing unit 6 in October of 2012?

1   A    Yes, sir.

2   Q    Are you able to explain looking at this picture where the

3   welding on the knife is?

4   A    On the top part of the bottom picture right in the

5   middle, you can see the head of one of the screws has been

6   ground off and there was a weld made and grounded down.

7   Q    Are you referring to right in the middle of the bolt

8   there?

9   A    Yes.  Okay.  And then on the end, the right end, my right

10  end of the shank, you can see it was welded and ground down.

11  Q    Is this what you are referring to?

12  A    Yes, sir.  And then the whole portion of the shank is

13  ground down like you would by a knife to a sharpened edge and

14  point.

15  Q    How sharp was the knife?

16  A    It was sharp, sharp enough to cut.  The screw portion of

17  that would then be -- it was made to screw in the end of that

18  so they could wrap cloth or something around it to form a

19  handle.

20  Q    Okay.  And is that what we are looking at in the top

21  picture there?

22  A    Yes.

23  Q    And you are saying cloth would have been wrapped around

24  the bolt to make a handle?

25  A    Something to make a handle, cloth, plastic.

1    Q    In your experience at Potosi Correctional Center, have

2    you ever seen a prison-made weapon more sophisticated than

3    this?

4    A    No, sir.

5    Q    After inspecting this knife, did you form an opinion as

6    to where the knife had been made?

7    A    I believed it to be made in the MVE metal factory.

8    Q    All right.  And why was that your opinion?

9    A    Due to the welding and just the way it was ground down

10   real nice and everything.  A lot of times the offenders use

11   concrete to sharpen a weapon of metal and it does not come out

12   like that.

13   Q    In your experience, are most prison-made knives made out

14   of metal?

15   A    Most?  Half and half.  They use a lot of plastic, hard

16   plastic, anything they can get their hands on.

17   Q    Do you know whether Mr. Davis had a job at the time when

18   this knife was found?

19   A    He was employed at the MVE metal factory.

20   Q    And can you tell the jury what MVE stands for, if you

21   know?

22   A    Missouri Vocational Enterprises.

23   Q    All right.  Did you know at that time when you inspected

24   this knife how many inmates had the skills necessary to do

25   this grinding and welding?

1   A    Not at that time, no.

2   Q    And did you investigate to find out which offenders

3   possessed the skills necessary to make this knife?

4   A    Yes, sir.

5   Q    All right.  What did you do?

6   A    I spoke to Jim Kennon and Bruce Nipper who were both

7   supervisors in the metal factory to find out who were the

8   welder fabricators and who had that experience.

9   Q    And after speaking with these gentlemen in the metal

10  factory, did you believe that Mr. Davis possessed the skills

11  necessary to make this knife?

12  A    I was told he did possess those skills, yes.

13  Q    You were asked yesterday about Jim Kennon and Bruce

14  Nipper, and so I would like to know, to your knowledge, have

15  either of them ever lied to you?

16  A    Not to my knowledge, no.

17  Q    Do you have any reason to suspect that they were lying to

18  you in this instance?

19  A    No, I don't.

20  Q    How long had they worked in the metal factory as of

21  October of 2012?

22  A    Mr. Kennon I believe had 20 plus years; Mr. Nipper was

23  relatively new, maybe a year, year and a half.

24  Q    And in that time period, you don't recall them ever

25  having lied to you to your knowledge?

<u>Volume 2</u>

13

1    A    No, sir.

2    Q    Did you ask Mr. Kennon or Mr. Nipper if the other suspect

3    who you had in administrative segregation at that time

4    possessed the skills necessary to make this knife?

5    A    I did.

6    Q    Okay.  And how did they respond?

7    A    They said he did not have the skills nor was he in that

8    area.  He worked on the other side of MVE, which was more of

9    pipe bending and that form of work.

10   Q    And during your investigation, you interviewed Mr. Davis

11   and that other suspect; is that correct?

12   A    Yes.

13   Q    Was Stanley Pruett present during either of those

14   interviews?

15   A    No, sir.

16   Q    And he wasn't present when you interviewed Mr. Davis?

17   A    No, sir.

18   Q    During your interview with Mr. Davis, you testified that

19   one of the questions you asked him was about whether he'd be

20   willing to take a CVSA test.  Do you remember that?

21   A    Yes, sir.

22   Q    Okay.  What is a CVSA test?

23   A    A constant voice stress analysis.

24   Q    And in layman's terms, could it be considered a truth

25   verification test?

14

1    A     Yes, sir.

2    Q     Now why did you ask Mr. Davis that question?

3    A     I pose that question often to offenders to gauge a

4    reaction.  Possibly they will close up, they'll adamantly

5    state no, or just to see what their reaction is to that.

6    Q     At the time of this investigation back in October of

7    2012, were you authorized to administer a CVSA test?

8    A     No, sir.

9    Q     At that time, were you trained to be able to administer a

10   CVSA test?

11   A     No, sir.

12   Q     Did you have any authority to order that somebody else

13   administer Mr. Davis a CVSA test?

14   A     No, sir.

15   Q     If you wanted to try to get a CVSA test in one of your

16   investigations, what would you do?

17   A     I would request through my chain of command to have one

18   given.

19   Q     Okay.  And so who would your request go to specifically?

20   A     The warden.

21   Q     And what would the warden do with that to your knowledge?

22   A     He would have to request it through his supervisor or the

23   Inspector General at that time.

24   Q     Who would make the final decision regarding the

25   administering of a CVSA test to an inmate?

1   A    The Inspector General.

2   Q    If Mr. Davis had passed the CVSA test and it came back

3   suggesting he was being truthful, would you have been able to

4   clear him as a suspect at that time?

5   A    Not immediately.

6   Q    Why not?

7   A    Well, I still had other things indicating he may have

8   been involved.

9   Q    If Mr. Davis had failed that CVSA test suggesting that he

10  was being untruthful, would you have been able to issue a

11  conduct violation against him at that time?

12  A    No, sir.

13  Q    Why not?

14  A    That's not conclusive evidence.

15  Q    Did you know -- or do you know in October of 2012 how

16  many people in the state of Missouri were trained and

17  authorized to administer CVSA tests within the Department of

18  Corrections?

19  A    At that time, there was one, Mike Lozano, Investigator 3,

20  who was stationed in Bowling Green.

21  Q    In your experience, how common is it for a CVSA test to

22  be conducted in this type of investigation?

23  A    Very rarely.

24  Q    Now you've testified that you reviewed some surveillance

25  video as part of your investigation.  Do you recall that?

16

1   A     Yes.

2   Q     All right.  What if anything did you see on that video

3   with respect to this knife?

4   A     The area in which the officer reported finding the

5   weapon, I reviewed that.  It showed him conducting his duties

6   on midnights, which is searching common areas looking for

7   contraband, weapons, drugs hidden in an area that wouldn't be,

8   you know, just put on one offender.  He goes to the shower.

9   You see some flashlight action on the door, which the door

10  opens like this.  The camera angle was pointing at it.  You

11  could see some camera lighting on it.  He digs in the -- there

12  is a rubber mat on the bottom of the door, which you really

13  can't see from the camera angle, and the weapon is discovered

14  hidden in that.

15  Q     Can you describe the placement of the security camera in

16  relation to the shower?

17  A     Okay.  If this was the wing, the shower is in the top

18  walk of that corner over there -- or let's see, it was either

19  the top or the bottom walk.  The camera would be up here on

20  the wall pointing that way.  The door opened out like this.

21  Q     So you are pointing to the back corner of the courtroom

22  as where the shower would have been?

23  A     The left corner, yes, sir.

24  Q     And then approximately above the judge's bench as to

25  where the camera would have been?

1  A    A little bit further, but that would be the viewing of

2  it, yes.

3  Q    Further, is that what you said?

4  A    A little further away, yes.

5  Q    Can you gauge how far the camera was?  Just approximate

6  is fine.

7  A    Let's see, 250 feet maybe.

8  Q    Okay.  And you mentioned a rubber mat.  So the knife that

9  was found in the shower door, how was it hidden in the rubber

10  mat?

11  A    It was reported that -- the rubber matting is bolted to

12  the bottom of the metal door with screws.  It was reported the

13  matting was pulled back and there was soap put on top of it to

14  conceal it.

15  Q    Okay.  Based on the position of the security camera, if

16  an inmate was in the shower with the door closed, would you be

17  physically able to see what he was doing in there?

18  A    No, sir.

19  Q    Okay.  And why not?

20  A    Just the angle that the camera shines down the wall with

21  the door closed, if the offender was squatted down, you

22  wouldn't even be able to tell what he was doing.

23  Q    All right.  If you had gone back and reviewed every

24  minute of every video you had in the prison pointing toward

25  that shower, I presume you would see inmates entering and

1    exiting.  Is that fair?

2    A    Well, for example, if there was 45 days of video, 200

3    offenders in the wing taking showers for 45 days, I would have

4    had tons of suspects entering that shower.

5    Q    Hundreds?

6    A    Yes.

7    Q    All right.  If those hundreds of inmates went into the

8    shower and closed the door, would you have been able to see

9    what they were doing in there?

10   A    No, sir.

11   Q    Okay.  And I believe you said earlier that the metal

12   factory was searched as part of the investigation; is that

13   right?

14   A    Yes, sir.

15   Q    And who was it searched by?

16   A    The only person I remember that headed up the search was

17   Lieutenant Blair.  He had four or five of our better searchers

18   down there searching while myself and Ms. Steele were

19   searching computer hard drives and stuff like that looking for

20   diagrams or anything.

21   Q    So you helped search the computers, is that what you are

22   saying?

23   A    Yes, sir.

24   Q    Was anything relevant found on the computers?

25   A    No.

1   Q    In Mr. Davis's complaint, he accuses you of saying that

2   you wanted him off the yard.  Did you ever say that to him?

3   A    No, sir.

4   Q    He also accuses you of telling him that he won't file

5   another lawsuit.  Did you ever say that to him?

6   A    No, sir.

7   Q    Finally, he's accused you of telling him whether he's

8   involved or not, this at least will get him out of here.  Did

9   you ever say that to him?

10  A    No, sir.

11  Q    Do you recall receiving a letter from Mr. Davis during

12  the knife investigation where he is talking about the

13  investigation?

14  A    I do.

15  Q    Was it just one letter that you remember receiving?

16  A    To my knowledge, there was only one, yes.

17  Q    And are you familiar with the contents of the letter?

18  A    Vaguely, but yes.

19  Q    Do you recall what if anything he said about the

20  investigation in the letter?

21  A    He adamantly denied his involvement with the weapon.  I

22  recall that.

23  Q    In that letter, did he talk about the interview that you

24  had with him during the investigation?

25  A    A little bit, yes, I believe.

1  Q    And do you recall him saying anything in that letter

2  about Stanley Pruett allegedly being present during the

3  interview?

4  A    No.

5  Q    Did he say anything in that letter about Stanley Pruett

6  allegedly telling him to stop filing lawsuits?

7  A    No.

8  Q    Did he say anything in the letter about Stanley Pruett

9  allegedly saying "when will you guys realize that we run the

10  prison"?

11  A    He did not.

12  Q    Did he say anything in the letter about you allegedly

13  telling him that he won't file another lawsuit?

14  A    No, sir.

15  Q    Did he say anything in the letter about anything Dan

16  Bryan allegedly said to him?

17  A    No.

18  Q    And did he say anything about anything Troy Steele

19  allegedly said to him?

20  A    No, sir.

21  Q    Okay.  Did you create a report regarding your

22  investigation?

23  A    I did.

24       MR. KINGHORN:  Your Honor, Exhibit X has already been

25  admitted.  May I have permission to publish it to the jury?

1          THE COURT:  You may.

2    Q    (By Mr. Kinghorn) Okay.  Aside from these names that have

3    been redacted for privacy, is this the report that you wrote

4    during the investigation?

5    A    Yes, sir.

6    Q    All right.  Now the first three pages of this report

7    lists down the left side Subjects, and if we go ahead and flip

8    all the way to the third page, we will see that there are 28

9    of them.  What does that mean by the word "Subjects"?

10   A    It's what they are in relation to the investigation.

11   Q    So are these people all suspects necessarily?

12   A    Yes, sir.

13   Q    Are they all witnesses?

14   A    There is a couple witnesses on there.

15   Q    Okay.  At the bottom of page 3, it looks like that's

16   where you started sort of your narrative of the investigation;

17   is that right?

18   A    Yes, sir.

19   Q    Okay.  And in the first sentence, you wrote that the

20   knife was found in the housing unit 6 shower; correct?

21   A    Yes, sir.

22   Q    Where did Mr. Davis reside at that time?

23   A    Housing unit 6, B wing.

24   Q    And then in the next two sentences, you wrote "the knife

25   was made of metal and two pieces and measured approximately

22

1    7.5 inches in length.  The knife had much detail and also one

2    piece contained welding.  Photocopy attached."  Do you see

3    where it says that?

4    A    Yes, sir.

5    Q    And is that the photocopy that we just looked at

6    previously, Exhibit B?

7    A    It is.

8    Q    Okay.  And then you talk about a statement you received

9    from Bruce Nipper.  Do you see that?

10   A    Yes, sir.

11   Q    And did you receive a written statement from Bruce

12   Nipper?

13   A    It was a handwritten statement, yes.

14   Q    Would you recognize that statement if you saw it today?

15   A    I would.

16          MR. KINGHORN:  And, Your Honor, I have a document

17   marked for identification as Exhibit I.  It has not yet been

18   admitted.  I would like to put it on the screen just for Mr.

19   Lancaster to see.

20          THE COURT:  Did you say it has not yet been admitted?

21          MR. KINGHORN:  It has not yet been admitted.

22          THE COURT:  For his eyes only then?

23          MR. KINGHORN:  Yes.

24          THE COURT:  Okay.

25   Q    (By Mr. Kinghorn) Okay.  Can you see that okay,

<u>Volume 2</u>

23

1    Mr. Lancaster?

2    A    Yes.

3    Q    Do you recognize this document?

4    A    I do.

5    Q    How do you recognize it?

6    A    This is the one that was submitted to me by Mr. Nipper.

7    Q    And can you speak up?  I'm sorry, I couldn't hear you.

8    A    It was the one submitted to me by Mr. Nipper in relation

9    to my questioning him.

10    Q    When did you first see this letter?

11    A    I guess on the 31st when he wrote it.

12    Q    So it would have been contemporaneously with your

13    investigation?

14    A    Yes.

15    Q    And is this the statement that is referenced on page 3 of

16    your report?

17    A    It is.

18    Q    Does this document accurately show the contents of the

19    written statement you received from Bruce Nipper during the

20    investigation?

21    A    It does.

22          MR. KINGHORN:  Your Honor, I move to admit

23    Defendant's Exhibit I into evidence.

24          MR. SABLEMAN:  No objection, Your Honor.

25          THE COURT:  Exhibit I will be admitted.

24

1    MR. KINGHORN:  And permission to publish to the jury?

2    THE COURT:  Any objection to publication?

3    MR. SABLEMAN:  No, Your Honor.

4    THE COURT:  Very well.  Publication granted.

5  Q   (By Mr. Kinghorn) Okay.  So again, now that the jury can

6  see this statement that we are referencing, is this the

7  statement that is referenced on page 3 of your report?

8  A    Yes, sir.

9  Q    Okay.  And it says, "On Friday, the 26th of October,

10 2012, at about 9:30 a.m., I spoke to Offender, blank, about

11 the shank that was found on the previous day in housing unit

12 6."  Do you see that?

13 A    Yes.

14 Q    Okay.  It goes on to say, "He told me that the only thing

15 he knew was that three weeks earlier or three months earlier

16 that he spoke to, blank, to keep an eye on Offender Fred

17 Davis, that he might be up to something."  Do you see that?

18 A    Yes.

19 Q    "That is all the information he had to give me."  And we

20 can go ahead and flip back to your report, and I believe we

21 are onto page 4 now.

22    MR. KINGHORN:  This is Exhibit X.  It's been

23 admitted, and I would like to re-publish to the jury.

24    THE COURT:  Uh-huh.

25 Q    (By Mr. Kinghorn) Okay.  At the top it says that you

1   interviewed –– in that top line there, it says you interviewed

2   all MVE workers; is that correct?

3   A    Yes.

4   Q    Okay.  And as you said earlier, that's the metal factory

5   we have been discussing?

6   A    Yes, sir.

7   Q    A little further down it says, "On October 30, 2012, I

8   did interview Offender Davis."  Do you see that?

9   A    Yes, sir.

10  Q    All right.  And that's the interview that we have already

11  discussed; correct?

12  A    Yes, sir.

13  Q    All right.  And the section in the middle says "Davis

14  demanded to be released."  Do you see that?

15  A    Yes.

16  Q    Demanded to be released from where?

17  A    From TASC, ad-seg.

18  Q    Okay.  What if anything did you say in response to

19  Mr. Davis's demand?

20  A    I advised him there was an ongoing investigation and I

21  would have to complete the investigation before he could be

22  released if he was released then.

23  Q    Okay.  The next portion just below that, which has an

24  offender's name redacted, talks about an interview you had

25  with another offender; is that correct?

26

1    A    Yes.

2    Q    Was this the other suspect that you had at that time who

3    was in administrative segregation with Mr. Davis?

4    A    It was.

5    Q    And why were this offender and Mr. Davis held in

6    administrative segregation as suspects at that time?

7    A    They were both out of housing unit 6, B wing.  They were

8    the only two MVE workers in that wing.

9    Q    Okay.  You wrote in this section in those bullet points,

10   you wrote that this offender said that he does not weld.  Do

11   you see that?

12   A    Yes.

13        MR. SABLEMAN:  Objection, Your Honor, that misstates

14   the evidence.

15        THE COURT:  Rephrase.

16   Q    (By Mr. Kinghorn) The quote from the offender is "I do

17   not weld."  Do you see that?

18   A    Yes.

19   Q    And below that, you wrote that this offender works on the

20   bending machine.  Do you see that?

21   A    Yes.

22   Q    What does that mean, the bending machine?

23   A    Pipes, they have -- the larger pipes and stuff, you have

24   to have special equipment to get certain bends for like making

25   chairs or different things like that so they don't break or

1  tear them up and you can get the same bends every time.

2  Q    So the bending machine is not the welding machine; is

3  that correct?

4  A    The bending machine is located at the opposite end of

5  MVE.  The welders are all on the other end.

6  Q    Is the bending machine the same as the grinding machine?

7  A    No.

8  Q    Did you believe at that time that welding and grinding

9  were necessary skills in order to make the knife?

10  A    Yes.

11  Q    Did you do anything to confirm the information that you

12  had received from this offender?

13  A    I believe that's when I went back and spoke to Mr. Nipper

14  and Mr. Kennon about everybody's abilities.

15  Q    Okay.  So that's the conversation we've already discussed

16  before --

17  A    Yes.

18  Q    -- where they told you that this offender did not have

19  the skills necessary to make the knife?

20  A    That's what Mr. Kennon told me, yes.

21  Q    Okay.  And you testified yesterday that Bruce Nipper told

22  you he was asked by a factory worker to keep an eye on

23  Mr. Davis because he might be up to something.  Do you

24  remember that?

25  A    Yes.

28

1  Q    And is that referenced in your report in the next

2  paragraph?

3  A    Yes.

4  Q    And is that also the written statement that has been

5  admitted as Exhibit I?

6  A    It is.

7  Q    All right.  Based on the information you received in your

8  investigation, did you form an opinion as to whether or not

9  the other suspect you had besides Mr. Davis likely made the

10  knife?

11  A    Can you rephrase that?

12  Q    Did you form an opinion as to whether or not it was

13  likely that this other suspect had made the knife?

14  A    I didn't believe he had the skills.

15       MR. SABLEMAN:  Objection, Your Honor, improper

16  opinion evidence.

17       THE COURT:  Sustained as to form.

18       MR. KINGHORN:  I will move on.

19  Q    (By Mr. Kinghorn) On the bottom of page 4, you start

20  talking about interviews you had with offenders in the metal

21  factory.  Do you see what I am referring to?

22  A    Yes.

23  Q    And I will try to mark this for you on the screen.  Right

24  there where you were speaking with an offender and his name

25  has been redacted and you wrote -- well, let me ask first.  Is

 1    this line here that I am indicating, is that a quote?  Is that

 2    what the offender told you?

 3    A    Those are quotes.  The bullets are quotes from the

 4    offenders I am interviewing.

 5    Q    Understood.  So it says Blank -- and when I say "blank",

 6    I am referring to a redaction on the page.  "Blank had

 7    mentioned Davis, that he was acting weird."  All right.  Do

 8    you see that?

 9    A    Yes.

10    Q    From the bottom of page 4 to it looks like the middle of

11    5 I believe, it looks like from the bottom of 4 to the middle

12    of 5, you talked about additional interviews that were

13    conducted during the investigation; is that correct?

14    A    Yes, sir.

15    Q    Okay.  And towards the top of page 5, you wrote about

16    some information it looks like from another offender.  I will

17    try to mark it on the screen for you.  Do you see that?

18    A    Yes.

19    Q    And the quote that you attribute to this particular

20    individual says "just what I mentioned to Nipper, Davis was

21    just acting strange."  Do you see that?

22    A    Yes.

23    Q    A little further down, you have a quote from another

24    offender that states "everyone is saying it's Davis, but I

25    believe it's speculation."  Did I read that correctly?

1   A     Yes, you did.

2   Q     And then finally you wrote, "I finished interviewing the

3   other 19 offenders with the same results.  There was nothing

4   definitive resulting from the interviews, merely speculation."

5   Do you see that?

6   A     Yes, sir.

7   Q     So obviously you didn't write a little synopsis for all

8   of these folks because we only saw a handful; is that correct?

9   A     That's correct.

10  Q     Did any of the other offenders who you do not provide a

11  synopsis for, did they provide you any additional pertinent

12  information regarding the investigation?

13  A     Nothing pertinent.

14  Q     Okay.  Let's go ahead and look at the paragraph in the

15  middle of page 5 and it says, "On November 1st, a typed letter

16  arrived in the warden's office signed by Offender Blank."  Do

17  you see that?

18  A     Yes.

19  Q     And it then goes on to say, "It stated that Offender

20  Blank had also stated that Blank had helped David fabricate

21  the shank in MVE."  Do you see that?

22  A     Yes.

23  Q     And who is David?  I will try to mark it for you so you

24  can see where I am referring to.

25  A     That was probably a typo.  Davis, that's supposed to be

1   Davis.

2   Q    Okay.  Was this letter that is referenced in your report

3   given to you as part of your investigation?

4   A    It was.

5   Q    What if anything did you do to investigate this letter?

6   A    I first pulled the offender's handwriting like from his

7   class file with his signature and stuff because it was a

8   signed signature, but the letter was typed.  I got to looking

9   at the signature, and they didn't -- they were nowhere even

10  close to a match, so I was like -- you know, that's the first

11  thing I do.  I try to check some handwriting when I get kites

12  against known handwriting and then I go interview them.  I

13  went to interview him, and his posture and everything, he's

14  like I didn't write no kites to you at all, you know.  So then

15  I show him the kite, and he's pointing at the signature.  He

16  said, That's not my signature, which I had already seen that,

17  but I still interviewed him.  So I go back to the warden, I

18  state this offender did not write this kite, somebody is

19  trying to lead me astray, make me chase ghosts per say, and I

20  advised him that we had an offender locked up over the kite.

21  I believe he contacted Classification for the release of that

22  offender.

23  Q    And you referred to this letter as a kite.  Can you

24  explain to the jury what a kite is?

25  A    Kites are written correspondence from offenders to staff

32

1  alleging different things in the institution or complaints.

2  We call them kites.

3  Q    After the factory supervisors told you that the other

4  suspect in ad-seg didn't have the necessary skills and after

5  you interviewed the offenders in the factory and determined

6  that this letter was meant to lead you astray, did you know of

7  any other evidence against the offender at that time?

8  A    I'm trying to remember what date the search took place.

9  The search could have been taking place that day -- no, it was

10 the next day.

11 Q    I can ask it a different way.

12 A    Okay.

13 Q    After you determined that this kite was intended to lead

14 you astray and you informed the warden, was the other suspect

15 soon thereafter released from administrative segregation?

16 A    The one that was locked up?

17 Q    The other suspect that was in ad-seg as a suspect besides

18 Mr. Davis.

19 A    I do not recall what date he was released.  I just told

20 them I had nothing to hold him on as a suspect, so if they

21 didn't have nothing more to hold him on, they could do

22 whatever they want, you know, needed to do.

23 Q    At the bottom of page 5 you wrote, "In all, I interviewed

24 26 suspects and two witnesses;" is that correct?

25 A    Yes.

33

1   Q    Did your investigation result in any definitive proof as

2   to who made the knife?

3   A    No, sir.

4   Q    And ultimately, you closed your investigation; is that

5   correct?

6   A    I did.

7   Q    To your knowledge, have you ever treated Mr. Davis

8   unfairly in any way?

9   A    I have not.

10          MR. KINGHORN:  And if I could just have a moment?

11          THE COURT:  Certainly.

12          MR. KINGHORN:  No further questions at this time.

13          THE COURT:  All right.  Anything further on behalf of

14   plaintiff of this witness?

15          MR. SABLEMAN:  Yes, Your Honor, we would like to

16   redirect.

17                    REDIRECT EXAMINATION

18   BY MR. SABLEMAN:

19   Q    Mr. Lancaster, good morning.

20   A    How are you.

21   Q    Good.  Thank you.  I would like to begin with the Webb

22   case and your knowledge of the Webb case.  You stated that you

23   knew that the Webb case was dismissed.  It was dismissed on a

24   motion for summary judgment; is that correct?

25   A    I believed it to be dismissed, yes.

1   Q    Are you aware that it is currently on appeal?

2   A    No.

3        MR. SABLEMAN:  Okay.  Your Honor, I would like to

4   introduce Plaintiff's Exhibit 1 into evidence.  It has not

5   been stipulated to.  It is the answer to the complaints.  I

6   believe it is important to show what Mr. Lancaster knew about

7   the complaint since he says everything went through his

8   attorney.

9        MR. KINGHORN:  We object to the admission of this

10  document -- well, we object for two grounds.  It's irrelevant.

11  Also on 403, it's unduly prejudicial.  It is a document that

12  was drafted by an attorney and also that it's likely to lead

13  to confusion based on 403 as well.

14       THE COURT:  You want the entirety of the answer in;

15  is that correct?

16       MR. SABLEMAN:  Your Honor, yes, I would like the

17  entire one in.  I would only like to publish one page to the

18  jury.

19       THE COURT:  Side bar.

20  **(A Bench Conference Was Held On the Record and Outside of the**

21  **Hearing of the Jury As Follows:)**

22       THE COURT:  What page are you referring to?

23       MR. SABLEMAN:  Your Honor, I would just like to show

24  that Mr. Lancaster made specific admissions and denials to his

25  lawyer to demonstrate his specific knowledge of the Webb case

1    and involvement with it because he says everything went

2    through his lawyer so he had no interaction with the case

3    itself.  For example, he wasn't aware of orders.

4         MR. SIMON:  He admits certain things.

5         MR. SABLEMAN:  So he is communicating through his

6    lawyer.

7         THE COURT:  Well, on the issue of communicating

8    through his lawyer, is there some issue at this stage based

9    upon the examination of the witness by Mr. Kinghorn that is

10   not a fact, that it is not true?  I mean, I guess I'm confused

11   by what it is that you are intending to demonstrate or show.

12        MR. SABLEMAN:  I want to demonstrate, Your Honor,

13   that he had an active communication with his lawyer and,

14   therefore, his lawyer wasn't doing the case independently of

15   Mr. Lancaster.  He had involvement through admissions and

16   denials.

17        MR. SIMON:  Can we ask him that question, Your Honor?

18        THE COURT:  Well, I was just going to say, why don't

19   you just ask him that question and then we get around this

20   whole issue of the answer and what's in the answer and then is

21   the answer being substituted for testimony, is there some

22   truth and veracity to the answer.

23        MR. SABLEMAN:  I'm not using this for the truth, just

24   his communications.

25        THE COURT:  Why don't we just ask him that question

36

1    then.

2    **(The Following Proceedings Were Held Within the Hearing and**

3    **Presence of the Jury.)**

4    Q    (By Mr. Sableman) Mr. Lancaster, with regard to the Webb

5    suit, when you were answering the complaints, did you

6    communicate with your lawyer?

7    A    I don't recall if we discussed anything with the lawyers

8    concerning that case.  There may have been a form of

9    interrogatories possibly or something, but I do not recall off

10    the top of my head.

11    Q    Do you recall that you made specific denials and

12    admissions with regard to answering the complaint?

13    A    I don't remember if we got to that or not.

14    Q    Would it help if I showed you your answer to the

15    complaint to remember if you made specific admissions and

16    denials?

17        MR. KINGHORN:  Your Honor, I'm going to object on the

18    same grounds as before.

19        THE COURT:  Overruled as to that.

20    Q    (By Mr. Sableman) Would that help refresh your memory?

21    A    If I made admissions and denials, yes.

22        MR. SABLEMAN:  Your Honor, may I approach the

23    witness?

24        THE COURT:  Certainly.

25        MR. SABLEMAN:  I just would like to direct your

1    attention to that page.

2            THE COURT:  And for the record, what page are you

3    referring to in your inquiry, Counsel?

4            MR. SABLEMAN:  Your Honor, I am directing the witness

5    to page 5 --

6            THE COURT:  Very well.

7            MR. SABLEMAN:  -- of his answer.

8            THE WITNESS:  Which question?

9            MR. SABLEMAN:  Question 5, question 6, and question

10   7.  Let me know when your memory has been refreshed.

11           THE WITNESS:  I did do those, yes.

12   Q    (By Mr. Sableman) Just to confirm, Mr. Lancaster, you had

13   some type of communications with your lawyer about the Webb

14   lawsuit which was necessary for you to answer the complaints?

15   A    Right.

16   Q    And the allegations against you?

17   A    I did not recall them.

18   Q    Let's talk about your job at Potosi and let's start with

19   your job during the relevant time period.  How did you

20   describe your job just a moment ago for Mr. Kinghorn?

21   A    Which part?

22   Q    What were your primary responsibilities?

23   A    Conduct mid-level investigations assigned to me by the

24   warden.

25   Q    Did those involve allegations and complaints?

1    A    It does.

2    Q    Against staff?

3    A    It does.

4         MR. SABLEMAN:  Your Honor, I would like to introduce

5    Plaintiff's Exhibit 10, which has been stipulated to, and

6    publish to the jury.

7         THE COURT:  Very well.

8    Q    (By Mr. Sableman) Mr. Lancaster, this is a request for an

9    admission that was served on you by Mr. Davis.  It's number

10   80.  You deny it.  That request was, "Your primary job as an

11   inquiry officer is to investigate allegations or complaints

12   levied against staff."

13   A    Is this in the Webb case?

14   Q    This is in the current case.

15   A    Okay.  My duties changed when I was assigned as the

16   institutional investigator.  I no longer conduct

17   investigations against staff.

18   Q    This was completed on February 24, 2015, so your job had

19   changed by then?

20   A    Not completely, no.

21   Q    Is that an inaccurate statement, that your primary job

22   was to investigate allegations --

23   A    I'm not exactly sure when I started not conducting the

24   investigation on staff as far as an exact date, but it was

25   already in motion.

1    Q    I'd like to turn now to the investigation, and I would

2    like to start with the security camera footage.  Is that

3    security camera footage digital, do you know?

4    A    Yes.

5    Q    Are you familiar with rewinds and fast forward?

6    A    It can be rewinded and fast forwarded, yes.

7    Q    Are you familiar with fast rewind and fast forward at

8    higher speeds?  Typically, it's two times.  Are you aware of

9    that?

10   A    I'm not sure that our digital system is what you are

11   speaking of.

12   Q    Yes, Mr. Lancaster, I'm referring to the security camera

13   video system, surveillance camera system, at issue, the one in

14   the shower.  Why didn't you fast forward or fast rewind?

15   A    I didn't have no reason to.

16   Q    Right.  Well, you stated yesterday that you didn't want

17   to review every minute of footage because that would take

18   time.  In fact, just a second ago you said there were hundreds

19   of inmates in the last 45 days that would have entered the

20   shower.  Is it fair to say that the reason that you didn't do

21   it is because you thought it would take too long?

22   A    It would have taken too long, and I did not have the time

23   to do all that.

24   Q    Even if you had fast rewinded?

25   A    The quality of the video would not have gave me -- it

1  would have gave me more suspects, yes, but if the suspect was

2  seen on that video in that shower, you would not have been

3  able to tell what they were doing.

4  Q    Would knowing who the previous offenders to enter the

5  shower, would knowing who those people are have any probative

6  value to help --

7  A    If I had a start point, yes.

8  Q    Let's say the start point was the moment the knife was

9  found.  Assuming that's the start point, if you rewinded from

10 that point, could you have determined who entered the shower?

11       MR. KINGHORN:  Objection, calls for speculation.

12       THE COURT:  Sustained.

13 Q    (By Mr. Sableman) Have you viewed other security camera

14 footage in other incidents?

15 A    A lot, yes.

16 Q    During those reviews, have you used those videos to

17 determine which offenders were in the frame at certain times?

18 A    Yes.

19 Q    Could you have done that same thing in this case?

20 A    It would not have yielded a definitive answer, no.

21 Q    Rather than going back the previous 45 days where

22 hundreds of suspects might have entered the shower, what if

23 you had gone back five days?

24 A    And narrowed it down to 25 you say or?

25 Q    Sure.

41

1  A    I guess that could have been done, yes.

2  Q    Okay.

3  A    There was only two in the wing though that worked in the

4  MVE factory.

5  Q    Yeah, let's talk about that other worker at the MVE

6  factory who lived in housing unit 6, wing B.  Let's refer to

7  him as Offender S.  You stated that you do not have the

8  authority to release people from ad-seg; is that correct?

9  A    That's correct.

10 Q    Did your investigation result in Mr. S's release?

11 A    No, it didn't.  I advised that I had nothing to hold him

12 on.  If the ad-seg committee had nothing more to hold him on,

13 then that's it.

14 Q    Doesn't that mean that your recommendation had some

15 persuasive effect in getting Offender S released?

16 A    I had nothing more to hold him on.  I couldn't tell them

17 to keep him; I couldn't tell them to hold him.

18 Q    The ad-seg committee, whoever made the decision, did they

19 use your findings?

20      MR. KINGHORN:  Objection, call for speculation.

21      THE COURT:  Rephrase.

22 Q    (By Mr. Sableman) Do you know if the ad-seg committee

23 used your recommendations?

24 A    I am not sure when he was released.  If they didn't have

25 anything further to hold him on, he was released.

42

```
1   Q    You stated in your investigation report, Exhibit X, that

2   you learned that Mr. S did not have the knowledge or the

3   skills required to make the knife; is that correct?

4   A    Yes.

5   Q    This right here, "I do not weld," was this Offender S?

6   Was that the Offender S that we are talking about?

7   A    Yes, he made that statement.

8   Q    Did any of the statements, offender statements, on this

9   report, did you give any of the offenders the opportunity to

10  verify their statements to determine if you had recorded their

11  statements accurately?

12  A    I am not following your question.

13  Q    You stated that these are quotes; correct?

14  A    Yes, that's what they stated to me.

15  Q    And when you recorded these quotes, did you at that time

16  or anytime after that confirm with the offenders that this was

17  an accurate representation of what they said?

18  A    No.

19  Q    And when you say quotes, do you mean loose quotes,

20  paraphrased, or do you mean actual quotes?

21  A    They are paraphrased.

22  Q    Okay.  Let me direct your attention back to that exact

23  same statement "I do not weld."  Did that offender tell you he

24  doesn't know how to weld or that he doesn't weld?

25  A    He stated "I do not weld" is what he told me.
```

43

1    Q    Did you ask him how long he had worked at the metal

2    factory?

3    A    I don't recall, but I do not believe so.

4    Q    Were you aware that he had worked at the metal factory

5    since 1989, which was over 20 years in 2012?

6    A    I was aware of that I think yesterday when somebody --

7    you stated that.

8    Q    This was the first time you were aware of that?

9    A    Yes.

10   Q    Sorry.  One moment.  Let me just direct your attention to

11   a few of these statements:  "I haven't seen anyone making

12   shanks;" "no one has said who;" "everyone is saying it's Mr.

13   Davis, but I believe it's speculation."  Are these statements

14   consistent or inconsistent?

15   A    They are obviously inconsistent.

16   Q    Do many of these statements contradict each other?

17   A    Yes.

18   Q    Is that why you reported to Warden Steele -- sorry, is

19   that why when you finished the interviews you said there was

20   nothing definitive?  Is that one of the reasons why, because

21   of all the contradictory statements?

22   A    That was after the ones I didn't add a report on.  I

23   stated there was nothing definitive resulting from those

24   interviews, merely speculation.  That's why they weren't added

25   into the report.

44

1   Q    Oh, here we are.  Okay.  This statement here, "Offender

2   {redacted} mentioned to Davis that he was acting weird."  Did

3   you ask a followup question about what the offender meant by

4   "Davis was acting weird"?

5   A    I don't believe so.

6   Q    Does acting weird have a clear meaning to you?

7   A    It's prison.  I mean, you hear that a lot.

8   Q    So what does that mean to you, acting weird?

9   A    It could mean many things.

10   Q    Let me show you what's marked as Exhibit I which has been

11   entered into evidence.  This is a letter from Bruce Nipper to

12   yourself on the 31st and it says, "I spoke to Offender

13   {redacted}.  He told me that the only thing he knew was that

14   three weeks earlier or three months earlier, that he spoke to

15   {redacted} to keep an eye on Offender Davis, that he might be

16   up to something."  Did you clarify with Bruce Nipper what "up

17   to something" meant?

18   A    I asked him if he had anything further than that.  He did

19   not.  He just said he was acting, you know, that he might be

20   up to something.  That's kind of open-ended as I kept running

21   into in this case.

22   Q    Did you ask Mr. Nipper to make this statement for you?

23   A    I told him -- when he made the statement to him, I told

24   him I needed it in a memo form, and this is what he gave me.

25   Q    So you requested this statement from Bruce Nipper?

45

```
 1   A    I did.

 2   Q    I'm going to turn back to the report.  I want to talk

 3   about this November 1st kite.  This is a kite; correct?  The

 4   November 1st typed letter is the kite; correct?

 5   A    Yes.

 6   Q    It stated that Offender -- this is a long redaction.  It

 7   also states that "{redaction} helped Davis fabricate the

 8   shank."

 9   A    Yes.

10   Q    You heard on opening and you confirmed just a moment ago

11   that we'll call him Offender J was the person who was locked

12   in ad-seg as a result of this letter; correct?

13   A    Yes.

14   Q    You testified that he was released sometime after you

15   determined that this letter was false, it was unreliable;

16   correct?

17   A    Yes, sir.

18   Q    Would it be fair to say that as a result of your finding

19   that the letter was unreliable, Offender J was released?

20   A    I reported that to my warden, yes.

21   Q    So someone else made the ultimate decision, but is it

22   fair to say that the evidence and findings that you put forth,

23   that that played -- that that was the substantial factor, that

24   was the main factor, for Offender J's release?

25            MR. KINGHORN:  Objection, calls for speculation.
```

46

1          THE COURT:  Rephrase.

2     Q    (By Mr. Sableman) Was that the primary piece of

3     information that resulted in Offender J's release?

4          MR. KINGHORN:  Same objection.

5          THE COURT:  I will allow it.

6     Q    (By Mr. Sableman) Mr. Lancaster, would you like me to

7     repeat the question?

8     A    I would be answering for the ad-seg committee if that was

9     the case, and I can't do that.

10    Q    So you have no personal knowledge of whether your

11    findings played any role in releasing Offender J?

12    A    I didn't place him on TASC.  I just told them I was done

13    with that part of it.  If they didn't have nothing else to

14    hold him on, I reported that to the warden, I guess he let

15    them know to release him.  That's what I am saying.

16    Q    Do you see your investigations and investigative role as

17    being completely separate from when and for how long prisoners

18    are sent to ad-seg?

19    A    I'm not on the ad-seg committee.

20    Q    Okay.  I am going to provide you with a copy of what is

21    marked as Defendant's Exhibit J.  That's the kite.  However, I

22    will not be admitting this into evidence.

23         MR. SABLEMAN:  Your Honor, may I approach the

24    witness?

25         THE COURT:  You may.

47

1    Q    (By Mr. Sableman) I am handing you what is marked as

2    Exhibit J.  I would like to direct your attention to the third

3    paragraph down.  I am going to read from this letter.  "I

4    don't know the specifics on who actually carried the knife.

5    All I know to be a fact is that J made it for Davis."  Is that

6    accurate so far?

7    A    It says Fred.

8    Q    Is that Davis?  Does that mean Davis?

9    A    Yes.

10   Q    Okay.  I will say Fred.  "J made it for Fred, and Fred

11   was doing it for a dude named {redacted}."  That's all the

12   information I want to read from this unreliable letter.

13   Although unreliable, what does that information tell you?

14   A    Somebody else has knowledge of what is going on with this

15   in the institution.

16   Q    Okay.  And I just want to preface this question, this

17   letter is unreliable.  You admitted yesterday that it could

18   have been made to frame Mr. Davis.  That's the logical

19   conclusion; correct?

20   A    Yes.

21   Q    Okay.  Let's assume that the letter is actually accurate.

22   It says that the person who wrote the letter is saying that

23   they don't know the specifics, but they know that J made it

24   for Davis and Davis was doing it for someone else.  So if the

25   letter was accurate, wouldn't J have been the knife maker?

1   A    Actually, when you look at this, since Mr. Davis was

2   already on TASC, it appears to me they were trying to set up

3   Mr. J to get him locked up as well.  That's what it appears to

4   me as.

5   Q    Okay.  And was there a third offender mentioned in this

6   letter?  It also says "doing it for a dude named {redacted};"

7   correct?

8   A    I don't recall what that name was.

9   Q    Right.  But I'm asking you was that --

10  A    It appears there was a third name, yes, sir.

11  Q    Okay.  So this information resulted in the release of

12  Offender J; correct?

13        MR. KINGHORN:  Objection, calls for speculation.

14  Q    (By Mr. Sableman) The letter -- I'm just clarifying what

15  he's already testified to.  The letter resulted in the release

16  of Offender J; correct?

17  A    When I was done with this, I reported to the warden I was

18  done looking at this, it appears somebody is trying to get

19  somebody locked up, I didn't like the smell of it, so I was

20  done with it.  I guess if he contacted Classification and told

21  them to release him or the assistant warden, then they did so.

22  I don't know.

23  Q    Okay.  So my question in that regard is, the letter was

24  reliable enough to release one of three offenders -- well, I

25  guess only two were in ad-seg, J and Davis.  Why was the

49

1   contention that J made the knife and that he was going to pass

2   it to Davis who was going to pass it to someone else, why does

3   that information result in J's release but not Mr. Davis's?

4          MR. KINGHORN:  Your Honor, I'm going to object.  This

5   misstates the evidence.  Offender J and Offender S are two

6   separate offenders.  I think they are being confused here.

7          MR. SABLEMAN:  I didn't mean to say Offender S.  Let

8   me restate the question.

9          THE COURT:  Please.

10  Q    (By Mr. Sableman) The information from the letter that I

11  just read out loud in effect states that Offender J made the

12  knife for Davis to pass to a third unknown prisoner; correct?

13  Is that correct?

14  A    That's what it reads, yes.

15  Q    Why does that information result in releasing Offender J

16  but keeping Davis in prison in ad-seg?

17         MR. KINGHORN:  I have my same objection.

18         THE COURT:  Sustained.

19  Q    (By Mr. Sableman) Okay.  You stated yesterday that you

20  weren't aware of the race struggle and that's why it's not in

21  your report; correct?

22  A    Correct.

23  Q    Did you ever learn of the race struggle?

24  A    Somewhere throughout, yes.

25  Q    Do you know how you learned of it?

50

1   A    There was talks of it.  Another offender's name was

2   mentioned.  That may have been in December sometime.  That was

3   after I closed my case on this without further information

4   coming forward.  I receive a ton of information daily.  I try

5   to sift through the information that is no good, like this

6   kite here that we received, and I try to follow what's good

7   information.

8   Q    Let me ask you.  Did Warden Steele give you information

9   about the race struggle?

10  A    I did not talk to him about that, no.

11  Q    At any point during or after your investigation, did he

12  inform you that he learned about a race struggle?

13  A    I believe somebody may have said something to him

14  pertaining to that.  I don't know how accurate that

15  information was.

16  Q    I would like to turn now to the Computer Voice Stress

17  Analysis, the truth verification test.  Real quickly, you

18  stated that he was not -- that if he had been given a truth

19  verification test, that would not have resulted in his

20  immediate release.

21  A    Yes, sir.

22  Q    It would not have been immediate.

23  A    Yes, sir.

24  Q    Would it have been possible eventually?

25  A    It would have assisted possibly had he passed it I mean,

51

1   but I couldn't use that alone to find guilt or non-guilt.

2   Q    How far away was the CVSA test administrator in Bowling

3   Green?

4   A    From Potosi, I believe it's two and a half, three hours

5   approximately.

6   Q    Do you know if that person has made the trip before?

7   A    Sure he has.

8   Q    And you said it was not common in this type of

9   investigation; correct?

10  A    Yes.

11  Q    Wasn't this a very unique investigation, the first time a

12  knife was ever found in the prison that was made in the prison

13  factory allegedly?

14  A    The first time made in the MVE, but we find weapons

15  often, but this was found in a common area.

16  Q    When you said "for this type of investigation", were you

17  referring to this very unique type of investigation or what

18  else were you referring to?

19  A    A weapon investigation.

20  Q    But not this admittedly very dangerous --

21  A    They're all weapon investigations.  They are all

22  dangerous, yes, sir.

23        MR. SABLEMAN:  No further questions.  Thank you.

24        THE COURT:  Anything else?

25        MR. KINGHORN:  I don't have any further questions.

52

1    THE COURT:  All right.  You may step down.

2    THE WITNESS:  Thank you, sir.

3    THE COURT:  This is probably a good time to take a

4    short recess.  During the course of the recess, do not discuss

5    the case amongst yourselves or with anyone else.  Don't allow

6    anyone to discuss it within your hearing or presence.  Do not

7    form or express any opinions about the case until it is given

8    to you to decide.  Do not read, view, or listen to any media

9    accounts, blogs, or otherwise, and do not utilize your cell

10   phones or any other web-enabled device to utilize the internet

11   for interaction with social media.  We will be in recess for

12   15 minutes, folks.

13        **(Court Recessed from 11:00 a.m. until 11:20 a.m.)**

14        THE COURT:  Call your next witness.

15        MR. SIMON:  Yes, Your Honor, we are going to call Ms.

16   Sheri Shawver.  We are going to call her out of order just

17   because she is here and we want to let her go.

18        THE COURT:  All right.  Any objection?

19        MR. KINGHORN:  No, Your Honor.

20        THE COURT:  All right.  Step up, madam, to the

21   courtroom clerk here and be sworn in.

22                    **SHERI SHAWVER,**

23   **Having Been First Duly Sworn, Was Examined and Testified As**

24   **Follows:**

25

53

<u>DIRECT EXAMINATION</u>

1

BY MR. SABLEMAN:

2

Q    Hi.  Ms. Shawver, could you please state your full name

3

for the jury.

4

A    Sheri Lynn Shawver.

5

Q    And what is your current position?  Where do you work

6

now?

7

A    Probation and Parole.

8

Q    Where did you work back in 2012?

9

A    At Potosi Correctional Center.

10

Q    And, Ms. Shawver, you and I have never spoken before,

11

correct, except yesterday when we were scheduling your

12

appearance today?

13

A    I suppose.  I mean, I've talked to you on the phone, so

14

face-to-face I wouldn't have known you.

15

Q    You haven't spoken with me on the phone though.

16

A    Oh, okay.

17

Q    My name is Brian Sableman.  Have you spoken with my

18

co-counsel, Tony Simon, on the phone?

19

A    Yes.

20

Q    And was that for the purpose of scheduling your subpoena

21

or your appearance?

22

A    Yes.

23

Q    And nothing else?

24

A    Correct.

25

1  Q    Okay.  You are familiar with the knife investigation at

2  Potosi; correct?

3  A    Somewhat.

4  Q    And you are familiar through that investigation with

5  Mr. Davis?

6  A    I believe he was under investigation.

7  Q    And had you processed legal requests for Mr. Davis?

8  A    Yes.

9  Q    And did those occur before the investigation?

10  A    I'm not sure.

11  Q    But certainly some occurred after the investigation

12  began; correct?

13  A    Yes.

14      MR. SABLEMAN:  I would like to show the witness

15  Exhibit 7.  It's not been admitted.

16      THE COURT:  For her eyes only, all right.

17  Q    (By Mr. Sableman) Ms. Shawver, I am showing you what's

18  marked as Exhibit 7.  Let me zoom out.  Can you see anything?

19  A    No.  I could for a minute, but then it went away.

20      MR. SABLEMAN:  May I approach the witness?

21      THE COURT:  You may.

22  Q    (By Mr. Sableman) This is Exhibit 7.  Ms. Shawver, I

23  would like to direct your attention to paragraph 8 of this

24  exhibit.  Can you read that silently.  Did you make a mistake

25  in this affidavit that you filed?

<u>Volume 2</u>

55

1   A    If at the time when I stated this, then that would have

2   been my memory of the incident at that time.

3   Q    Okay.  Let me ask you.

4         MR. SABLEMAN:  May I approach the witness, Your

5   Honor?

6         THE COURT:  You may.

7   Q    (By Mr. Sableman) This is what is marked as Exhibit 6.

8   Do you recognize that?

9   A    Not really.

10  Q    Okay.  I apologize, let me back up and cover some more

11  background before we jump into these affidavits.  Tell me the

12  position you had at Potosi.

13  A    I was a case manager.

14  Q    Okay.  And what were your job duties?

15  A    There were many of them, violations, trying to do what I

16  could for ad-seg, meaning administrative segregation,

17  clientele.  If they had requests for property or mail or

18  anything that they were having a problem with, I would attempt

19  to address it for them.

20  Q    You mentioned two types of requests, property requests

21  and I don't know if you mentioned Qualified Legal Claim

22  Verification forms.  Are those two types of requests that you

23  handled?

24  A    Yes.

25  Q    And did you handle those types of requests for Mr. Davis?

56

1    A    I do not remember.

2    Q    Okay.  I would like to show you what is marked and what

3    is stipulated to in evidence marked as Exhibit 7 -- S, excuse

4    me.

5         THE COURT:  S?

6         MR. SABLEMAN:  S.

7    Q    (By Mr. Sableman) Ms. Shawver, do you recognize this

8    Qualified Legal Claim Verification form?

9    A    Yes.

10   Q    Do you see the date up here?

11   A    Yes.

12   Q    Do you see this date as well?

13   A    Yes.

14   Q    That says November 16th; correct?

15   A    Correct.

16   Q    And that was the date it was approved; correct?

17   A    Yes.  That is the signature approving it.

18   Q    And over here, you can see that that says checked

19   approved; correct?

20   A    Correct.

21   Q    Okay.  So we have covered this is the date it was

22   approved, November 16th; this is the date it was submitted,

23   November 1st.  Now I would like to direct your attention back

24   to what is marked as Exhibit 7, and that is an affidavit.  Do

25   you recognize that affidavit?

1    A    Okay, yes.

2    Q    So that was an affidavit that was filed in this court for

3    the prior lawsuit, the Webb case; correct?

4    A    The what case?

5    Q    Oh, I'm sorry, the prior lawsuit that Mr. Davis filed

6    against one of the defendant's name was Webb.  I'm referring

7    to it as the Webb case.

8    A    Okay.

9    Q    And the paragraph I direct your attention to, it states

10   that you never received a request from Mr. Davis up to that

11   point on November 13th for legal materials; correct?

12   A    Correct.

13   Q    However, you later recognized that that was a mistake;

14   correct?  You had mistakenly forgot or didn't -- there was for

15   some reason you didn't acknowledge that he had requested legal

16   materials?

17   A    It's not a matter of whether or not -- when I wrote this,

18   this statement was true because you have to understand that

19   there are many channels that requests go through before they

20   end up landing on my desk.

21   Q    Let's talk about some of those channels if that's okay.

22   A    Uh-huh.

23   Q    So on this form marked as Exhibit S, who is this?

24   A    I believe that probably would have been the property room

25   personnel at that time.

1    Q    I believe this is Daniel Bryan; is that correct?

2    A    Okay, it could possibly be.  I couldn't tell you.

3    Q    Do you recognize Daniel Bryan, one of the defendants?

4    A    Yes.

5    Q    Okay.  And this is the stamp of the assistant warden;

6    correct?

7    A    Yes.

8    Q    Can you tell me, what is the process for getting those

9    two approvals?

10   A    I do not remember.  It's been too long since I've been in

11   the system down there.

12   Q    Was the -- how did you initiate the process?  Did you

13   hand Mr. Davis a form?

14   A    Yes.

15   Q    And he would fill it out and give it back to you?

16   A    Yes.

17   Q    Then would you give it to someone else?

18   A    Yes, to the best of my recollection.

19   Q    Do you recall with this form specific, this is the one

20   dated November 1st.

21   A    Uh-huh.

22   Q    Do you recall when you handed it off to either Daniel

23   Bryan or the assistant warden?

24   A    No, I do not.

25   Q    Do you typically hold on to the forms for awhile or do

59

1  you hand it off relatively quickly after you have completed

2  your portion?

3  A    It depends on the workload at that time.

4  Q    But your intention is to get the form processed to get it

5  moving?

6  A    Correct.

7  Q    So you would hope to do it -- would you do it in a matter

8  of days typically?

9  A    Yes.

10  Q    Okay.  Is it fair to say that Daniel Bryan or the

11  assistant warden had the form within let's say a week?

12  A    I can't answer that question with a yes or no.

13  Q    Typically though that would have been the case?

14  A    We would hope.

15  Q    Okay.  Do you have any recollection of why this form was

16  not approved until November 16th?

17  A    No, I do not.

18  Q    Okay.  I would like to direct your attention back to --

19  with regard to why this form was not approved until

20  November 16th, did you receive any instructions not to

21  complete it or not to hand it to another person?

22  A    No, I did not.

23  Q    You don't recall anyone telling you to do something with

24  this form?

25  A    No.

1   Q    I would like to direct your attention to Exhibit 6, which

2   is in front of you.  This is an affidavit you filed in the

3   Lancaster case; correct?

4   A    Okay.

5   Q    I would like to direct your attention to paragraph 8,

6   which says that "I signed an affidavit on November 13th saying

7   that Mr. Davis had made no requests to access any of his legal

8   materials stored in the property room since his assignment to

9   ad-seg on October 29th.  That was a mistake.  At that time, I

10  did not remember giving Davis a property request form on

11  November 1st."  Did I read that correctly?

12  A    Yes.

13        MR. SABLEMAN:  I would like to admit into evidence

14  which has already been stipulated to marked as Exhibit Q.

15        THE COURT:  Very well.

16        MR. SABLEMAN:  Publish to the jury?

17        THE COURT:  Go right ahead.

18  Q    (By Mr. Sableman) This is a property request form;

19  correct?

20  A    Correct.

21  Q    And you can see that it says it was -- the date of the

22  form is November 5th, and the form was approved on

23  November 1st.

24  A    Uh-huh.

25  Q    How is that possible?

61

1  A    Again, I'm very foggy on the way we did everything down

2  there at that time because I would have gotten that form on

3  the 1st from Mr. Davis.  I would have approved it and went

4  ahead and sent this and put it in the proper mailbox to go to

5  the property room, then they would have -- then it would have

6  gone to the property room, and then when it was approved, then

7  I would have gotten notification that it was approved that we

8  could bring him down to retrieve his property to the best of

9  my recollection.

10  Q    Is this form back-dated from November 5th to November 1st

11  as in the form was initially received and completed on

12  November 5th, but this date, November 1st, was put there in

13  place of a date later than November 5th?

14  A    I don't understand what you are asking.

15  Q    I'm sorry.  I am asking is this form back-dated?

16  A    No.  It would have all -- I would have -- on 11/5 I would

17  have said that I received his request on 11/1.

18  Q    Is this your handwriting or Mr. Davis's?

19  A    That is my handwriting.

20  Q    Is it typical for you to fill out these property room

21  requests?

22  A    It depends.  If the person is incarcerated in ad-seg and

23  we need to get paperwork processed, then I would have filled

24  it out.

25  Q    Did someone direct you to fill this out for Mr. Davis?

1    A     No.

2    Q     So this would have been Mr. Davis asking you?

3    A     This would have been me filling it out, sending it to the

4    property room so that they would have notification that he

5    wanted to get to his property.

6    Q     Did Mr. Davis tell you he wanted to access his property?

7    A     Yes, on 11/1.

8    Q     Oh, okay.  So this is the property room request that goes

9    with that Qualified Legal?

10   A     Correct.

11   Q     Okay.  I'm going to switch back to Exhibit S.  This is

12   the Qualified Legal Request form which prompted you to fill

13   out that property request; correct?

14   A     Correct.

15   Q     Okay.  And do you see the lawsuit here, 1983 lawsuit,

16   case number, Frederick Davis v. Webb, response due

17   November 19th?  Are you familiar with what that is

18   referencing?

19   A     No.

20   Q     Okay.  What about "per paperwork attached", what was

21   that?

22   A     That would have been the other form that you just showed

23   me.

24   Q     Okay.  Do you know who received this form first, was it

25   Dan Bryan or was it the assistant warden?

63

1  A    I would say that it was Mr. Bryan as he was my immediate

2  supervisor at that time.

3  Q    When you turned this form in to Mr. Bryan, did he

4  instruct you to do anything with regard to the property room

5  request or this form?

6  A    No, because I probably wouldn't even have conversed with

7  him.  It would have went in a mailbox.

8  Q    I would like to direct your attention to the second page

9  of Exhibit S.  This is a Qualified Legal Request form.  This

10  one is dated November 16th and approved on the 26th.  I don't

11  know if you can see that very well.  Does that say the 26th?

12  A    Twenty-sixth possibly or the 21st, I can't really see.

13  Twenty-sixth.

14  Q    Okay, 26th.  So this one was processed ten days later.

15  It's asking for the same things, right, law library and legal

16  materials?

17  A    Correct.

18  Q    And it's got Dan Bryan's initials.  Why is this one

19  stamped March 15th?

20  A    Don't know.

21  Q    Is that a long time since it was initially requested to

22  be received by the housing unit?

23  A    It depends.  If they -- like they may go to the law

24  library and get what they need and then two days later or

25  three days later they decide that they need something

64

1  different, so the process starts all over again.  Or when they

2  went the first time, they didn't get what they wanted to get,

3  so they want to go back.

4  Q    Mr. Davis was in ad-seg at the time he completed this

5  form; right?

6  A    Yes.

7  Q    So he couldn't access the law library unless he filed one

8  of these forms?

9  A    Correct.

10  Q    The prisoners in gen pop, can they access the law library

11  freely without filing these forms?

12  A    To the best of my knowledge, I believe, yes, they can at

13  the time when they are allowed to have access to those areas.

14  Q    So prisoners in ad-seg face more restrictions on their

15  access to their legal materials?

16  A    Correct.

17  Q    Let me show you the third page of Exhibit S.  This is a

18  Qualified Legal Request form dated January 14th, approved the

19  next day on January 15th.

20  A    Uh-huh.

21  Q    And received on January 15th.

22  A    Uh-huh.

23  Q    What accounts for the rapid approval here versus those

24  other two forms?

25  A    I couldn't answer that.

1    Q    Is it fair to say that with regard to the first form I

2    showed you, this one here dated November 1st and approved

3    November 16th, and this one dated November 16th and approved

4    the 26th and maybe not received until March 15th, is it fair

5    to say that somebody sat on these forms where they didn't with

6    that third one?

7    A    I couldn't answer that.

8         MR. KINGHORN:  I object.  Calls for speculation.

9         THE COURT:  Sustained.

10   Q    (By Mr. Sableman) To your knowledge, why would it take

11   ten days or 13 days to approve a form?

12   A    Work overload.

13   Q    Okay.

14   A    A lot of clients in ad-seg, we take them in rotation as

15   we can when we can get them into their legal material.  Legal

16   material is kept in a small room.  They have to be escorted

17   and they are put in confines escorted down to that room,

18   placed in a secured area, then the property manager and/or

19   myself has to go and locate what material they are looking

20   for.  If we can't, then we end up -- we would have to end up

21   bringing the tubs out and hopefully, you know, because we are

22   working between a barrier, hopefully they can see what they

23   are looking for, we can pull it out and hand it to them.  You

24   are talking 200 ad-seg offenders that have to have access to

25   their legal material at any given time, so we have to wait for

1  an approval from the property room stating that we can bring

2  that offender down.

3  Q    Okay.  So the ad-seg was pretty busy in the month of

4  November, and that may account for the reason that these two

5  Qualified Legal Request forms that Mr. Davis submitted took

6  over a week to turn around?

7  A    Could possibly contribute to it.

8  Q    And then January, turned around the next day,

9  January 14th, and he is transferred on the 22nd.

10 A    Lighter load.

11 Q    Okay.  I would like to direct your attention back to

12 Exhibit 6.  That's your affidavit in this case.  In

13 paragraph 9 you said, "On November 13th, I gave Davis a

14 Qualified Legal Claim Verification form.  I do not know what

15 happened to that form."  Do you recall what happened to that

16 form?

17 A    No, I do not.

18 Q    Did any of the defendants in this room instruct you to do

19 anything with that form?

20 A    No.

21      MR. SABLEMAN:  Okay.  No further questions.

22      MR. KINGHORN:  We don't have any questions for

23 Ms. Shawver today.

24      THE COURT:  All right.  You may step down.  Call your

25 next witness.

67

1          MR. SABLEMAN:  Your Honor, the plaintiff calls

2   Pruett, Mr. Pruett.

3          THE COURT:  Step up, sir, and be sworn in by the

4   clerk.

5                      **STANLEY PRUETT,**

6   **Having Been First Duly Sworn, Was Examined and Testified As**

7   **Follows:**

8          THE COURT:  Proceed.

9                   <u>DIRECT EXAMINATION</u>

10  BY MR. SABLEMAN:

11  Q    Mr. Pruett, could you please state your full name for the

12  jury.

13  A    Stanley Wayne Pruett.

14  Q    Where do you currently work?

15  A    Potosi Correctional Center.

16  Q    Did you work at Potosi in 2012?

17  A    Yes, sir.

18  Q    What was your job?

19  A    Case manager.

20  Q    Is that Case Manager II?

21  A    Yeah, I believe it was Case Manager II.

22  Q    Is that abbreviated C-O Roman numeral II?

23  A    It's CCM II, Corrections Case Manager II.

24  Q    And you were aware of the investigation into Mr. Davis?

25  A    At that time?

Volume 2

68

1    Q    Yes.

2    A    No.

3    Q    Do you have an office in the ad-seg section of the

4    prison?

5    A    Yes.

6    Q    That's your office?

7    A    No.  It's called a caseworker office, but the sergeants

8    use it, the caseworkers use it, mental health uses it,

9    medical, anybody that needs to have, you know, some privacy.

10   And also on that wing was general population inmates, so they

11   could come out and they would go in there and they'd request

12   forms and that type of thing.

13   Q    Were you in that office on October 29, 2012?

14   A    I don't know.

15   Q    This was the date that Mr. Lancaster conducted the

16   interview.

17   A    No.

18   Q    You weren't in the office at all that day?

19   A    No, sir.

20   Q    Do you typically go to the office every day?

21   A    No.  Usually two days a week I will go and do office

22   hours and do rounds.  At that time, part of the wing was

23   ad-seg, the top half of the walk, maybe half of it, and then

24   the rest of it was general population, so I would go over a

25   day or so and take care of the general population inmates and

 1   go another day and take care of the ad-seg inmates.  You have

 2   to go door-to-door to see them.  So I didn't use that office

 3   every day, no.

 4   Q     You had to go door-to-door for the ad-seg because they

 5   are locked in?

 6   A     Yes, sir, they are locked there in the room.

 7   Q     So to the best of your recollection, you were doing

 8   general population rounds on that day, October 29th?

 9   A     No, sir, I do not remember doing anything on that day.

10   Q     Were you at work that day?

11   A     You'd have to look back in the record and see if I was at

12   work that day.  I don't know.  How many years ago was that?

13   Q     2012, five years ago, six years ago.

14   A     Sir, I couldn't tell you if I was at work that day or

15   not.

16   Q     Okay.  So you were not in that office when Mr. Lancaster

17   conducted his interviews?

18   A     No, sir.

19   Q     You have no knowledge of interviews?

20   A     No knowledge.

21   Q     You didn't hear -- you didn't tell Mr. Davis "stop filing

22   lawsuits"?

23   A     No, sir.

24   Q     And you didn't tell him he could get his legal materials

25   at another institution?

70

1   A    No, sir.

2   Q    Were you Mr. Davis's CCM when he was assigned to housing

3   unit 3?

4   A    3B, if he was in 3B.  If he was placed on TASC that day,

5   yes, I probably would have been his case manager, but if he

6   would have went to 2 house the next day, no, sir, I wouldn't

7   have been his case manager.

8   Q    If he wanted to talk to you about his legal materials,

9   possible retaliation, would you have been the go-to person as

10  his case manager?

11  A    If I would have been in the wing to talk to him, yes.

12  Q    If you were there, you would have been the person that

13  Mr. Davis would have talked to?

14  A    Yes.

15  Q    And did Mr. Davis ever inform you that he had a

16  Court-appointed deadline of November 19th?

17  A    Not that I remember, no, sir.

18  Q    And he never told you that at any point?  Not just on

19  October 29th, but did he ever tell you he had a court deadline

20  of November 19th?

21  A    No, sir, not to any of my memory have I talked to him

22  when he was locked up at that time.  I have no memory of that

23  incident whatsoever.

24  Q    Okay.  So you don't recall ever speaking to Mr. Davis?

25  A    No, sir.

71

1    Q    Is that ever or as when you were his case manager, did

2    you ever speak with him?

3    A    He was in 6 house before that.  I knew him.  I mean, I

4    have worked at Potosi for 24 years.  I have known hundreds of

5    inmates.  I remember him, but I don't remember talking to him

6    about that case or anything or the investigation or anything.

7            MR. SABLEMAN:  Okay.  No further questions.

8            THE COURT:  Mr. Kinghorn.

9            MR. KINGHORN:  If I could have just a moment, Your

10   Honor.

11           THE COURT:  Sure.

12           MR. KINGHORN:  Your Honor, I just have a few

13   questions for Mr. Pruett.

14           THE COURT:  All right.

15                        CROSS EXAMINATION

16   BY MR. KINGHORN:

17   Q    And you said you were the case manager in housing unit 3,

18   is that right, in October of 2012?

19   A    3B at that time, yes, sir.

20   Q    Okay.  And did you have any role in investigating the

21   knife that was found in housing unit 6 in October 2012?

22   A    No, sir.

23   Q    Have you ever participated in any interview between

24   Mr. Lancaster and Mr. Davis?

25   A    No.

1    Q    Have you ever attended any interview between

2    Mr. Lancaster and Mr. Davis?

3    A    No, sir.

4    Q    Have you ever been present for any portion of any

5    interview between Mr. Lancaster and Mr. Davis?

6    A    No, sir.

7    Q    Do you ever take part in interviews between an offender

8    and the investigator?

9    A    I have never taken part with Mr. Lancaster in any

10   investigation.  I can participate in investigations, but I

11   don't.  It's his job.  He's the investigator, and I let him

12   handle those things.

13   Q    And can you explain what -- does administrative

14   segregation differ from disciplinary segregation in some way

15   to your knowledge?

16   A    Administrative segregation is where an offender can be

17   placed for his safety, for the safety of others, for the

18   safety of staff, maybe there's been something said that

19   something's going to take place or they can even be placed in

20   ad-seg for having too much canteen or what we call running a

21   store, having canteen and selling it.  And then disciplinary

22   is I'm a case manager, so I do team violations.  I can place

23   an offender in ad-seg for ten days, 20 days, refer him to

24   ad-seg.  That would mean the ad-seg committee would see him if

25   the violation warranted it.

1  Q    When you say violation, you mean a conduct violation?

2  A    Conduct violation, yes, sir.

3  Q    By the inmate?

4  A    Yes.

5  Q    Okay.  And did housing unit 3 at that time where you were

6  assigned, wing B, did that contain -- was that exclusively

7  ad-seg offenders in October of 2012?

8  A    No, I believe we had general population offenders in

9  there on the bottom walk, and then the top walk was used for

10  like overflow when they didn't have beds in 2 house at that

11  time.  You've got to realize, over the years, 3 house has been

12  utilized many different times, 3B for ad-seg, all GP, and was

13  back to ad-seg.  We are a small institution.  Sometimes we get

14  way too many ad-seg offenders from other institutions that are

15  long-term ad-seg, so sometimes we run out of bed space and

16  then you have to use the bed space in 3 house until you can

17  get them to 2 house.

18  Q    Okay.  So 2 house would have been exclusively ad-seg.  Am

19  I understanding you correctly?

20  A    It is now, yes.

21  Q    And if there were too many inmates on ad-seg to fit in 2

22  house, then 3 house would be an overflow?

23  A    An overflow, yes, sir.

24  Q    Do offenders who are assigned to administrative

25  segregation in 3 house receive any perks that ad-seg offenders

1    wouldn't receive if they were in 2 house?

2    A    No, sir.  It's the same cell as 2 house, same size, same

3    cell, same everything.

4    Q    Was it common or uncommon for offenders to be moved from

5    3 house to 2 house?

6    A    Very common at that time.

7    Q    Why is that?

8    A    We tried to keep as many ad-seg offenders in 2 house as

9    possible and keep the beds open in 3B because see, 3B is also

10   baseline.  When offenders are released from ad-seg, they go to

11   3B, so we have to keep beds open for our releases for the GP

12   offenders and try to keep as many beds open as we can for

13   those.

14   Q    In October and November of 2012 when the investigation

15   was taking place, did you know that Mr. Davis had a lawsuit

16   against Timothy Lancaster at that time?

17   A    No, I did not.

18   Q    Did Timothy Lancaster ever talk to you about that

19   lawsuit?

20   A    We have never discussed that lawsuit.

21   Q    And finally, to your knowledge, have you ever treated

22   Mr. Davis unfairly in any way?

23   A    Not to my knowledge.

24         MR. KINGHORN:  I don't have anything further, Your

25   Honor.

1    MR. SABLEMAN:  Your Honor, a few questions on

2    redirect.

3    THE COURT:  Certainly.

4    REDIRECT EXAMINATION

5    BY MR. SABLEMAN:

6    Q    Mr. Pruett, you said Potosi is a small institution.

7    A    Uh-huh.

8    Q    When you talked with Mr. Lancaster, did you talk about

9    other lawsuits against prison staff?

10   A    I have never talked about any lawsuits with -- with

11   Mr. Lancaster or Mr. Davis?

12   Q    Mr. Lancaster.

13   A    No, I've never talked to him about lawsuits.  There's

14   always lawsuits.  There's always lawsuits going on.  I don't

15   discuss them.  I don't care.

16   Q    They are always going on, but you don't discuss them?

17   A    No.

18   Q    Sometimes Mr. Lancaster's interviews took place in the

19   caseworker office; correct?

20   A    According to the paperwork I have seen, yes.  I don't

21   know that personally, no.

22   Q    Is ad-seg a form of punishment?

23   A    No.

24   Q    You didn't just say that it's sometimes used to punish --

25   A    We don't punish inmates.  Ad-seg is used for the safety

1    and security of the institution and their safety, our safety.

2    Q    What did you mean when you said "too much canteen"?

3    A    There is a limit on the canteen they can purchase each

4    week and the limits they can have total, and I'm not sure if

5    it's like somewhere around $300 worth.  Sometimes they may

6    have up to $800 to a thousand dollars worth of canteen in

7    their cell, and they are using that for betting purposes and

8    different things.

9             MR. SABLEMAN:  No further questions.

10            MR. KINGHORN:  I don't have anything further, Your

11   Honor.

12            THE COURT:  Thank you, sir.  You may step down.  Call

13   your next witness.

14            MR. SIMON:  Yes.  We call Dan Bryan, Your Honor.

15            THE COURT:  Mr. Bryan, step up and be sworn in.

16            MR. SIMON:  Your Honor, may I approach the witness

17   and retrieve an exhibit please?

18            THE COURT:  You may.

19                         **DANIEL BRYAN,**

20   **Having Been First Duly Sworn, Was Examined and Testified As**

21   **Follows:**

22                    DIRECT EXAMINATION

23   BY MR. SIMON:

24   Q    Could you tell the jury your name please.

25   A    Daniel Bryan.

1  Q    And, Mr. Bryan, what is your current job occupation?

2  A    Currently I am the city administrator for the City of

3  Desloge, Missouri.

4  Q    Okay.  And did you previously at some point in time work

5  at the Potosi Correctional Center?

6  A    Yes, sir.

7  Q    When was that?

8  A    I left there July of last year, and I began working

9  February of '12 I think.

10 Q    February of 2012?

11 A    I believe so.

12 Q    Until when?

13 A    Just last July.

14 Q    Okay.  And what was your position?

15 A    I was a unit manager.

16 Q    Is it a functional unit manager?

17 A    Yes, sir.

18 Q    I've seen in the papers sometimes it's called FUM, F-U-M?

19 A    Correct.

20 Q    Okay.  What are your roles in that -- what was your role

21 in that position?  What were your responsibilities?

22 A    I would supervise the case managers and the housing unit

23 officers and housing unit sergeant.

24 Q    Okay.  What was your interaction with respect to

25 Mrs. Shawver who testified earlier today?  Were you here when

1   she testified?

2   A    Yes, sir.  She worked for me.

3   Q    Okay.  And I want to talk to you about Exhibit S, which

4   we went through earlier was a Qualified Legal Claim

5   Verification form.  I am not going to put it up there yet.  I

6   just want to talk to you about that form.

7   A    Sure.

8   Q    Okay.  So take us through the steps of when somebody in

9   solitary confinement or administrative segregation needs their

10  legal file.  What is the process and how does it get to you?

11  A    All the direct contacts would come from the case manager.

12  The case manager would process that with the offender.  It

13  would then be given to me for review, and then I would forward

14  it on to the assistant warden for approval.

15  Q    And did you indicate your approval in some way on the

16  form?

17  A    I always initialed it.  Every time I reviewed anything, I

18  would initial it.

19  Q    Is that DB?

20  A    That's correct.

21  Q    That's what you would write on it?

22  A    Those are my initials, yes, sir.

23  Q    So it would go from Ms. Shawver to Mr. Pruett then to

24  you?

25  A    No, no.  Mr. Pruett worked for me in a different unit, so

1   Ms. Shawver's assignment and Mr. Pruett's assignment were

2   totally different.

3   Q    I thought you said it would go to the case manager?

4   A    Ms. Shawver was the case manager along with Mr. Pruett as

5   being a case manager, correct.

6   Q    And that's what I was making sure.

7   A    Two different individuals, two different jobs.

8   Q    Okay.

9   A    Same title.

10  Q    I am not trying to cut you off, but when you stop, I

11  think you're done, so just bear with me because we can't both

12  talk at the same time.  So Mr. Pruett and Ms. Shawver were

13  both case managers but in different units?

14  A    Correct.

15  Q    Okay.  All right.  Now I am going to put up Exhibit S and

16  the first page of Exhibit S, which has been admitted already.

17  We have already seen this with a couple of witnesses.  Can you

18  indicate to us where your handwriting would be on this when

19  you would receive it in the normal course of business?

20  A    Those would be my initials, DB.

21  Q    Down here at the bottom right here?  Yes?

22  A    Yes, sir, DB.

23  Q    Okay.  She just has to take down verbal answers, so if

24  you nod your head, I am going to prompt you to give me a

25  verbal answer.  And then this handwriting up here at the top,

80

1    you see that, did you have any role in that?

2    A    No.  That would be the section for the assistant warden.

3    Q    Okay.  And then there is a stamp here that says Assistant

4    Warden, Potosi Correctional Center.  That would also come from

5    the assistant warden's office after you received it; right?

6    A    Right.  Typically, a clerical would stamp that when it

7    was received in the office.

8    Q    Okay.  But I'm just talking right now about the process.

9    It would start with Ms. Shawver.  She would receive it from

10   Mr. Davis; right?

11   A    Correct.

12   Q    And then Ms. Shawver would then -- how would she transmit

13   it to you typically?

14   A    She would typically put it in my mailbox or drop it on my

15   desk if I was there.

16   Q    And then you would review it I take it; right?

17   A    Yes, sir.

18   Q    And then if it was approved, you would initial it?

19   A    Correct.

20   Q    And then how would you transmit it?  Would it then go to

21   the assistant warden's office after you?

22   A    Right.  That would be put in the mailbox to the assistant

23   warden.

24   Q    Okay.  So this is -- this was submitted on November 1;

25   right?

1    A    Correct.

2    Q    Okay.  And then the handwriting at the top under Staff

3    Classification, Staff SL Shawver, do you recognize that

4    handwriting?

5    A    I do.

6    Q    Whose is it?

7    A    That's Sheri Shawver.

8    Q    Okay.  And then they would put the offender's name here;

9    right?

10    A    Right.

11    Q    And then here is a description of a case; right?

12    A    Yes, sir.

13    Q    And you would review that to make sure that before you

14    approved the form, that there was a proper reason for the

15    offender to receive their legal file or whatever they were

16    requesting?

17    A    Correct.

18    Q    Okay.  So you read that at the time before you put your

19    initials on it; right?

20    A    I would have reviewed it, yes, sir.

21    Q    Okay.  And it says Lawsuit, Case Number, and it has a

22    case number, Frederick P. Davis versus Terry Webb.  So you

23    knew there was a lawsuit pending the date you approved this

24    that was Mr. Davis versus Terry Webb; right?

25    A    Correct.

1   Q    Or otherwise you wouldn't have approved the form?

2   A    Right.

3   Q    Okay.  And then it says Response Due by November 19,

4   2012, Eastern District Court of Missouri.  You would have

5   reviewed that at the time, too; right?

6   A    Yes, sir.

7   Q    Okay.  And it wasn't received in the assistant warden's

8   office until November 16th, and Mr. Davis filled it out on

9   November 1st.  Can you explain why?

10  A    No, sir.  Typically, these things I would not hold at

11  all.  I would process those quickly and then I would forward

12  them on to the next level.  I would have no reason to hold on

13  to it.

14  Q    And was there anything happening at that time that would

15  have caused you to delay transmitting this form to the

16  assistant warden's office?

17  A    Not that I recall, no, sir.

18  Q    And then we have got a date at the top here -- they went

19  through it with Ms. Shawver -- it looks like November 16th.

20  Do you recognize that as the date that it would have been

21  approved?

22  A    That would be the approval date.

23  Q    Okay.  And I'm going to show you the second page of

24  Exhibit S, and this is another Qualified Legal Claim

25  Verification; right?

1    A    Yes, sir.

2    Q    And this one's dated November 16, 2012; right?

3    A    Yes, sir.

4    Q    And this is also from Mr. Davis; correct?

5    A    Correct.

6    Q    And this one has your initials on it; right?

7    A    Yes, sir.

8    Q    So you would have reviewed it?

9    A    Correct.

10   Q    All right.  And then at the bottom it says "approved for

11   access to the law library and legal materials as needed" down

12   there at the bottom; right?

13   A    Yes, sir.

14   Q    You recognize that handwriting?

15   A    That's Assistant Warden Crump.

16   Q    Okay.  And can you tell -- there was some testimony

17   earlier that this was either the 26th that it was approved.

18   Can you tell if I can zoom in on it maybe.

19   A    I remember from earlier it was the 26th.

20   Q    Okay.  Do you agree that that's what it says?

21   A    I agree it looks like the 26th.

22   Q    Okay.  Can you explain why there is a stamp here instead

23   of -- remember before we had Received by the Assistant

24   Warden's Office on the first page -- I'm going to put those

25   together on there of Exhibit S, the first two pages -- and it

1    says Received November 16, 2012, and yet we have a stamp on

2    the second page and it says Received March 15, 2013, Housing

3    something.  Do you recognize that stamp?

4    A    No, I have not seen that stamp.  I don't recognize it.

5    And if you have used those things before, they are a dial, and

6    sometimes, you know, the dates are incorrect.  I don't know

7    why it says that particular date.

8    Q    Well, it's not even the same stamp, is it, if you look at

9    the Received on the left and the Received on the right?

10   A    No, it's not the same stamp.

11   Q    Do you recognize who makes the stamp on the right, what

12   department?

13   A    No.  Yeah, it says Housing Unit and I can't see anything

14   else beyond that.

15   Q    Okay.  And let's look at the third page of Exhibit S.

16   This is another Qualified Legal Claim Verification form,

17   right, for Mr. Davis?

18   A    Yes, sir.

19   Q    And this is dated January 14, 2013; right?

20   A    Yes, sir.

21   Q    And I am trying to see where your initials are on this.

22   Do you see your initials anywhere on this?

23   A    It's under the stamp.

24   Q    You mean right here?  That?

25   A    That's right.

85

1   Q    Okay.  So they stamped it on top?

2   A    Yes, sir.

3   Q    And that one, that was approved one day later; right?

4   A    That's what it says.

5   Q    Okay.  And that Received stamp -- I'm going to put all

6   three Received stamps up here so we can see them.  These are

7   three requests submitted by my client for access to the law

8   library and for his legal files on November 1st,

9   November 16th, and January 14th, and the first one and the

10  third one have a Received stamp from the assistant warden, but

11  the middle one, we don't know where that stamp came from.

12  A    Yeah, I don't know where that stamp came from.

13  Q    Okay.  Do you remember this incident as you think about

14  it today?

15  A    Things come back to your memory as you sit here and

16  listen to things, sure.

17  Q    Okay.  Do you recall any reason that anyone would

18  purposefully slow play processing the request by Mr. Davis in

19  2012 for access to his legal files?

20  A    Not at all.

21  Q    Okay.  But there is no question, is there, that you knew

22  about the Webb lawsuit because you saw it on that form; right?

23  A    Right, it said Davis v. Webb.

24  Q    And you wouldn't have approved a request for access to

25  the law library and legal papers unless there was a valid

86

1    reason for it; right?

2    A    Correct.

3    Q    Now you were on the committee, the classification

4    committee, right, at that time?

5    A    Yes, sir.

6    Q    Tell the jury what the classification committee was

7    please.

8    A    Basically, there is a three-member panel that would

9    review reasons why offenders were placed in administrative

10   segregation.  Typically, I would chair the committee.  I would

11   have a case manager that was either assigned to that

12   particular unit or one that worked for me, and we would have a

13   custody supervisor, typically a lieutenant, that would sit on

14   those committees as well.

15   Q    And what was the purpose of the committee?  What was the

16   function of the committee?

17   A    The function of the committee would be to allow us to

18   review why offenders were placed in administrative

19   segregation, was it a referral because of discipline, was it a

20   referral because of protective custody needs, or an

21   investigation that applies to this particular case.

22   Q    All right.  Do you remember any of the meetings that you

23   participated in with respect to Mr. Davis in 2012 and '13 when

24   he was in administrative segregation?

25   A    I do not remember each meeting, no, sir.

1    Q    Okay.  Do you remember submitting an affidavit in this

2    case?

3    A    I don't.

4         MR. SIMON:  Okay.  Your Honor, may I approach the

5    witness please?

6         THE COURT:  You may.

7         MR. SIMON:  I have handed the witness an affidavit he

8    previously submitted in this case.  It's not marked as an

9    exhibit and I don't intend to introduce it.

10   Q    (By Mr. Simon) If you could just take a look at that and

11   see if it refreshes your recollection that you submitted an

12   affidavit in this case.

13   A    Yeah, I do.

14   Q    Okay.  And turn to paragraph 7 please.

15   A    Uh-huh, I'm there.

16   Q    All right.  So you participated in two classification

17   hearings for Mr. Davis, December 4, 2012 and January 2, 2013;

18   right?

19   A    Yes, sir.

20   Q    And you recommended continuing his assignment for the

21   safety and security of the institution because he was under

22   investigation; right?

23   A    That's right.

24   Q    That's what you said in the affidavit?

25   A    Right.

88

1   Q     Were you here when Mr. Lancaster testified?

2   A     I was.

3   Q     The investigation ended November 29th, so he wasn't under

4   investigation on December 4th and January 2nd, was he?

5   A     Maybe I hadn't received the information to clear him, but

6   listening to the testimony, you have to remember I only would

7   make action when I would receive information to do so.

8   Q     Well, isn't the whole purpose of the classification

9   committee to make a determination about whether my client

10  should be released from administrative segregation?

11  A     Some of those would also as I recall, those committee

12  meetings, one of them was to continue his assignment pending a

13  transfer.  So I couldn't speak to which one of those committee

14  meetings was talking about the investigation and which one of

15  those meetings spoke on transferring Mr. Davis out of the

16  facility.

17  Q     So when you signed this affidavit to submit to this

18  Court, you were under oath; right?

19  A     Right.

20  Q     And you swore to tell the truth?

21  A     Uh-huh.

22  Q     Yes?

23  A     Correct.

24  Q     Where is that in your affidavit what you just told me,

25  that one of those meetings was for something else?

1    A     That was recollection when I filled out the affidavit.

2    This is I guess additional information that I have recalled

3    over being experienced and exposed to all of the aspects of

4    the case.

5    Q     So when you signed this affidavit in 2015, you didn't

6    remember it as you remembered it just now today?

7    A     That's exactly how I remembered it when I did the

8    affidavit.

9    Q     Okay.  So let's get back to my question.  He was no

10   longer -- Mr. Davis was no longer under investigation as of

11   December 4th or January 2nd; correct?

12   A     I couldn't say with a hundred percent certainty that

13   those were the topics of those particular committee meetings.

14   Q     I appreciate that, but my question isn't whether those

15   are the topic of the meetings.  My question is, on

16   December 4th, the investigation was done; right?  That's what

17   Mr. Lancaster said; right?

18   A     You have to also remember, sir, the content of those

19   meetings would be based on the information that I had at the

20   time.  So what would be on the actual classification class

21   hearings would be accurate.  I don't have them in front of me.

22   I can't verify one over the other, and I don't recall what the

23   topics were on each of those hearings.

24   Q     Okay.  So there is some documentation submitted at these

25   meetings that would have that information?

90

1   A    We do a classification -- yeah, each one of those

2   classification meetings are documented, so there would be a

3   class hearing form on each of those incidents.

4   Q    And we should have received those in this litigation

5   then; right?

6   A    I don't know what you received.

7   Q    Okay.  Let's get back to this.  So for these

8   classification hearings, you expect to receive information

9   that is relevant to whether or not my client, Mr. Davis,

10  should be released from administrative segregation, right,

11  given that's the purpose of the meeting?

12  A    Do a review.  Yeah, I would do a review every 30 days.

13  Q    And who would you receive the information from about the

14  investigation we are talking about here?

15  A    The investigator or my immediate supervisor who would

16  have been the assistant warden.

17  Q    Who was that?

18  A    Mr. Crump.

19  Q    Okay.  And then the investigator was Mr. Lancaster?

20  A    Mr. Lancaster, right.

21  Q    Do you know of any reason why they didn't tell you that

22  Mr. Davis was no longer under investigation?

23  A    That, I can't answer, sir.  I don't recall that.

24  Q    Okay.  You also say "Mr. Davis was suspected of making a

25  knife to be used on another offender and we requested that he

1   be transferred;" right?

2   A    Correct.

3   Q    Okay.  And that's what you told this Court in March of

4   2015?

5   A    That was the direction that I received because I didn't

6   know any of the content of the investigation until the day I

7   met with Assistant Warden Crump when we discussed the need for

8   the transfer, and that's when I was given additional

9   information that particular day.

10  Q    Okay.  And what information were you given?

11  A    What you just read.

12  Q    Okay.  Did they tell you that there were others that were

13  suspected of making that knife?

14  A    I wasn't aware of others.

15  Q    Did they tell you that they had no credible evidence that

16  Mr. Davis made the knife?

17  A    That wasn't shared with me.

18  Q    Do you know why they didn't share that with you?

19  A    It wasn't relevant to the transfer, so I guess they chose

20  not to share it.

21  Q    You never saw any evidence linking Mr. Davis to making

22  the knife, did you?

23  A    Never.

24        MR. SIMON:  That's all I have at this time, Your

25  Honor.

1          THE COURT:  Mr. Kinghorn.

2          MR. KINGHORN:  Yes, Your Honor.

3                      CROSS EXAMINATION

4    BY MR. KINGHORN:

5    Q    At that time when Mr. Davis was assigned to

6    administrative segregation in your housing unit, did you know

7    what he was under investigation for?

8    A    No, I did not.

9    Q    Did you help conduct the investigation?

10   A    Never.

11   Q    Did you have any role in placing Mr. Davis under

12   investigation?

13   A    No, I did not.

14   Q    Did you assign Mr. Davis to temporary administrative

15   segregation when the investigation first began?

16   A    No, I wouldn't have approved the assignment.  I would

17   have seen him shortly after to identify the assignment change

18   from general population to ad-seg.

19   Q    And can you -- you were talking about the classification

20   committee previously.  Does the administrative inquiry officer

21   participate in those hearings?

22   A    No, he doesn't.

23   Q    Okay.  But the classification committee would decide

24   whether to release an offender from ad-seg.  Is that what you

25   testified to?

1   A   They would not decide.  They would make a recommendation.

2   Q   Is administrative segregation the same thing as

3   disciplinary segregation?

4   A   No, it's not.

5   Q   And what is the difference?

6   A   Disciplinary segregation, as Mr. Pruett spoke on, would

7   be one of the outcomes for a conduct violation.  He could

8   assign this particular individual to disciplinary segregation

9   for a period of days for a behavior reason.  Administrative

10   segregation, as we spoke on, is several different reasons,

11   safety and security of the facility, of the staff, of the

12   offenders.  It could also be for protective custody needs of

13   the offender.  So there is a clear difference, and

14   administrative segregation is not a punishment.

15   Q   Are inmates placed on administrative segregation for

16   punishment?

17   A   No, sir.

18   Q   Is administrative segregation the same thing as solitary

19   confinement?

20   A   No, it's not.  In the segregation units, we have both

21   double-man cells and single-man cell, so if you would break

22   down that, solitary confinement you would have to speak on

23   just the single-man cells.

24   Q   Do you recall whether Mr. Davis was in solitary

25   confinement when he was in administrative segregation?

1    A     No, he was not assigned to a single-cell confinement.

2    Q     Do offenders who are being held in administrative

3    segregation, do they receive three meals a day?

4    A     They receive three meals a day, yes, sir.

5    Q     Can they access legal materials?

6    A     Yes, they can.

7    Q     Do they get any rec time?

8    A     Yes, they do.  They also receive phone calls and visits.

9    Q     And visits?

10   A     Yes, sir.

11   Q     Okay.  And how many people did you say were on the

12   classification committee when you were reviewing back in

13   October and November 2012?

14   A     We would have three committee members and then the fourth

15   would be -- the fourth member would be the warden or the

16   assistant warden.

17   Q     Okay.  And at the time of the classification hearings,

18   did you know what the investigation was for with regards to

19   the knife?

20   A     No, I didn't, and typically in these situations, I didn't

21   want to know any of the details of any investigation.  That

22   left me a clear mind when I had to have these monthly reviews.

23   I just didn't want to know.

24   Q     Okay.  And were ad-seg offenders assigned to both housing

25   unit 3 and housing unit 2 at that time?

95

 1   A     They were.  Housing unit 2 is the primary segregation

 2   unit.  3B served as an overflow.  At times, we would have more

 3   offenders that needed to be at ad-seg status, so we needed a

 4   place to put them, so we utilized 3B as an overflow unit.

 5   Q     Do ad-seg offenders in either of those housing units

 6   receive any kind of perks or benefits that ad-seg offenders in

 7   the other unit don't receive?

 8   A     They are identically the same.

 9   Q     And do you know whether it is common or uncommon for an

10   offender to be moved from housing unit 3 ad-seg to housing

11   unit 2 ad-seg?

12   A     Very common.  It happened daily.

13   Q     Why was that?

14   A     We wanted to keep the longer term offenders in housing

15   unit 2.  Typically, we would put the offenders that had a

16   lower term left in segregation in 3B because it was an easy

17   transition.  3B also served as the first step when offenders

18   were released from ad-seg to go to general population.  That

19   was their first stop.  So it was simple to keep the guys who

20   were going to be released soon in that unit, so that's how it

21   worked.

22   Q     And I believe you testified earlier that the committee's

23   recommendation during the classification hearings that we're

24   discussing was to keep Mr. Davis in administrative

25   segregation?

96

1   A    That was the recommendation.

2   Q    In your experience, is it common or uncommon to hold an

3   offender in administrative segregation while they are being

4   investigated?

5   A    It always happens, very common.

6   Q    In your experience, is it common or uncommon to hold an

7   offender in whatever housing unit they are in when they have a

8   transfer request pending?

9   A    That's very common as well.

10  Q    If an offender is in administrative segregation when a

11  transfer is being processed, is it common or uncommon for them

12  to remain in administrative segregation pending the transfer?

13  A    They would remain in administrative segregation if that

14  was their assignment pending the approval of that transfer.

15  Q    Did you know at the time of the classification hearings

16  that Mr. Davis had a lawsuit pending against Timothy

17  Lancaster?

18  A    Never.

19  Q    Did Timothy Lancaster ever talk to you about that

20  lawsuit?

21  A    Never.

22  Q    Did he ever tell you that he wanted Mr. Davis off the

23  yard?

24  A    No, he didn't.

25  Q    Did you ever tell Mr. Davis to drop his lawsuit against

1  Timothy Lancaster?

2  A    No, sir.

3  Q    And as a point of clarification, you were shown Exhibit S

4  earlier, the Qualified Legal Claim forms.  I will just pop it

5  up really quick, these documents, and there were three pages

6  to Exhibit S.

7  A    Yes, sir.

8  Q    So just for clarity, are those three pages part of one

9  document or are these three separate Qualified Legal Claim

10  forms that would have been submitted?

11  A    Those are three separate claims that would have been

12  submitted it appears on three separate dates.

13  Q    Okay.  Thank you.  And in your words, what was a

14  Qualified Legal Claim form used for?

15  A    It was a way for an offender to verify that he had a

16  legal need.  With him being in a restricted unit, he would

17  have to prove the need to go visit the law library or have

18  access to materials.  So that form completed would be verified

19  through the case manager, I would review it, finally approved

20  by the assistant warden to grant approval.  That would allow

21  the offender more time for materials from the law library.

22  Q    In your experience, was it common or uncommon for inmates

23  to submit Qualified Legal Claim Verification forms?

24  A    It happens nearly daily.

25  Q    And if those forms are approved, then the offender

1  receives what?  What happens?

2  A    If it's approved, then the law library is notified that

3  this particular offender has authorization to retrieve or

4  request materials from the law library, and then it would be

5  coordinated with the case manager to ensure that those forms

6  are back and forth from the law library to the offender and

7  from the offender to the law library.

8  Q    As part of your job at that time, did you routinely sign

9  forms like these?

10  A    I routinely reviewed them, yes, sir.

11  Q    At Potosi Correctional Center, approximately how many

12  Qualified Legal Claim forms did you approve?

13  A    Oh, I would have no way to give you a solid number.

14  Q    Do you think it's over a hundred?

15  A    It would be well over a hundred.

16  Q    Several hundred possibly?

17  A    It could even be that many.

18  Q    And based on Exhibit S that you looked at, you signed off

19  or initialed Mr. Davis's Qualified Legal Claim forms.  Would

20  you agree with that?

21  A    I did.

22  Q    So by doing so, you were approving -- if I could

23  republish S and just let me know when you can see that.

24  A    Okay.

25  Q    So by initialing, you would be approving this for

1    Mr. Davis.  It says "access to law library, access to legal

2    materials."

3    A    That's correct.  And to go further, it would be that, you

4    know, I reviewed it.  It would give additional information for

5    the assistant warden to consider and that I had reviewed it

6    and it seemed legit.

7    Q    And it looks like the same thing was approved on -- we

8    were just looking at page 1 of Exhibit S.  Now we are on

9    page 2 of Exhibit S.  It looks like the same access to law

10   library, access to legal materials; is that correct?

11   A    Yes, sir.

12   Q    And then page 3, it looks like it's the same request, law

13   library and legal materials; correct?

14   A    Same request, same granted.

15   Q    Thank you.  Have you ever punished any inmate for filing

16   a Qualified Legal Claim form?

17   A    Never.

18   Q    Aside from the information that's on an inmate's

19   Qualified Legal Claim form, do you normally have any other

20   knowledge about the inmate's legal matter?

21   A    No, I do not.

22   Q    Why would that be?

23   A    I would have no reason to look into the particular case.

24   For example, with this Qualified Legal Claim, it said Davis v.

25   Webb, and that's all the information that I had on that.

1    Q    And so when you signed or initialed these Qualified Legal

2    Claim forms, did you know anything else about Mr. Davis's

3    legal matter at that time?

4    A    Nothing further than what was written on the form.

5    Q    Do you recall how soon after the investigation closed

6    that your facility, the Potosi Correctional Center, began the

7    transfer process for Mr. Davis?

8    A    It was nearly immediately that we began the talks and

9    completed the proper paperwork to get that.

10   Q    To your knowledge, have you ever treated Mr. Davis

11   unfairly in any way?

12   A    Never.  No, sir.

13        MR. KINGHORN:  And if I could just have one moment,

14   Your Honor?

15        THE COURT:  Of course.

16        MR. KINGHORN:  We don't have anything further at this

17   time.

18        THE COURT:  You may step down, sir.

19        MR. SIMON:  Oh, I'm sorry, Your Honor, I just have a

20   couple followups.

21        THE COURT:  Oh, I'm sorry.

22                    REDIRECT EXAMINATION

23   BY MR. SIMON:

24   Q    Mr. Bryan, so just so we're clear, you said when somebody

25   is in a more restrictive unit, they can't get the access to

1    the legal materials and the law library without special

2    approval?

3    A    That's the use for the form, yes, sir.

4    Q    And you don't need that in general population?

5    A    No, you can go when you have the authorized window and

6    the time for your unit to go when you are in general

7    population, you can go to that law library.

8    Q    And there is no question that Mr. Davis submitted a form

9    on November 1st that said, hey, I've got a response due

10   November 19th, I need access to my legal materials; right?

11   A    He submitted one on the 1st and one on the 16th and one

12   January whatever date it was.

13   Q    Well, let's just focus on the one on the 1st please,

14   Exhibit S, page 1.  You said you filled out -- looked at

15   hundreds of these forms; right?

16   A    Yes, sir.

17   Q    And it didn't always take two weeks to get them approved;

18   right?

19   A    I would process them as soon as I would get them and I

20   would send them on their way.

21   Q    Okay.  But this one says, hey, I've got a response due

22   November 19th, I need access to the law library, access to my

23   legal materials; right?

24   A    Yes, sir.

25   Q    And he needed to do this because they put him in ad-seg;

1   right?

2   A     That's correct.

3   Q     And as long as he was in ad-seg, in order to get working

4   on his legal case, he had to get special permission?

5   A     He needed this form.

6   Q     And you would expect when you were on the committee to

7   determine whether he should get out of ad-seg to get truthful

8   information about the investigation from Mr. Lancaster and

9   whoever else; right?

10  A     I don't understand your question.

11  Q     Okay.  Well, you are on the committee.  It's up to you to

12  let him out of ad-seg; right?

13  A     No, it's not.  I make recommendations.

14  Q     You make recommendations.  Without your recommendation,

15  he ain't getting out of ad-seg; right?

16  A     That's fair.

17  Q     Okay.  So in order to get out of ad-seg, he wants your

18  recommendation, and when you're making that recommendation,

19  you expect to receive truthful information about the reason

20  he's in ad-seg?

21  A     I would -- investigation, that's the only thing that I

22  was concerned about.  I wasn't concerned with the details.

23  Just knowing that there was an active investigation is what I

24  was concerned about.  When the investigation is over, we would

25  want to know that and proceed forward.

1    Q    That's my point.  You would want to know when the

2    investigation is over, and so if it ended on November 29th,

3    you would expect somebody to tell you that; right?

4    A    November 29th?  Yes, sir, I assume if that's the date.

5    Q    Well, that's what Mr. Lancaster testified to.  Do you

6    have any reason to dispute it?

7    A    I have no knowledge of that, sir.

8    Q    So it took him two weeks to get his legal information

9    three days before something was due, and as long as he's in

10   ad-seg, he wasn't getting access to his legal files unless he

11   got these forms approved; right?

12   A    Right.

13   Q    And he ain't getting out of ad-seg unless you have

14   truthful information about the investigation; right?

15   A    That's fair.

16          MR. SIMON:  Thanks.

17                     RECROSS EXAMINATION

18   BY MR. KINGHORN:

19   Q    Mr. Bryan, looking at Exhibit S, can you tell based on

20   this document when Sheri Shawver actually gave this to you?

21   A    There is no place to really identify when she gave it to

22   me.  There is no place on there to identify when I forwarded

23   it on for approval.

24   Q    And so this date up here at the top, is this when Davis

25   submitted it to Shawver?

1  A     That would be the date that they had the interaction,

2  yes.

3  Q     So Mrs. Shawver could have -- I will strike that

4  question.   There is no date on here that indicates when she

5  would have given it to you?

6  A     There is no date to indicate that.

7           MR. KINGHORN:  We don't have anything further, Your

8  Honor.

9           MR. SIMON:  Nothing further, Your Honor.  Thank you.

10           THE COURT:  You may step down.  How about lunch,

11  Counsel?

12           MR. SIMON:  Yes, I think we need to feed the jury,

13  Your Honor.

14           THE COURT:  We will take this as our luncheon recess.

15  During the course of the recess, do not discuss the case

16  amongst yourselves or with anyone else.  Do not allow anyone

17  to discuss it within your hearing or presence.  Do not form or

18  express any opinions about the case until it is given to you

19  to decide.  Do not read, view, or listen to any media accounts

20  regarding the trial, and do not utilize your cell phones or

21  other web-enabled devices to access the internet which might

22  allow for a viewing or discussion of matters that might be

23  related to the trial.  We will see you back at 1:35, all

24  right?

25    **(Court Recessed for Lunch from 12:35 p.m. Until 1:40 p.m.)**

1   **(The Following Proceedings Were Held Outside the Hearing and**

2   **Presence of the Jury.)**

3       THE COURT:  Are we ready to proceed?

4       MR. SIMON:  Yes, Your Honor.

5       THE COURT:  Will you swear in the witness.

6                   **FREDERICK DAVIS,**

7   **Having Been First Duly Sworn, Was Examined and Testified As**

8   **Follows:**

9       MR. SIMON:  I'm sorry, Your Honor, I forgot we had a

10  question on the exhibit.  Your Honor, if we could real quick,

11  so Exhibit 8 is a letter dated November 8th that Mr. Davis's

12  former attorney wrote to Potosi asking for them to stop

13  violating his rights.  We had previously agreed to redact out

14  because there were claims in this case, the denial of access

15  to his legal file was a separate claim, you dismissed that.

16      THE COURT:  Right.

17      MR. SIMON:  But we think that it's relevant to show

18  intent of retaliation, that they did it because of the

19  previous legal lawsuit, which is part of what we have to show.

20  That letter has two sentences, which we had redacted out and

21  we're prepared to go either way based on your ruling.  The

22  sentences are, "More importantly, since he has been placed in

23  ad-seg, he has been denied access to his legal materials and

24  the forms necessary to institute a formal grievance regarding

25  this action", and "Mr. Davis has a pending deadline in the

1  civil lawsuit later this month and denial of his legal

2  materials is illegal and unacceptable under the

3  circumstances."  They have an objection to those sentences.

4         MR. KINGHORN:  Our objection is based on the fact --

5  well, in part that the access to the court's claim has been

6  dismissed.  In addition, we have a 402 and -- well, I guess

7  that is the 402 issue.  The 403 issue being that -- well, the

8  second sentence there states a legal conclusion.  It says this

9  is illegal under these circumstances.  As to that first

10  sentence that counsel read, we think that it's far more

11  prejudicial than it is probative because this is a letter from

12  an attorney who is not here to testify saying very matter of

13  factly, "More importantly since he's been placed in ad-seg,

14  he's been denied his legal material."  So we think a jury

15  receiving this would attribute some unfair prejudice to it.

16         MR. SIMON:  We have heard a lot of testimony about

17  his denial of access to the legal files.  That's a fact the

18  jury's already considering.  The fact that he went out of his

19  way to get his attorney to write them a letter shows how

20  important this was to him and it shows notice that they knew

21  he needed access to those legal files.

22         MR. KINGHORN:  We would not object to if Mr. Davis is

23  questioned as to, you know, what did you tell your attorney,

24  and he wants to respond that, well, I told him I was being

25  denied legal materials.  We have no objection to that.

1      MR. SIMON:  That would waive the attorney/client

2 privilege, Your Honor.  I can't have him do that, what he told

3 his attorney.  What he told his attorney isn't what's

4 relevant.  What's relevant is what they knew.  They were on

5 notice that he had -- every defendant here is saying we didn't

6 know anything about his lawsuit, we didn't know he needed his

7 legal file, we just processed stuff.  He went to the point of

8 having a lawyer write them a letter that spelled it out for

9 them.

10      THE COURT:  To whom was -- that's Exhibit 8?

11      MR. SIMON:  Yes, to Mr. Steele, Warden Steele.

12      MR. KINGHORN:  And I believe that there was a

13 response to this letter, but it was sent by another

14 administrator.

15      MR. SIMON:  There was a response.  We're going to go

16 through that with Mr. Steele because he was copied on it.  But

17 Mr. Davis was copied on this letter.

18      THE COURT:  So, Mr. Kinghorn, I understand your

19 objection, but a little clarification as to how broad your

20 objection is.  Are you objecting to the general existence of a

21 fact which is that a letter was sent to Mr. Steele or someone

22 on behalf of Mr. Davis complaining about a denial of access to

23 his legal files?  Are you objecting to that generally, that

24 factual concept?

25      MR. KINGHORN:  No, I don't think that -- no, I'm not.

1    THE COURT:  All right.  So your objection is more

2    centered on the nature of the letter directed by the attorney

3    for Mr. Davis who is not present in court today to testify

4    about the letter?

5    MR. KINGHORN:  Right, and just the fact that it came

6    from an attorney and is stated matter of factly as though

7    there is some, you know, conclusive proof of this when there

8    hasn't been any evidence of that.

9    THE COURT:  All right.  So then the question is,

10   would you then be objecting if Mr. Simon asked whether a

11   letter was sent on behalf of Mr. Davis by Mr. Davis's attorney

12   complaining about/requesting that he be granted access to his

13   legal files?

14   MR. KINGHORN:  I think I would be all right with

15   that.

16   THE COURT:  Mr. Simon?

17   MR. SIMON:  That's fine, Your Honor.  I intend to ask

18   the question, but I would like to introduce the letter into

19   evidence.  No?  Well, they would agree to me introducing it if

20   I redact out those sentences that they're objecting to, which

21   if that's your ruling, I'm ready to do that.

22   THE COURT:  Well, but my ruling went directly to

23   those sentences that they were objecting to, and I was

24   assuming that the sentences that they were objecting to were

25   not the sentences that were going to be redacted out.

1          MR. SIMON:  Okay.

2          THE COURT:  So you don't care about the letter coming

3    in as long as those aspects about the legal file are not

4    included in the letter?

5          MR. KINGHORN:  If those redactions remain on the

6    letter, we are fine with it.

7          THE COURT:  Okay.  So the letter will come in with

8    the redacted portions and you may inquire --

9          MR. SIMON:  "Did you ask your lawyer to send this

10   letter and ask that you have access to your legal file"?

11         THE COURT:  Yes.

12         MR. SIMON:  Okay.  Thank you.

13         THE COURT:  It's a lot easier being on this side.

14   Are you guys ready?

15         MR. SIMON:  Yes, Your Honor.

16         THE COURT:  All right.  Bring them out.

17   **(The Following Proceedings Were Held Within the Hearing and**

18                   **Presence of the Jury.)**

19         THE COURT:  Are you ready, Mr. Simon?

20         MR. SIMON:  Yes, Your Honor.

21         THE COURT:  Mr. Davis, you have already been sworn

22   in, so you may proceed.

23                   DIRECT EXAMINATION

24   BY MR. SIMON:

25   Q    Could you please tell the jury your name.

110

1   A    My name is Frederick Paul Davis.

2   Q    Tell the jury about your education.

3   A    I have a GED.  I made it to the 12th grade.  I am in the

4   process of working on a master's degree in theology.  I have

5   completed the course for my bachelor's in theology and my

6   associate's, and I have -- I am awaiting the funds to pay for

7   my diploma.

8   Q    All right.  Now how long have you been in prison?

9   A    Twenty-five years.

10  Q    So 25 years ago you were convicted of first degree

11  murder?

12  A    Correct.

13  Q    And you've been in prison ever since?

14  A    Correct.

15  Q    And before this incident that is the subject of this

16  lawsuit, did you have a job in prison?

17  A    Yes, I did.

18  Q    Tell the jury what your job was and what you did.

19  A    I worked in the MVE metal factory in Potosi Correctional

20  Center, and my job was welding, grinding.  We made specialty

21  products and things of that nature.

22  Q    Okay.  And did you actually get paid for that job?

23  A    Yes, I did.

24  Q    And how much did you get paid?

25  A    I made between 75 and $85 a month on that job.

1  Q    And what did you do with the money you earned in that

2  job?

3  A    That money was split between me paying for my

4  corresponding courses, me paying my attorney, my 2915 or post

5  counselor attorney, and trying to survive in here.

6  Q    Okay.  And that was related to your conviction?

7  A    Correct, not this case.

8  Q    All right, not this case.  Now I want you to describe the

9  difference between general population and ad-seg for the jury.

10 A    The difference is like night and day.  General population

11 you have freedom to move around, freedom to go to the library,

12 freedom to go to recreation, freedom to go to canteen, freedom

13 to hang out in the wing if you like, play sports, whatever it

14 is that general population -- church, chapel, whatever it is

15 that general population actually entails.  I was heavily

16 involved in my Bible studies that was in the institution and

17 with the VICs.  Ad-seg is very restrictive.  You have none of

18 those things, and everything is based on someone authorizing

19 them.  You have recreation on a very small yard that's just

20 you.  There is no equipment out there.  You just run or stand

21 or just enjoy the air, you know, which is most of the time

22 what I did just to be out.

23 Q    Can I ask you a specific question, too.  Describe the

24 difference between access to the law library, the law clerks,

25 and your legal file when you are in general population versus

1    in administrative segregation.

2    A    When I'm in general population and I attend the law

3    library, it's just me going in there at my own free will, and

4    I have access to any law computer or any law materials that I

5    choose, any case law that I choose.  I don't need the

6    permission of anybody to go in there and work on my case.  In

7    ad-seg, or administrative segregation, I have to wait on the

8    caseworkers to process files, work documents for me to be able

9    to be approved to get access to the library to work on my

10   case, for me to be approved to get access to my legal work,

11   for me to be approved even to go in the yard for recreation.

12   And so there is no canteen other than your bare minimums,

13   cosmetics and writing paper, pen, ink pens, things of that

14   nature, so you don't have any eating material, eating aspects

15   to what you can purchase out of the canteen.  You're limited

16   to $20 where on the yard on general population, you have $75 a

17   week that you can spend.  And those are some of the primary

18   differences.

19   Q    Okay.  Now I want to switch gears and talk about the

20   first lawsuit, the Webb lawsuit, that we talked about in this

21   case.  What was the basis of the Webb lawsuit?  Why did you

22   file it?

23   A    I filed it because I was issued a false conduct

24   violation.  I was placed under investigation.

25        MR. KINGHORN:  Your Honor, objection.

113

1          THE COURT:  What is your legal objection, Mr.

2   Kinghorn?

3          MR. KINGHORN:  I object it's with regards to a motion

4   in limine order.

5          THE COURT:  Yeah, rephrase your question, Mr. Simon.

6          MR. SIMON:  Okay.  May I inquire briefly?

7          THE COURT:  Uh-huh.

8                    (Attorneys consult)

9          MR. SIMON:  I will rephrase.

10  Q    (By Mr. Simon) You previously filed a lawsuit against

11  Defendant Lancaster and some others that we've been referring

12  to as the Webb lawsuit; right?

13  A    Correct.

14  Q    Okay.  And do you remember when you filed that lawsuit?

15  A    It was in -- I want to say it was in October or November

16  of 2012 or 2011.

17  Q    Okay.

18  A    I don't remember the exact date.

19  Q    Okay.  In October of 2012 is when the incident we've been

20  talking about started, so your Webb lawsuit had been pending

21  already?

22  A    No, it was pending already, correct.

23  Q    Okay.  So about how long -- well, let me bring it forward

24  and we'll put it in that context.  So in October of 2012, what

25  happens is the knife is found in the -- was it the shower?

114

1   A    Right.

2   Q    So if that's October 2012, approximately how long had

3   your previous lawsuit been pending?

4   A    It had been pending since 2011.

5   Q    Okay.  So what was the status of your Webb lawsuit

6   immediately before the knife was found in the shower?

7   A    The motion to dismiss for the defendants had just been

8   denied.

9   Q    Okay.  And had a case management order been entered in

10  the case?

11  A    A case management order had been entered in the case.

12  Q    Okay.  And in that case management order, did you have a

13  deadline to respond to something in that previous lawsuit?

14  A    Yes, I did.

15  Q    And what was that deadline, do you remember?

16  A    The deadline was November the 19th I had a deadline to

17  respond to.

18  Q    Okay.  Now I'm going to move forward, and I want to talk

19  about the incident when the knife was found.  Can you take us

20  through that day?  Up until that point, had you still been

21  working in the metal factory?

22  A    Yes, I had.

23  Q    So on that day, October 26, 2012, what were you doing

24  when you found out about the knife being found?

25  A    That morning I had went to -- I didn't go directly to

1    work.  It was my habit to go to the law library and then when

2    the law library would close, I would go to work, and this was

3    understood by the managers in the shop.  And so I went to the

4    law library, I went to work after that closed at 10:30, and

5    after arriving at the factory, I was informed by several of

6    the factory workers -- in fact, I was the only one that wasn't

7    present.  I was informed by the factory workers that Warden

8    Steele and an investigator had been to the factory inquiring

9    about a knife that had been found in the shower in housing

10   unit 6.  They informed me that this knife had been found.  No

11   administrator had informed me that a knife had been found.  I

12   even inquired it from the officer that was down there, and he

13   wouldn't even say anything about it.  And so that was my

14   extent of any knowledge of the knife.

15   Q    And I forgot to ask you this question before.  When you

16   would be at work, did you have a particular area in the

17   factory that you would work at?

18   A    Yes, I did.

19   Q    And where was that?

20   A    It was -- it's kind of hard to describe.  You have like,

21   as it's been described earlier, like cubicles.

22   Q    Okay.

23   A    And everybody's assigned to a cubicle; however, everybody

24   visits everybody's cubicle.  There is no restriction on

25   anybody.  And a lot of times we would help out one another in

1    these areas on different projects.

2    Q    Were you the only one that was allowed to be in the area

3    that you were assigned to at the metal factory?

4    A    No, I was not.  There were actually three people assigned

5    to the area where I was assigned.

6    Q    And did other prisoners who weren't assigned to that

7    area, did they have access to your area?

8    A    All the time, visiting as well as participating in work

9    projects.

10   Q    Okay.  Let's talk about the knife.  Did you make the

11   knife?

12   A    No, I did not.

13   Q    Did you hide the knife?

14   A    No, I did not.

15   Q    Did you ever see the knife?

16   A    No, I did not.

17   Q    Were you investigated about the knife?

18   A    Yes, I was.

19   Q    Were you interviewed?

20   A    Yes, I was.

21   Q    Who interviewed you?

22   A    Timothy Lancaster.

23   Q    Was anybody else present when you were interviewed by

24   Mr. Lancaster?

25   A    Mr. Pruett was present when I was interviewed by

1    Mr. Lancaster.

2    Q    And where did that interview take place?

3    A    In the caseworker's office that Mr. Pruett often used in

4    housing unit 3.

5    Q    Okay.  What changed after the knife was found with

6    respect to your assignment?  Where were you assigned before

7    the knife was found?

8    A    As far as?

9    Q    Housing unit.

10   A    I was in housing unit 6.  Housing unit 6B is where I was

11   living where they allege the knife was found.

12   Q    And is that general population?

13   A    That's general population.

14   Q    The shower area where the knife was found, are you

15   familiar with it?  Have you been there?

16   A    I'm familiar with the shower area.  I never used that

17   shower because it was often the sight of unGodly things

18   sometimes, so I never participated or used that shower area.

19   I always used the two showers upstairs and downstairs that was

20   directly in front of the bubble area.

21   Q    Okay.  Now with respect to access to that shower area,

22   who in your housing unit had access to the shower area where

23   the knife was found?

24   A    All 100 inmates that occupy that wing.

25   Q    Okay.  After the knife was found, were you transferred

1    from housing unit 6?

2    A    Yes, I was.

3    Q    Where were you transferred to?

4    A    I was transferred on October 29th to housing unit 3,

5    ad-seg, and placed on TASC.

6    Q    Okay.  Now you are alleging three retaliatory actions in

7    this case; right?

8    A    Correct.

9    Q    And do you remember what they are?

10   A    I was alleging that --

11   Q    What about the investigation?

12   A    Wrongful investigation.

13   Q    Denied an opportunity to --

14   A    Denied opportunity to defend myself.

15   Q    What about that, what would you have used to defend

16   yourself?

17   A    I was adamant about being given a CVSA test.  I was

18   adamant about the review of the video cameras.  I just firmly

19   believed that if they had been engaged, some type of evidence

20   could have been found to exonerate me, and that was just not

21   the motivation for the individuals that I was dealing with, so

22   understanding that.

23   Q    Okay.  And then the third one was being locked and moved

24   to ad-seg for 86 days?

25   A    Correct.

1    Q    Okay.  Now I want to talk about —— you filed a complaint

2    in this case.  I'm trying to look for the date, but it's

3    really hard to read.  It was in 2013.  Do you remember that?

4    A    For this case?

5    Q    For this case.

6    A    Correct.

7    Q    Okay.  And in the complaint, you allege that certain

8    things were said by some of the defendants.  Do you remember

9    that?

10   A    Yes, I do.

11   Q    All right.  Did Mr. Lancaster say anything to you that

12   led you to believe that he was doing what he did that you just

13   told us about, his involvement in that was a retaliatory

14   action for the prior lawsuit?

15   A    Yes, he did.

16   Q    What did he say?

17   A    He told me as the interview was concluding and I was

18   about to leave, he made the statement "you won't file another

19   lawsuit here."  So I stopped and I said, What you say, and he

20   wouldn't repeat it.  He just had a smirk on his face.  So I

21   went on and the officer took me back to my room.

22   Q    Okay.  Did he also say "whether you're involved or not,

23   this will at least get you out of here"?

24   A    On November the 13th, he was investigating some guys that

25   were locked up in ad-seg for some colognes, that they had them

1  placed on investigation, and I was talking to him about me

2  being released, and he said "I don't care if you were involved

3  or not, this at least will get you out of here."

4  Q    Okay.  And did he also inquire as to why you were still

5  there at a certain time?

6  A    On November the 20th, the cell mate that I was in the

7  cell with, he came and read that young guy a violation who had

8  been involved in an altercation in the gym, and he looked

9  around him, he said, Oh, still here, ugh.  I said, Yeah, I'm

10  still here.

11  Q    Okay.  Now how about Mr. Pruett, did he say anything

12  which led you to believe this was retaliatory?

13  A    During the interview, Mr. Pruett was present.  He was

14  sitting behind his desk, and I had made a statement to

15  Mr. Lancaster after he had finished the series of questions,

16  and I said, You just doing this to retaliate for the lawsuit,

17  and Pruett jumped in and said, "Well, stop filing lawsuits.

18  If you don't want the consequences, stop filing lawsuits.

19  When are you guys going to understand we run this prison."

20  Q    Did Mr. Pruett say anything to you about your legal

21  materials?

22  A    No.  Other than on November the 19th, I caught him

23  coming -- I was moved from 3 house to 2 house at this time,

24  and he was coming down the walkway from seeing somebody over

25  there, and I asked him, I said, Pruett, why didn't you give me

1    my legal work like I asked you.  I said, I missed my court

2    deadline.  He said, You can get it at another prison, and he

3    kept on moving.

4    Q    Now how about Mr. Bryan, did he say anything?

5    A    On December the 20th, the caseworkers were passing out

6    canteen trying to expedite things because Christmas was coming

7    up, and I asked Mr. Bryan about why I was still being held in

8    ad-seg, and he said I will be back to talk to you.  So he

9    didn't give me the canteen he had for me.  He brought it back

10   to me along with my stamps and he said, Well, he said, just

11   drop the lawsuit, he said, as if things will go back to normal

12   and I will be released from ad-seg, and I knew that wasn't

13   going to happen so.

14   Q    Did he mention anything about Mr. Lancaster?

15   A    He mentioned that Lancaster wanted me off the yard

16   because of my legal activities.

17   Q    Okay.  Now I noticed and it seems curious that you

18   remember dates there.  You gave us some dates in addition to

19   what was said.  Why do you remember the dates?

20   A    I remember the dates because I had asked for the video

21   cameras to review -- to be reviewed.  I had been to Potosi

22   before, so I knew how they functioned, and I knew they was

23   going to destroy that or not give me access to them, so I had

24   to find a way to associate the situation and the incidence, so

25   I wrote down the dates and the times when things happened.  So

1   I recalled that clearly because I just had to associate them

2   with other things.

3   Q    Okay.  Now -- and I am not going to go through these in

4   detail because we have been through them a number of times,

5   but Exhibit S -- so now you are in administrative segregation,

6   and did you fill out a QLCV, a Qualified Legal Claim

7   Verification, form?

8   A    Yes, I did.

9   Q    And is this your writing here where it says the name of

10   the case and when your response is due?

11   A    Yes, it is.

12   Q    Okay.  When did you fill this out?

13   A    When I was transferred from 3 house to 1 house November

14   the 1st, I filled this out November the 1st and gave it to

15   Sheri Shawver.

16   Q    Okay.  And what were you trying to do here?  Why did you

17   fill this out?

18   A    I was trying to obtain access to the law library and my

19   legal materials that was in the property room.

20   Q    Did you get access to that through this form?

21   A    No.

22   Q    Okay.  And before I jump to page 2 of Exhibit S, I'm

23   going --

24   A    I should say not immediately.

25   Q    Okay.  When did you get your legal file?

1   A    I got my legal file November the 14th.

2   Q    Okay.  I'm going to show the witness something that has

3   not been admitted, Exhibit EE.  Do you recognize that, sir?

4   A    Yes, I do.

5   Q    Now that was a motion for an injunction you filed in the

6   Webb case; right?

7   A    Correct.

8   Q    Why did you file that motion in the -- well first, when

9   did you file it?

10  A    It was the early part of November because the Court got

11  it -- it was around the 4th or the 5th, and the Court received

12  it on the 8th and filed it.

13           MR. SIMON:  Okay.  And, Your Honor, I move the

14  admission of Exhibit EE.

15           THE COURT:  Any objection?

16           MR. KINGHORN:  Yes, Your Honor -- oh, I'm sorry, EE

17  you said?

18           MR. SIMON:  EE.

19           MR. KINGHORN:  No, no, Your Honor.

20           THE COURT:  Exhibit EE will be admitted.

21  Q    (By Mr. Simon) So, sir, this is your motion that you

22  filed in your Webb case; right?

23  A    Correct.

24  Q    And I'm not going to go through all these pages, but you

25  hand-wrote this motion, yes?

1  A    Correct.

2  Q    And, I don't know, it's got attachments to it.  What was

3  the purpose of filing EE?

4  A    I was desperately trying to get access to my legal files

5  and notify the Court that I was being denied those things by

6  the administration.

7  Q    Okay.  So the deadline of November 19th was in the Webb

8  case?

9  A    Correct.

10 Q    And you filed that motion for injunction, EE, in the Webb

11 case?

12 A    Correct.

13 Q    Okay.  And that was around November 8th.  Do you remember

14 the next thing you did or thereabouts?

15 A    I remember around November the 8th contacting my attorney

16 and having him understand my plight at the time.

17 Q    This was your post conviction attorney?

18 A    My post conviction attorney, Kent Gipson.

19        MR. SIMON:  I believe Exhibit 8 has been admitted.

20 Is that agreed?

21        MR. KINGHORN:  Yes.

22 Q    (By Mr. Simon) I will put that in front of you, sir.  Now

23 did you request that your attorney send a letter to Potosi

24 Correctional Center saying that they needed to give you access

25 to your legal file?

1    A    Correct.

2    Q    And is this a copy of that letter, Exhibit 8?

3    A    Yes, it is.

4    Q    And so he copied you on the letter and you got a copy of

5    it?

6    A    Correct.

7    Q    Okay.  And then after that, do you recognize -- well

8    here, I'm going to show you this and ask if you recognize it.

9    I don't know if it was after or before because the dates are a

10   little confusing on this.  But what is Exhibit Q?

11   A    It's a Property Room Request form.

12   Q    Is that something that you fill out, that somebody else

13   fills out on your behalf?  What is it?

14   A    No, that was filled out by Sheri Shawver, and I never saw

15   that document until the discovery.

16   Q    In this case?

17   A    In this case.

18   Q    Okay.  Had you ever seen this form before?

19   A    I have seen the form before, but I didn't see this form

20   until discovery when it was given to me.

21   Q    And in the times where you have been involved, have you

22   used this form before in other times?

23   A    Yes, I have.

24   Q    What is the purpose of it?  What do you use it for?

25   A    It is to obtain property or legal materials from the

126

1   property room when you are in ad-seg.

2   Q    So sometime around either November 1st or November 5th if

3   the dates are right, Ms. Shawver was requesting something from

4   the property room for you according to this?

5   A    According to that.

6   Q    But you didn't know about that?

7   A    No, I didn't know about that.

8   Q    And I am going to show you Exhibit R.  Has R been agreed

9   to?  I believe it has.  Yes, R has been agreed to.  Do you

10  recognize this, sir?

11  A    Yes.

12  Q    What is it?

13  A    That is a property room transaction document.  It's

14  actually a history of my documents, but the one at the top is

15  the one that the caseworker, not Sheri Shawver but Thomas

16  Collins, who took me to the property room to get my legal

17  materials on the 14th, 11/14.

18  Q    Okay.  That's Exhibit R.  Let's go back to Exhibit S,

19  page 2.  Is this something you filled out?

20  A    No, it's not.

21  Q    Okay.  So you didn't fill out this request for legal

22  file?

23  A    No, I didn't receive this document until the discovery of

24  this case.

25  Q    Okay.  And none of this handwriting on here is yours?

1    A    None of it.  It's Sheri Shawver's handwriting.

2    Q    Okay.  And then how about Exhibit S, page 3, do you

3    recognize that?

4    A    No, I never received that document or saw it until the

5    discovery of this case.

6    Q    Okay.  In your prior experience with the Qualified Legal

7    Claim Verification form, is that something you would usually

8    initiate?

9    A    Yes.  What has to happen is the inmate normally fills the

10   portion out dealing with the case, and you submit it to the

11   caseworker, and the caseworker will take it from there and

12   approve it or send it up for approval and it gets approved or

13   denied.

14   Q    Okay.  Back on that Exhibit EE, that motion for

15   injunction that you submitted, did Ms. Shawver submit an

16   affidavit in opposition to this motion for injunction in the

17   Webb suit?

18   A    Yes, she did.

19   Q    And did you receive a copy of that?

20   A    Yes, I did.

21   Q    Did she agree that you had requested your legal file?

22   A    Did she agree?

23   Q    In her affidavit, did she agree that, yes, you requested

24   your legal file?

25   A    No.

1   Q    Instead she said that you hadn't?

2   A    She said I never requested it.  In fact, I had a

3   conversation with her after receiving the affidavit, and she

4   ran away from my door.

5   Q    Okay.  And then apparently she submitted another

6   affidavit correcting that she, in fact, had received a request

7   from you?

8   A    Correct.

9   Q    Let's go to Exhibit G.  Do you recognize Exhibit G?

10  A    Yes.

11  Q    What is it?

12  A    It is a staff offender correspondence.

13  Q    And who is this to?

14  A    It's to me from Fred Johnson.

15  Q    Okay.  And what is the purpose of this?

16  A    I was complaining about not having received the TASC

17  order which when you are placed on TASC, temporary

18  administrative assignment, you are supposed to be given a TASC

19  order, and a TASC order is supposed to identify why you are

20  actually emphatically placed in ad-seg.  I didn't receive one.

21  Along with that, they went beyond the time period that they

22  were supposed to.  I was supposed to have been seen by the

23  classification staff, and so I acknowledged these things to

24  them in this particular document -- I mean, in a letter, and

25  he responded in this particular document.

1   Q    Okay.  So explain the difference between TASC -- which is

2   housing 2 upper floor; right?

3   A    Three.

4   Q    Three, I'm sorry.  And administrative segregation --

5   which is 2?

6   A    Right.

7   Q    Okay.  What's the difference?

8   A    TASC is temporary administrative assignment; ad-seg is

9   you are assigned.  It's nothing temporary about it anymore.

10  It is to be determined when you will be released.  And so when

11  I was initially placed on TASC, it was for an inquiry

12  investigation according to Lancaster after I saw him on the

13  30th, October 30th, and I never was released from ad-seg.  I

14  was released from TASC to ad-seg, and until I was transferred,

15  that's where I was.

16  Q    Okay.  And were you ever released back into general

17  population at Potosi?

18  A    No.

19  Q    Okay.  Let's talk about the Computer Verified Stress

20  Analysis test.

21  A    Correct.

22  Q    How did you know about that?

23  A    Lancaster, Mr. Lancaster, had asked me if I would take

24  one during the interview, and I agreed to, and actually he

25  seemed to be startled that I agreed to it, and I asked him

1  could we take it today, and he said no, and so in every

2  opportunity that I got, I initiated the request for that, and

3  no one would respond favorably, and so it was just always

4  denied.

5  Q    Had you ever taken one before?

6  A    No.

7  Q    Had you ever seen another inmate have one?

8  A    No, but I knew that there was incidents in the factory

9  before where they had been administered, so I knew that it

10  could happen.

11  Q    Do you feel that you were wrongfully singled out with

12  respect to the knife?

13  A    I believe I was targeted from the very beginning.

14  Q    Okay.  Why do you think that in addition to what we

15  already talked about?

16  A    You know, you can't always articulate when a person or

17  how a person is retaliating against you, but you know it, and

18  Potosi has a history of this, and so when I was placed in

19  segregation and I was placed on TASC with another inmate, a

20  white inmate, and he was released the next day, it was pretty

21  much from that point that I knew what this was all about, and

22  the course of action, it just confirmed for me that this was

23  me being targeted for this lawsuit.  The statements that were

24  made to me, it was just all confirming to me.  And so I

25  screamed at every opportunity that I could in letters or

131

1   whatever and cited retaliation, but my mind was mainly focused

2   on me getting my legal work.  I wanted to make my court

3   deadlines and not mess up my case.

4          MR. SIMON:  Okay.  May I approach, Your Honor?

5          THE COURT:  You may.

6   Q    (By Mr. Simon) I am going to hand you Exhibits M, N, and

7   O, and I just want you to tell me what they are.

8   A    Exhibit M is a letter that I wrote to the Inspector

9   General.

10  Q    What date?

11  A    November -- it was received -- I wrote it November

12  the 1st.  It was received by them November the 9th.

13  Q    Okay.  And Exhibit N, what is it?

14  A    Exhibit N is a letter that I wrote to the Deputy Director

15  Dwayne Kempker on November the 6th.

16  Q    Okay.  And what is Exhibit O?

17  A    And Exhibit O is a letter that I wrote to the director,

18  George Lombardi, on November the 1st.

19  Q    And were all those letters related to the incident that

20  we've been talking about in getting access to your legal file?

21  A    Yes.

22  Q    Okay.  There's been some testimony that you worked in the

23  metal factory, the knife they believe was made in the metal

24  factory, and you lived in that housing unit.  Was there

25  another -- and you don't need to give me his name, but was

132

1   there another person incarcerated at Potosi who met those same

2   three characteristics?

3   A    In the wing where I resided as well as A wing, there were

4   metal factory workers.

5   Q    Now with respect to the particular metal factory worker,

6   we will call him Offender S, that was in solitary confinement

7   for a short period of time, had he also worked in the metal

8   factory?

9   A    Yes, he did.

10  Q    Did he live in your wing?

11  A    Yes, he did.

12  Q    And how long had -- was he in the metal factory working

13  before you were there?

14  A    He's worked in the metal factory longer than anybody.

15  He's been down there since 1989.

16  Q    Did he help you at all learn how to do anything in the

17  metal factory?

18  A    He was one of the individuals that taught me how to weld,

19  and I was by no means a prolific welder, but guys was working

20  with me trying to teach me how to weld, how to grind, how to

21  tack weld, different things like that.

22  Q    Now there's been some testimony about an unreliable

23  anonymous letter that was sent or a kite I think it's called,

24  and there was another inmate, C we'll call him or Inmate J,

25  that was identified in this letter.

1    A    Correct.

2    Q    All right.  And was he kept in ad-seg as well?

3    A    Yes, he was.

4    Q    And how long was he kept in ad-seg?

5    A    He was placed in ad-seg on I believe the 5th of November,

6    and nobody interviewed him or anything.  He stayed in that --

7    he left his cell one time and that was to go be assigned by

8    the classification committee, and he was released on like

9    the 14th of November.

10   Q    And how long did you work at the metal factory?

11   A    Almost a year, right at a year.

12   Q    Okay.  Before the incident?

13   A    Yeah, before the incident.

14   Q    Okay.

15   A    I worked down there prior to that, but I was locked up

16   before and under investigation by Lancaster, which led to that

17   Webb suit.

18   Q    Now you had two classification hearings.  You understand

19   what those were, to see if you could get out of ad-seg?

20   A    Correct.

21   Q    Did you participate in those?

22   A    Yes, I did.

23   Q    And at the time you had those hearings, did you tell the

24   committee that the investigation was over?

25   A    I informed the committee that -- I didn't even know the

1    investigation was over because I was still being told it was

2    ongoing, but I did tell the committee that I was being

3    wrongfully held in ad-seg in retaliation for my lawsuit.

4    Q    And when did you finally find out that the investigation

5    by Mr. Lancaster was concluded November 29, 2012?

6    A    I found out when it was actually concluded during the

7    discovery and I got certain documents in discovery.  That's

8    when I found out officially when it was actually concluded.

9    Q    Okay.  Now when you say discovery, for the jurors, that

10   means in this lawsuit after you filed the lawsuit, the parties

11   exchange documents?

12   A    Correct.  I should say prior to that, prior to that, I

13   found out it had actually concluded because I was transferred

14   to another institution January the 22nd and released into

15   general population with an order to be released into general

16   population.  So I knew it was officially over then, but other

17   than that, during discovery of my lawsuit, then I received the

18   official documents stating that it was concluded at a

19   particular time.

20           MR. SIMON:  Okay.  If I could just have a quick

21   moment, Your Honor?

22           THE COURT:  Sure.

23           MR. SIMON:  That's all I have at this time, Your

24   Honor.

25           THE COURT:  Cross?

135

1    MR. KINGHORN:  Yes, Your Honor.

2                    CROSS EXAMINATION

3    BY MR. KINGHORN:

4    Q    Good afternoon, Mr. Davis.

5    A    Good afternoon.

6    Q    I want to just run through a little more slowly some of

7    the timeline.  So according to your complaint, on October 26,

8    2012, you learned from other offenders that a knife had been

9    found in the prison; is that correct?

10   A    Yes, I did.

11   Q    Okay.  And then you also mentioned in your complaint that

12   the offenders who worked in the metal factory at that time

13   were strip searched; is that right?

14   A    Correct.

15   Q    Okay.  Then on October 29, 2012, in your complaint you've

16   stated that you were escorted to ad-seg by two corrections

17   officers, a Ms. Pashia and a Mr. Hall; is that correct?

18   A    Correct.

19   Q    All right.  And according to your complaint, you learned

20   from Officer Pashia that Captain White ordered her to bring

21   you to ad-seg; is that right?

22   A    I believe that may be correct.  He was the shift

23   commander I learned at that time, so that may be correct.

24   Q    Do you recall putting that in your complaint?

25   A    I don't recall.  I may have, I don't recall though.

1   Q    Sure.  Would it help you remember if you could see your

2   complaint?

3   A    Yeah.

4        MR. KINGHORN:  Okay.  May I approach the witness,

5   Your Honor?

6        THE COURT:  You may.

7        MR. KINGHORN:  I'm going to go ahead and flip to the

8   paragraph for you here.

9        MR. SIMON:  I'm sorry, what page are we on?

10       MR. KINGHORN:  We are looking at paragraph 16.

11       MR. SIMON:  Of the complaint?

12       MR. KINGHORN:  Yes.

13       MR. SIMON:  Thank you.

14       THE WITNESS:  Yes, according to Officer Pashia,

15  Captain White directed them to take me to segregation, to

16  TASC.

17  Q    (By Mr. Kinghorn) All right.  And you asked Officer

18  Pashia why you were being held in ad-seg; correct?

19  A    Correct.

20  Q    And at that time, she informed you that you were under

21  investigation?

22  A    Right, but she wouldn't give me any details about why I

23  was being investigated.

24  Q    All right.  And you also talked about a TASC order

25  earlier.  Now you asked Officer Pashia for a copy of that TASC

137

1    order; is that correct?

2    A    Correct.

3    Q    When she brought you to ad-seg?

4    A    Correct.

5    Q    All right.  And then you also asked an officer named

6    Sullen for a copy of that TASC order; is that correct?

7    A    Correct.

8    Q    All right.  And those are the two officers that brought

9    you to ad-seg?

10    A    No.

11    Q    Okay.

12    A    Officer Pashia and Officer Hall are the two officers that

13    escorted me to ad-seg.

14    Q    Okay.  And Officer Sullen was --

15    A    Officer Sullen was simply an officer that worked in

16    housing unit 3.

17    Q    Okay.  And so I take it that neither of those officers

18    gave you the TASC order?

19    A    No, they didn't.

20    Q    All right.  Then the next day on October 30, 2012, in

21    your complaint you state that Timothy Lancaster interviewed

22    you about the knife that had been found; is that right?

23    A    Correct.

24    Q    All right.  You stated in your complaint that Timothy

25    Lancaster informed you that you and another inmate were both

1    being held in ad-seg under investigation at that time?

2    A    Correct.

3    Q    And he also told you that you were both under

4    investigation because you were the only two inmates in that

5    housing unit wing who both lived in that housing unit wing and

6    also worked in the metal factory?

7    A    Correct.

8    Q    Other than those two things that were mentioned to you,

9    do you know what other evidence the prison staff had against

10    you during the investigation?

11    A    The prison staff never had any evidence against me during

12    this investigation.  What they label as evidence is something

13    else, but they never had any evidence against me because I

14    never did anything wrong.  I didn't make the knife.  I didn't

15    know about the knife.  I didn't have a clue the knife existed.

16    They acknowledged that they didn't have evidence that I knew

17    about the knife or made the knife, so there was no evidence.

18    Q    You don't believe there was any evidence against you in

19    the investigation?

20    A    There wasn't any evidence.

21    Q    Would you agree that just because you were not told what

22    the evidence is that they had, that doesn't necessarily mean

23    they didn't have any?

24    A    They had no evidence.  You can only produce evidence of

25    something if somebody has done something.  I did nothing.

1   Q   But my question is, would you not agree with that

2   statement?

3   A   No, I don't agree with that statement.

4   Q   You testified earlier that when you were placed in

5   ad-seg, you had a November 19, 2012 court deadline in Davis

6   versus Webb; is that correct?

7   A   Correct.

8   Q   Do you recall requesting an extension of that deadline?

9   A   Yes, I did.  I was forced to.

10  Q   And that was granted?

11  A   Yes, it was.

12  Q   And, Mr. Davis, you are incarcerated because of a felony

13  conviction; is that right?

14  A   Yes, I am.

15  Q   And what felony were you convicted of?

16  A   First degree murder.

17       MR. KINGHORN:  Just one moment, Your Honor.  I have

18  no further questions for Mr. Davis at this time.

19       THE COURT:  Very well.  Redirect?

20       MR. SIMON:  Your Honor, I just had one followup

21  question.

22                    REDIRECT EXAMINATION

23  BY MR. SIMON:

24  Q   Mr. Davis, what happened to your job?

25  A   My job was -- I was terminated because of this

 1   investigation and me being transferred.

 2            MR. SIMON:  Thanks.

 3            THE WITNESS:  You're welcome.

 4            MR. KINGHORN:  Nothing further.

 5            THE COURT:  All right.  Is this witness excused for

 6   now?

 7            MR. SIMON:  Yes, Your Honor.

 8            THE COURT:  All right.

 9            MR. SIMON:  We have one more witness.

10            THE COURT:  We will take a short break right now.

11   During the course of the recess, again do not discuss the case

12   amongst yourselves or with anyone else.  Do not allow anyone

13   to discuss it within your hearing or presence.  Do not form or

14   express any opinions about the case until it is given to you

15   to decide.  Do not use your cell phones to interact with the

16   internet in any way.  Temporary recess.  Ten minutes?

17            MR. SIMON:  Five is fine, Your Honor.

18            THE COURT:  Ten minutes.

19        **(Court Recessed from 2:30 p.m. until 2:40 p.m.)**

20            THE COURT:  Call your next witness.

21            MR. SABLEMAN:  Your Honor, the plaintiffs call Warden

22   Steele.

23            THE COURT:  Warden Steele, step forward and be sworn

24   in by the clerk.

25                            **TROY STEELE,**

**Having Been First Duly Sworn, Was Examined and Testified As Follows:**

3    THE COURT:  Proceed.

4    <u>DIRECT EXAMINATION</u>

5  BY MR. SABLEMAN:

6  Q    Mr. Steele, please state your name for the jury.

7  A    Troy Louis Steele.

8  Q    What is your current position?

9  A    I'm the warden at the Eastern Reception Diagnostic

10 Correctional Center.

11 Q    That's ERDCC?

12 A    Yes, sir.

13 Q    And that's where Mr. Davis is now?

14 A    Yes, sir.

15 Q    Where were you employed in 2012?

16 A    I was the warden at the Potosi Correctional Center.

17 Q    Are you aware of Mr. Davis's suit, his prior lawsuit?

18 A    Yes.

19 Q    What was your involvement in that lawsuit?

20 A    I don't remember having any involvement with the lawsuit.

21 Q    And the events giving rise to that lawsuit?

22 A    The same, I don't remember having any involvement with

23 it.

24 Q    Mr. Lancaster worked for you at that time as well; right?

25 A    Yes, sir.

1    Q    As the investigator?

2    A    He was the administrative inquiry officer.

3    Q    Who performs investigations, inquiries?

4    A    Yes.  Yes, sir.

5    Q    Okay.  What did you first do on October 26th, the day the

6    knife was found?  What did you first do that day?

7    A    I think it was the -- I don't remember if it was the day

8    it was found or the day after it was found, we had a morning

9    meeting, which we have every morning, and they brought the

10    knife up, showed it to me, brought it to my attention of what

11    the knife was, and we immediately got the team together to try

12    to ascertain, you know, where it was made and what we were

13    going to do about it.

14            MR. SABLEMAN:  I would like to publish to the jury

15    Exhibit 4 which has already been stipulated to.

16            THE COURT:  Very well.

17    Q    (By Mr. Sableman) Paragraph 5, you consulted with MVE

18    metal factory employees, you believe the knife was made there.

19    You talk about the knife a little bit, a very detailed knife.

20    A    Slow down.  You are a little faster than me.

21    Q    Sure.  Sure.  I'm more interested in paragraph 6.  I am

22    going to slide up here.

23    A    Okay.  Thank you, sir.

24    Q    So you assembled a team -- this is your affidavit -- I'm

25    sorry, I should have prefaced that -- in this case.  Do you

1    agree?  Do you recognize this document?

2    A    Yeah.  Yes, sir.

3    Q    It says you assembled a team and spoke with some of the

4    offenders at the metal factory that morning in an attempt to

5    covertly ascertain who built the knife.  What did you mean by

6    "covertly"?

7    A    Well, I think we're a little further down the line.  When

8    I say I assembled my team, that was my administrative staff.

9    So initially when they brought it to my office, I talked with

10   my staff, and we looked at the knife and it was pretty quickly

11   ascertained that it was either manufactured -- well, it had to

12   have been manufactured at the factory.  It was the only place

13   where there was a welder that the offender population had

14   access to, which then led me to go down to MVE and speak with

15   the supervisor down there.

16   Q    Why did you personally go to the metal factory?

17   A    First, I was down there a lot.  I had a lot of access to

18   the metal factory.  And second, Mr. Lancaster wasn't there at

19   that time.

20   Q    Do you know why the metal factory in the housing unit

21   wasn't locked down on October 26th, the day the knife was

22   found?

23   A    I wanted to try to ascertain information before we jumped

24   to any conclusions.

25   Q    Is that what you meant by "covertly"?

1   A    Yes.

2   Q    So you didn't lock-down the institution so that you could

3   covertly obtain information?

4   A    Correct.

5   Q    Is that risky from a security standpoint?

6   A    If it was, I wouldn't have done it that way.

7   Q    So the risk was low enough that you could covertly obtain

8   information rather than locking down the institution when you

9   found the knife?

10  A    Correct.

11  Q    Okay.  Were the metal factory workers permitted to go to

12  work that day?

13  A    They were already at work when I found out about the

14  knife.

15  Q    Who found out about the knife overnight?

16  A    I don't know the name of the corrections officer, but it

17  was found by one of the corrections officers in the housing

18  unit.

19  Q    So nobody alerted you until the metal factory was already

20  open?

21  A    Correct.

22  Q    And you chose not to shut it down immediately?

23  A    Correct.

24  Q    So you said "offenders told us the knife was built due to

25  a white/black struggle which was started by a white offender.

1    The knife was made by a black offender who resided in housing

2    unit 6.  His primary function at the MVE was to weld and

3    grind.  The other black offenders were going to stab the white

4    offender when he was released from ad-seg."  Did you

5    collect -- you collected this information from offenders?

6    A    Correct.

7    Q    And these were offenders who worked at the metal factory?

8    A    Yes, sir.

9    Q    Did you take notes of these meetings you had, these

10   conversations?

11   A    No.

12   Q    Did you tell Mr. Lancaster about these meetings you had?

13   A    Yes.

14   Q    Why didn't they end up in his report?

15   A    At that point, it wasn't part of the report.  I initiated

16   the investigation with him to start the investigation, and I

17   just told him at that point what I had discovered.

18   Q    You heard Mr. Lancaster testify that he was not aware of

19   a white/black struggle when he began the inquiry.  He may have

20   become aware of it sometime during the inquiry.  So what

21   accounts for the fact that Mr. Lancaster was not aware of

22   these conversations?

23   A    I probably initially didn't tell him.

24   Q    So you had him start an investigation but didn't give him

25   this evidence you had obtained?

1   A     Well, a lot of times -- and this is something that you

2   have to understand when you are a warden or you work at an

3   institution.  You hear a lot of hearsay things.  You get

4   things from offenders, and sometimes it's better to let

5   somebody else vindicate what you found out by finding it out

6   themselves.  If I had already told him what I knew, you know,

7   then we would be jumping to a conclusion.  As far as I knew,

8   this was hearsay information, so I didn't know that there was

9   any credibility to it at all.  It's just what I had been told.

10  Now if he had went out and came back to me and said, hey, I'm

11  hearing out on the yard this and this and this, then I would

12  have told him I am hearing the same thing, and then, you know,

13  we're both getting together the same information from

14  different sides.  But, you know, I could have been being

15  misled.  I could have been, you know, being sent on a -- been

16  given false information or whatever.  So at that time, it

17  wasn't necessary for me to tell him.

18  Q     So this unreliable information told you that there was

19  some indication among the prison population that Mr. Davis was

20  involved; is that right?  Some indication that Mr. Davis was

21  involved?

22  A     Repeat the question please.

23  Q     These interviews gave you some indication that Mr. Davis

24  was involved in the knife?

25  A     There wasn't any interviews.

```
 1   Q     Say that again.

 2   A     There wasn't interviews.

 3   Q     There wasn't interviews?

 4   A     No.

 5   Q     Why did you appoint Mr. Lancaster to this suit knowing

 6   that there was some evidence that Mr. Davis may have been

 7   involved?

 8   A     That was his job.

 9   Q     But you were aware that Mr. Davis had a lawsuit pending

10   against Mr. Lancaster?

11   A     Yes, sir, I was.

12   Q     And you didn't think that presented any type of conflict?

13   A     No.

14   Q     Could you have appointed someone else to investigate the

15   knife?

16   A     There wasn't anyone else that held that position at the

17   prison.

18   Q     Let me ask you again.  Could you have appointed someone

19   else to investigate the knife?

20   A     I could have requested one of the other wardens to send

21   someone over, but I couldn't have demanded that they send me

22   somebody, no.

23   Q     You could have designated someone else, but you are

24   saying you couldn't have demanded.  What's the difference

25   between designated and demanded?
```

1   A    That's not what I said.  What I said was I could have

2   talked to one of my co-wardens and asked them if they could

3   have sent me one of their administrative inquiry officers to

4   do the job of my administrative inquiry officer, but I

5   couldn't have demanded of them and made them send me anybody.

6   Q    So let's fast forward to October 29th, three days into

7   the investigation.  The knife was found on October 26th.  You

8   wrote a letter to the Deputy Division Director Mr. Kempker.

9   You updated him on the status of the investigation.

10  A    Yes, sir.

11  Q    And this is Exhibit C which has been stipulated to.

12  A    You're going to have to give me -- my bifocals -- just a

13  second.

14  Q    Yes.  Let me pull it up.  This has been admitted into

15  evidence.  This letter is dated -- oh, this is dated October

16  26th, excuse me.

17  A    Yeah, that was the date of the incident, the initial

18  information that I did.

19  Q    Yes, in this letter you inform Mr. Kempker that you are

20  opening an investigation; correct?

21  A    Correct, and that I was shutting down the factory.

22  Q    And shutting down the factory, okay.  This is a letter

23  three days later that you sent again to Mr. Kempker,

24  October 29th, a weapon found in the housing unit.  This is

25  Exhibit D.  It has been admitted into evidence.  "The search

1    of the metal factory was concluded.  It did not result in any

2    additional -- metal for a weapon -- two computers were

3    removed, one suspect has been" -- okay, you say "we will be

4    releasing housing unit 5 metal factory workers to work normal

5    operations on Tuesday."  Did you intend to re-open the factory

6    on Tuesday?

7    A    Yes, sir.

8    Q    Okay.  "One suspect has been identified, Davis.  He will

9    be continued in ad-seg pending inquiry.  Information at this

10   point is from confidential informants."  Were those the metal

11   factory workers you spoke to?

12   A    Yes, sir.

13   Q    "And we have no hard evidence.  The other housing unit 6

14   offenders will be released on Wednesday as there is no grounds

15   to continue their ADS assignment.  Review of the computers

16   will be completed tomorrow.  Any inappropriate content will be

17   deleted."  You said you feel that "complete return to normal

18   operation Wednesday morning and will forward more information

19   at the conclusion of the inquiry into Frederick Davis."  So

20   you had concluded the search of the metal factory on

21   October 29th; is that correct?

22   A    Yes, sir, I believe that was after we had sent the team

23   down and they had completed their search of the factory.

24   Q    And then on Monday you planned to reopen it the next day

25   to release the housing unit 6 offenders.  I am looking at

1    paragraph 10 at the top.

2    A    Yes, sir.

3    Q    Could those confidential informants that you interviewed

4    at the metal factory, could they have been lying to you?

5    A    Yes, sir.

6    Q    And did you use those confidential informants to confine

7    Mr. Davis in ad-seg?

8    A    In part.

9    Q    Did confinement in ad-seg make it easier or harder for

10   Mr. Davis to access his legal materials?

11   A    I would have thought it would have made it harder.

12   Q    Did Mr. Davis request to be released from ad-seg?

13   A    Yes, sir.

14   Q    Did you have the authority to release him from ad-seg?

15   A    Yes, sir.

16   Q    I would like to talk about this anonymous letter.  I'm

17   going to fast forward to paragraph 14.  "On November 1st, I

18   gave Mr. Lancaster a copy of a typed letter from an offender

19   that said Davis and another Offender {redacted} made the

20   knife."  We'll call that offender Offender J.  "Offender J was

21   placed in temporary ad-seg."  You said that Davis and another

22   offender made the knife.  That's not entirely accurate, is it?

23   A    Repeat the question, I'm sorry.

24   Q    Is that entirely accurate that Mr. Davis and Offender J

25   made the knife?  Is that statement completely accurate or are

1   you interpreting the letter a little bit?

2   A    No, I'm pretty much saying exactly what the letter said.

3           MR. SABLEMAN:  May I approach the witness and give

4   him a copy of the letter?

5           THE COURT:  You may.

6           THE WITNESS:  Yeah.  I'm sorry, my bifocals, it's

7   hard for me to see the screen.

8   Q    (By Mr. Sableman) This is the kite.  This is the

9   anonymous letter.  I would like to direct your attention to

10  the third paragraph, and it said the writer of this letter --

11  and it's acknowledging that this turned out to be false, the

12  letter.

13          MR. KINGHORN:  Can you tell me what exhibit that is?

14          MR. SABLEMAN:  Oh, sorry, J.  This is marked as

15  Exhibit J.

16  Q    (By Mr. Sableman) "I don't know the specifics of who

17  actually carried the knife.  All I know to be a fact is that

18  Jordan made it for Fred and Fred was doing it for a dude named

19  {redacted}."  So the author of this letter, we don't know who

20  that is, they are saying "I know for a fact Jordan made it."

21  So when you say Davis and J made the knife, that's not

22  entirely accurate because Offender J made the knife for Davis;

23  correct?

24          MR. KINGHORN:  Your Honor, I object.  This is

25  mischaracterizing the witness's testimony.

1          THE COURT:  Overruled.

2          THE WITNESS:  Still I'm not really understanding what

3     you are trying to say.

4     Q    (By Mr. Sableman) So you wrote "Davis and Offender J made

5     the knife."  This is in your affidavit under penalty of

6     perjury; correct?

7     A    You are saying that on number 14?

8     Q    Fourteen.

9     A    Right.  What I said was I gave Mr. Lancaster a copy of a

10    letter of an offender that said, the letter said, that Davis

11    and Offender J made the knife.  I didn't say it.  I said the

12    letter said it.

13    Q    But that's not what the letter said.  The letter said

14    that Offender J made the knife for Fred and Fred was going to

15    pass it to someone else; correct?

16    A    Correct.

17    Q    When Mr. Lancaster determined that this letter was

18    unreliable, it was possibly intended to frame Mr. Davis, why

19    was Davis not released?

20    A    Because there was a lot of other circumstantial evidence.

21    Q    And by a lot of circumstantial evidence, you mean he

22    lived in the housing unit wing where the knife was found?

23    A    In part.

24    Q    What else did you rely on?

25    A    Well, you've got to go back to when I went to the housing

1   unit -- or actually went down to the factory.  I had been a

2   frequent person down at the factory.  I went down to the

3   factory.  I knew all the guys.  I had been all over the

4   factory.  As I walked around the factory, this time I went

5   into the office, and I told them to gather several of the

6   kind-of lead men that they had in the factory that had key

7   positions all over the factory, both of color and not, and I

8   brought them in and told them that a weapon had been found

9   that I knew was made at the factory.  I didn't tell them where

10  it was found.  I didn't say anything like that.  All I told

11  them was that a weapon had been found, I knew that it had been

12  made at the factory, and I told them that all the times that I

13  have come down there, you know, it was an understanding that

14  when I came to the factory, that we wouldn't discuss anything

15  other than work that was going on in the factory.  You know, a

16  lot of times they'll catch you and talk about housing unit

17  moves or talk about other issues, but when I went to the

18  factory, we normally just discussed the projects they were

19  making, some of the things that they were working on, etc.

20      On that particular day, I told them that I was going to

21  breach this and that I needed to know exactly whether there

22  were more weapons, who made the weapon, and I said, listen, I

23  don't ask you guys to tell on other people, I don't ask for

24  that kind of information, I don't work with so-called

25  snitches, but this is a dangerous instrument, someone in this

1    institution could have gotten killed, I don't know what is

2    going on here, I don't know if it's for a staff member, if

3    it's for an offender, but I want to know now who made it.  I

4    said, You, guys, out of here, you've got about five minutes.

5         So I went into the office.  I sit down and I talk with

6    Mr. Nipper for awhile.  I let the offenders go.  I walked

7    around the factory, and as I walked around, I kind of went in

8    and out -- the way the factory is set up, it's a big building

9    about the size of this room.  There is a lot of machinery in

10   the middle and then as the plaintiff testified, starting about

11   midway over here, there is some curtains that go around that

12   are dark because when they are welding, they have to shut them

13   to protect your eyes.  So those curtains go about, you know,

14   in like a little bit of an L and then there is machinery all

15   over here, there is machinery all in the middle.  There is a

16   paint room over here.  There is a plasma cutter room here and

17   then over here there is a build room and then there is a

18   warehouse dock.  So you have got inmates that are all around

19   there.  I went around and I spoke with different inmates, and

20   every inmate not knowing exactly what housing unit or what was

21   found --

22   Q    Can we get back to the question that I asked which was

23   about other evidence you relied on?

24   A    I am getting to that.  So all of the different offenders

25   as I walked around told me the same name.  So then I went into

155

1    the paint shop, and there was four or five offenders that were

2    in there, maybe six, and they handed me a little piece of

3    paper and then they walked out, and it had the plaintiff's

4    name on that piece of paper.  So I went back out, took the

5    piece of paper, threw it in the trash can --

6    Q    Excuse me, I have to stop you there.  You threw out the

7    piece of paper with Mr. Davis's name on it as soon as it was

8    given to you?

9    A    Correct.

10   Q    Why would you do that?

11   A    Because --

12   Q    It's evidence.

13   A    Right.  Because at this point, it's not really evidence.

14   It's still hearsay from an offender population.  I haven't had

15   anybody tell me they saw him make the knife.  All I have had

16   is people telling me this is who they think made the knife.

17   Q    Thank you.  I think you have answered the question.  I

18   want to take you back to the comments that you heard about a

19   white/black struggle.  You did hear comments from the people

20   you spoke to that day, October 26th, about a white/black

21   struggle; correct?

22   A    Yes.

23   Q    You then relayed that comment about the white/black

24   struggle to your boss, Mr. Kempker; correct?

25   A    Yes.

1  Q    But you didn't think to tell that to Mr. Lancaster;

2  correct?

3  A    Yes.

4  Q    Why didn't you tell it to Mr. Lancaster?

5  A    I already told you.  I didn't tell Mr. Lancaster because

6  I didn't want him to jump to conclusions.

7  Q    Okay.  "On November 29th, Mr. Lancaster closed his

8  inquiry into Mr. Davis.  He said it was not sustained.  They

9  did not have evidence to issue a conduct violation; however,

10  Mr. Davis was not released at that point."  Why wasn't he

11  released?

12  A    Because I told Mr. Lancaster and I told the

13  administrative team that I did not want him released.

14  Q    So this decision came from you?

15  A    From me, yes.

16  Q    Why wasn't Mr. Davis released after his classification

17  hearing on December 4th?

18  A    There was a couple of reasons.  One of the reasons was,

19  even though the initial investigation had been completed, I

20  was waiting to see if any additional information had came up.

21  The other reason was is there was a lot of feedback that there

22  were some hostilities toward Mr. Davis, and I was beginning to

23  get information that I felt that him going back into the

24  population could either, A, be a threat to someone else

25  because I still had believed that he had made the knife, or

1   that someone may pose a threat to him.  So I was still waiting

2   to get additional information back on what was going on.

3   Q    Why were you expecting additional information when Mr.

4   Lancaster had already concluded his investigation?  Who was

5   looking for additional information?

6   A    I think at this point, we were just pausing to see if any

7   additional information would come to light and waiting to see

8   for a transfer to be written for him to leave.

9   Q    Why wasn't Mr. Davis released after his committee hearing

10  on January 2nd?

11  A    Well because although I didn't get a chance to tell you

12  all the circumstantial evidence, there was still other

13  evidence, and I believed and still believe that he made the

14  knife, and I would not release him back into that population.

15  Knowing his case, knowing that in my mind he did make the

16  knife, even though we couldn't prove it, I felt that there was

17  a purpose for that and that either someone else was in danger

18  or now that it was out there and people knew about it,

19  Mr. Davis could be in danger.

20  Q    You didn't tell Mr. Lancaster about any of these

21  additional rumors, and you didn't tell Mr. Kempker.  Did you

22  tell anybody about these rumors or did you keep them to

23  yourself?

24  A    I think I kept most of them to myself.

25  Q    Do you have any documents that can support any of these

1    rumors you were hearing past the conclusion of the

2    investigation?

3    A    No.

4    Q    Did you make any notes of the rumors?

5    A    Nope.

6    Q    You may have thrown them out if you did?

7    A    I didn't hear that.  Excuse me?

8    Q    Could you have thrown out the notes?

9    A    I didn't make any notes.

10   Q    You didn't make any.  Let me just -- you have the kite in

11   front of you still; right?

12   A    Yes, sir.

13   Q    So that same paragraph, it says "Offender J made the

14   knife for Fred who was going to give it to a third offender."

15   It's redacted.  We don't know who it is.  Did you do anything

16   to investigate that third offender?

17   A    I turned this over to Mr. Lancaster.

18   Q    So you let him handle the letter?

19   A    Yes.

20   Q    Okay.  Let me just cover the other inmate, Offender S,

21   who was also confined at the same time as Mr. Davis because he

22   lived in the same housing unit, same wing.  Are you familiar

23   with the person I'm talking about?

24   A    Yes, sir.

25   Q    Do you have any personal knowledge as to what skills he

1   possessed in metal working?

2   A    I met with -- Mr. Nipper was new to the institution.  I

3   waited until Mr. Kennon who ran the factory for years and

4   years had returned back to the institution.  When Mr. Kennon

5   got to the institution, I actually showed him the knife.  I

6   spoke with him about it.  He went over and showed me the bolts

7   that the knife was made out of.  He said, well, this is

8   obvious that this was manufactured here.  We went over and

9   there was a little nut that was on the blade, he showed me

10  where the nut was, and he was, you know, very -- he was upset,

11  the fact that something like that had happened, and then I

12  talked to him about where it was found and told him that there

13  was two individuals living in the wing.  He said, Look, I have

14  known this other guy, he's worked here for years, there is no

15  way that he had the skills to make that knife.  And based on

16  the information that the supervisor was saying he did not have

17  the skills, we released him.

18       MR. SABLEMAN:  Your Honor, motion to strike that

19  answer as hearsay to the extent he related what that other

20  individual told him.

21       MR. KINGHORN:  Your Honor, it's not hearsay.  One,

22  it's not offered for its truth.  He is offering it -- his

23  testimony goes towards his motivations and how he responded to

24  the information.  Whether it was true or untrue, if Mr. Steele

25  believed it and acted accordingly, then it's entirely relevant

1   to the retaliation claim, which one of the big elements is

2   motivation.

3        MR. SABLEMAN:  Your Honor, my original question was

4   whether he had firsthand knowledge of who had skills not

5   whether he heard someone else say that they had knowledge.

6        THE COURT:  Right.  So to that extent, the objection

7   is sustained as to the portion of the witness's statement

8   referencing what someone else said.  Proceed.

9   Q   (By Mr. Sableman) I would like to talk to you about the

10  truth verification test.

11  A   Yes, sir.

12  Q   Before I do so however, the Offender S, he did not have a

13  lawsuit pending against Mr. Lancaster, did he?

14  A   I don't know.

15  Q   You were not aware of any lawsuits?

16  A   I don't know whether he had a lawsuit against

17  Mr. Lancaster or not.

18  Q   Offender J, the one mentioned in that kite, did he have a

19  pending lawsuit against Mr. Lancaster that you were aware of?

20  A   I don't know.

21  Q   When are truth verification, CVSA, tests used?

22  A   I don't use them.

23  Q   Do you know when they are used?

24  A   I don't use them.  I don't believe in them so I don't use

25  them.

161

1   Q     Do you know that they are sometimes used during

2   investigations for contrabands?

3   A     Yes, I know that, not necessarily for contraband, but I

4   know that they are used in the department, but I don't use

5   them.

6   Q     I'm going to return to your affidavit, paragraph 17.

7   This is Exhibit 4, and I would like to direct your attention

8   to paragraph 17, which states "the inquiry Mr. Lancaster

9   conducted did not permit use of a truth verification

10  examination according to department policy and procedures."

11  Do you stand by that statement?

12  A     At that time, yes.

13  Q     You stated in your deposition -- do you remember taking

14  your deposition?

15  A     Yes, sir.

16  Q     Do you remember taking an oath to tell the whole truth

17  and nothing but the truth?

18  A     Yes, sir.

19  Q     I'm going to give you a copy of your deposition, and I

20  would like to direct your attention to page 39.

21  A     Yes, sir.

22  Q     Starting on line 18, page 39, you were asked -- sorry,

23  line 19, "According to truth verification exam policies, there

24  is nothing that would prevent you from administering a truth

25  verification exam to Davis during an inquiry investigation

162

1  about a knife; is that correct."  And your answer beginning on

2  line 25 is, "No, there was nothing that said we couldn't have

3  used it."

4  A    Correct.

5  Q    Do you believe that the policies changed such that the

6  department policies did not permit use of a truth verification

7  test in 2012 but they did permit it in 2015 when you gave this

8  deposition?

9  A    Say it again, I'm sorry.

10 Q    Do you believe that the MODOC policies regarding truth

11 verification tests changed between the investigation and when

12 you testified in this deposition?

13 A    No.  I was shown the policy yesterday, and I know that

14 they were not.

15 Q    That they are permitted?

16 A    Yeah.  I know that the policy was not changed.

17 Q    Okay.  And you know that truth verification tests are not

18 prohibited by any policy?

19 A    No, I didn't say that they were prohibited by policy.  I

20 said I wasn't allowed to do them at the time of this event.

21 Q    I would like you to look at 17 and tell me is this

22 truthful as you sit here today?  Is that a true statement or

23 not?

24 A    Where are we at, sir?

25 Q    "The inquiry Mr. Lancaster conducted" -- I am looking at

1    the screen now at paragraph 17 of your affidavit.  In this

2    court under penalty of perjury you said, "The inquiry

3    Mr. Lancaster conducted did not permit use of a truth

4    verification examination according to department policy and

5    procedures."  Is that true or were you mistaken?

6    A    I believe that's a misunderstanding.

7    Q    Okay.  Thank you for your honesty.  I would like to talk

8    about your authority to administer -- let's talk about the

9    investigation unit.  Did the investigation unit have the

10   authority to give a CVSA test?

11   A    Yes, sir.

12   Q    Because are they done at the investigative unit at their

13   discretion?

14   A    Yes, sir.

15   Q    Could you have authorized Lancaster or another

16   investigator to authorize a CVSA test?

17   A    No, not at that time.

18   Q    Did you know that Davis had requested a CVSA test?

19   A    Yes, sir.

20   Q    Did you have the authority to request a test?

21   A    Yes, sir, I did.

22   Q    Why didn't you give Mr. Davis that test?

23   A    I don't believe in the test.  I think that they are --

24   I've been working for the department 25 years.  I have seen

25   video evidence of offenders who have passed the test that on

1  the video plainly did exactly what the test said that they

2  said that they didn't do.  I have seen staff who have given

3  their name on the CVSA and it said that they were lying about

4  their name.  And so I have no -- my personal belief and I have

5  held this in my career is I give no validity to the CVSAs.

6  Q    You heard Mr. Lancaster testify that he verbally informed

7  you that Mr. Davis had requested a test.

8  A    Yes, sir, he did.

9  Q    However, you admitted in your request for admissions that

10 Mr. Lancaster never requested that Mr. Davis be issued a test;

11 is that correct?  Let me show you.

12 A    Are you asking me did Mr. Davis -- or did Mr. Lancaster

13 request to do the test?

14 Q    This is Exhibit 14.  I am looking at Request for

15 Admission 58.  Okay.  I have one last question.  I want to

16 direct your attention to a letter that Mr. Davis's attorney

17 wrote to you.

18 A    Yes, sir.

19 Q    And this letter is dated November 19, 2012, and it

20 says -- this is Exhibit 8.  I would like to direct your

21 attention to Exhibit 8.  This is a letter that Mr. Davis's

22 attorney wrote to you on November 8th to which you responded

23 to on November 19th.  Do you recognize this letter?

24 A    Can I see it closer up, I'm sorry?

25 Q    Yeah, I can zoom in on it.  This is the top of the

1    letter.

2    A    Okay, yeah.  Yeah, bring it up, if you would.

3    Q    Let me just ask you this question.  Did Mr. Davis's

4    attorney alert you to possible retaliation against him by

5    defendants here in this trial today with this letter?

6    A    I'm reading it.  Just a second, sir.

7    Q    And I will show you right here it says, "There are

8    circumstantial evidence of violations and retaliation for

9    pending lawsuit Davis v. Webb."  So you admit you were put on

10    notice that Mr. Davis was being retaliated against on

11    November 18th through a letter from his lawyer?

12    A    Can you move the letter up just a little bit to the

13    corner.  No, the other direction, I'm sorry.

14          MR. KINGHORN:  Can we give the witness a copy?

15          THE WITNESS:  Yeah.

16          THE COURT:  Sure.

17          MR. KINGHORN:  May I approach?

18          THE COURT:  Of course.

19          MR. KINGHORN:  Thank you.

20          THE WITNESS:  See, if I would have read it myself, a

21    lot of times when the letters in litigation comes in from

22    attorneys or stuff like that, we have a litigation officer and

23    they get sent to the litigation officer, and sometimes they

24    don't come directly to me.  Even though they are addressed to

25    me, they go to the litigation officer.  So if I read it, I

1    always initial the right corner, but where your exhibit stamp

2    is is where I would have initialed had I read it.

3    Q    Are you denying that you have seen this letter or that

4    you saw it sometime between November 8th when it was written

5    and the response, which was November 19th?

6    A    I don't remember whether I saw it or not.  That's why I

7    was looking for my initials.

8    Q    If you had seen this letter which you're copied on and

9    you are also copied on the response, would that have put you

10   on notice that Mr. Davis had retaliation -- was claiming he

11   was being retaliated against by the defendants?

12   A    It would have let me know that, but it wouldn't have

13   changed anything, no.

14          MR. SABLEMAN:  No further questions.

15                      CROSS EXAMINATION

16   BY MR. KINGHORN:

17   Q    Mr. Steele.

18   A    Yes, sir.

19   Q    Can you just give us sort of a brief overview of what

20   your duties are as warden of the facility.

21   A    I oversee the total operations of the institution, the

22   personnel, the security aspects, the budget, the physical

23   maintenance of the building, every liaison with the community.

24   So every aspect of the institution kind of umbrellas

25   underneath the title of warden.

1  Q    And can you remind us or tell us what security level

2  Potosi Correctional Center is?

3  A    Potosi Correctional Center is a level 5 facility that

4  holds the death row inmates and is when we have done our --

5  it's the most secure institution in the state of Missouri.

6  Q    Do you know approximately how many inmates were housed in

7  Potosi Correctional Center during the time of the

8  investigation?

9  A    Approximately 900.

10 Q    And do you know approximately how many corrections

11 officers there were at that time?

12 A    Approximately 250.

13 Q    And how did you say that you learned about the knife, you

14 first learned about the knife, when it was found in

15 October 2012?

16 A    I came in in the morning and always I met with my

17 executive staff in the morning for a few minutes to find what

18 had happened in the last 24 hours, and I don't remember who

19 approached me, but someone came over with the knife in an

20 evidence case and said, Hey, this was found last night in one

21 of the housing units.

22 Q    And were you concerned?

23 A    Oh, yes, absolutely.

24 Q    Why?

25 A    Well, a couple of reasons.  First, anytime that, you

1    know, you have a knife in a correctional facility and it's

2    not -- it's very rare, but when you have one, there is

3    generally a purpose.  It's not something that you find every

4    day, and when an offender goes to the extent of making it

5    knowing that it could be a very serious offense, there is

6    generally a purpose, either they are afraid that someone is

7    going to harm them or they have made it to harm somebody else,

8    and this particular one was one of the best I have ever seen

9    in my career, and because of the welding, you know, I knew

10   that it came out of the metal shop, and so my fear there was,

11   was this one knife or was this one of many.

12            MR. KINGHORN:  And permission to republish Exhibit B,

13   Your Honor?  It's already been admitted.

14            THE COURT:  Go ahead.

15   Q    (By Mr. Kinghorn) Can you see that, Mr. Steele?

16   A    Yes, sir.

17   Q    All right.  Is this the knife that you inspected in

18   October 2012 when you were informed about the knife that had

19   been found?

20   A    Yes, sir.

21   Q    All right.  I believe you said that you were of the

22   opinion that you knew where this knife had come from at that

23   time?

24   A    Yeah.  You can tell that it had been welded -- when you

25   hold it in your hands, you can tell that it had been welded a

1    couple of times.  It wasn't one long bolt.  There was like

2    about three different bolts that had been cut off.  What you

3    can't see in the picture is that the end of it was not

4    perfectly round.  It had actually been ground off so that it

5    was kind of a screw, so you could screw it in together, and

6    then where the nut was that connected it with the dagger

7    blade, it was made perfectly so that you could screw it in

8    there really tight and then have it or break it down pretty

9    quickly.  So it had several welds.  And then as Mr. Lancaster

10   had testified earlier, a lot of the homemade weapons are

11   sharpened on the floor and they have a very kind of blunt, you

12   know, dagger, you know, blade.  This I actually held a piece

13   of paper up and you could just cut right through it with

14   either side, and it was tempered like a dagger on both sides.

15   I mean, it was one -- like I said, it was one of the most

16   perfect weapons I have ever seen found in a correctional

17   center.

18   Q    Okay.  How did you know that these materials had come

19   from the factory?

20   A    At that time, I didn't know that they came from the

21   factory.  I just knew that it had been welded and there was no

22   other place in the factory that any offender would have had

23   access to a welder -- or in the institution other than the

24   factory.  That was the only place where inmates actually had

25   contact with welders.

1  Q    And at some point, did you confirm that the bolts and the

2  nut that you described could be found in the factory?

3  A    Yes.  I went down and I met with the supervisor.  I

4  showed it to him to kind of confirm, you know, my suspicions.

5  He personally walked over and got a handful of the bolts.  We

6  actually held them right next to it and showed where it was.

7  We went over to the scrap barrel where the scraps of metal

8  were.  We actually picked out a piece of metal that matched,

9  you know, I mean perfectly to what the blade was made out of,

10 and then we went over and actually -- he showed me the nuts.

11 I mean, he showed me all the components right there in the

12 factory.

13 Q    I would like you to tell me a little about the factory

14 itself.  How many times have you actually been there?

15 A    I probably went to the factory once a week.

16 Q    Okay.  And you've described the layout of the factory

17 earlier, but I would like you to tell me more about the

18 curtains that you mentioned.

19 A    Yes, sir.

20 Q    Can you describe them?

21 A    They were like big shower curtains, okay, so you had them

22 over here and they were on little rings, but they were a lot

23 thicker than shower curtains and they were like -- you

24 couldn't really see through them, they were that black.  I

25 mean, you could -- but if someone was welding on the other

 1    side, you could see through them.  So when they weren't

 2    welding or they weren't grinding or anything, the curtains

 3    were open and then that way you could actually sit from the

 4    middle and you could see in every one of the work stations.

 5    But if they were grinding in there where there were sparks or

 6    if they were welding, they would shut the curtains and then

 7    that would protect the eyes of the people there or it would

 8    protect from any sparks coming out and getting anywhere else

 9    in the factory.

10    Q    Was there any precaution in the factory, if that's the

11    word, to prevent inmates from going to different areas?

12    A    Absolutely.  We had three staff that worked in the

13    factory.  There was the factory manager, his assistant, and

14    then we had a corrections officer that was there at all times.

15    And then the corrections officer would wander through the

16    facility and check all the different posts, and if you saw

17    some offenders that were congregating or not in their assigned

18    area, then he would, you know, tell them, hey, you need to

19    move back and get back to what you were working on.

20    Q    Did you get a sense from speaking with the people in the

21    factory, the supervisor, how long a weapon like this would

22    have taken to make?

23    A    Yeah, you know, that was one of the questions I asked.

24    I'm not gifted at this kind of thing, and so he said it would

25    have taken -- a very skilled person, it would have taken, you

1    know, 30 minutes to an hour, and that's, you know, somebody

2    who was at the top of their game.  So it would have taken a

3    great deal of time.  And our feeling was it wasn't made in one

4    setting, that it probably was made over several different, you

5    know, several different settings.

6    Q    And I believe you testified earlier that you walked

7    around the factory sometimes?

8    A    Yes, sir.

9    Q    Did you feel that you had a rapport with the inmates

10   there?

11   A    I had a great rapport with the offenders there.

12   Q    All right.  You described some of the different areas in

13   the factory earlier.  Can you tell us how many different jobs

14   there actually were in the factory?

15   A    There were a paint room with about four guys in it.

16   There was a plasma cutter with about two guys.  There was an

17   area over here where they did all the building and they did

18   the schematic work and stuff.  There was like four guys that

19   were in there.  Then there was it was actually called the

20   chair factory.  It wasn't really a metals factory.  It was

21   actually called the chair factory because that's primarily

22   what they produced was the metal frames for chairs, and then

23   the chairs would be sent off and they would finish them at

24   another factory.  And so the metal bending where they actually

25   bent all the metal and cut it was all of the machinery in the

173

1    middle, and so you had people that were bending the metal for

2    the chairs, then you had a guy over here who was cutting the

3    metal, and then along the wall there were some like drill

4    presses and others, and then there was a forklift and a guy in

5    the back who operated the forklift and did the stuff over

6    here, and then about, like I said, about two-thirds of the

7    wall down on both sides, there were these -- you know, the

8    plaintiff said these cubicles where there were different

9    welding and metals, you know, different machinery where they

10   would shut the drapes or curtain or whatever you want to call

11   them and then do the work.

12   Q    How much of the metal factory would you say was dedicated

13   to welding?

14   A    Production-wise?  Maybe a third.

15   Q    I'd like to ask you about something that Mr. Davis's

16   attorney asked Timothy Lancaster yesterday.  He asked if

17   Mr. Lancaster would be surprised to hear that of the 40 or so

18   people in the factory, only four did not weld.  Do you

19   remember hearing that yesterday?

20   A    Yes, sir.

21   Q    Okay.  And he said to Mr. Lancaster that Mr. Davis

22   provided him with that information.  Do you remember that?

23   A    Yes, sir.

24   Q    In your experience, do you believe that is accurate, that

25   all but four of the inmates in the factory weld?

1   A     No, I think it was way under that.

2   Q     All right.  When the knife was initially found, who did

3   you think was a suspect?

4   A     Everybody.

5   Q     And what if anything did you do or how did you narrow

6   that down?

7   A     Well initially what I tried to do was we didn't want to

8   give away what we knew, okay?  We didn't know whether --

9   because most of the people that were there did not live in

10  housing unit 6, so we didn't even know that they knew whether

11  we had the knife or not.  And so the idea was to go down and

12  kind of see what they knew, you know, to see if we could find

13  out some information and not really show our hand, you know,

14  where the knife was found, any of the other things, which was

15  kind of like what I stated earlier.  I didn't tell them what

16  kind of knife it was.  I didn't tell them -- I just said, hey,

17  a weapon was found, it was made down here, and I want to know

18  who made it, and that was about the extent.  That was all that

19  I said to the guys.  So when they came with a name that just

20  was exactly in the wing where we had found it -- and I never

21  disclosed where we had found it or anything -- it just made it

22  very credible that, you know, here's the name of the guy and I

23  was hearing it from everyone.  You know, even in that setting,

24  there is a lot of different inmate groups, and a lot of those

25  groups don't get along, and unfortunately there is a lot of

175

1   racism in prison.  There is a lot of, you know, where those

2   groups don't get along.  They may work together, but they just

3   don't get along very good.  This was a unanimous name.  When I

4   went around, I was told basically the same name either

5   verbally or when I got the little piece of paper when I went

6   back in by everybody.  I mean, it was universal, which is very

7   unusual.  That is not something that you, you know, find.  So

8   with that information and them giving the name of a person and

9   them not knowing exactly where we had found the knife and it

10  being a person that was in that wing assigned to the knife,

11  that led to a great deal of suspicion on our part, and then

12  there was other evidence that came later toward Mr. Davis.

13  Q    All right.  Aside from speaking with the folks in the

14  metal factory, did you order any cell searches?

15  A    Yes, we ordered a search of the metals factory.  We

16  ordered a search of every individual who worked in the metals

17  factory.  We ordered a search of every cell of everyone who

18  worked in the metals factory.

19  Q    And the searches of the individuals who worked in the

20  metal factory, were those strip searches?

21  A    Yes, sir.

22  Q    Was the metal factory shut down at some point?

23  A    Yes, I shut it down right after I basically got the name,

24  then I went ahead and had it shut down and we did all the

25  searches.

1    Q    Okay.  And there's computers in the metal factory?

2    A    Yes.

3    Q    Were those searched?

4    A    Yes, we had IS -- I'm sorry, Information Systems, the

5    computer people from the Office of Administration, not the

6    Department of Corrections, actually came in and worked with us

7    to look at all of the memory and everything to see if there

8    was any schematics or anything else on the computers.

9    Q    All right.  Do you recall Mr. Davis being assigned to

10   administrative segregation along with another suspect early in

11   the investigation?

12   A    Yes, sir.

13   Q    All right.  And I believe you testified earlier that --

14   well, let me just ask you.  Who made that decision to assign

15   those two offenders to ad-seg at that time?

16   A    I think it was in collaboration with me and my team.  We

17   came back upstairs.  I told them a little bit of what the name

18   that I had gotten.  I was informed of the two people who

19   actually lived in that wing at that time, and so it was agreed

20   at that time that we would lock both of them up and that we

21   would go forward with the investigation.

22   Q    When you say the two people who worked in the wing at

23   that time, are you referring to two people who worked in the

24   metal factory as well?

25   A    I'm sorry, that worked in the metals factory that lived

1    in the wing where the knife was found in the shower.

2    Q    Is administrative segregation the same thing as

3    disciplinary segregation?

4    A    No, sir.

5    Q    When are inmates placed on administrative segregation?

6    A    Administrative segregation is a –– it's exactly what it

7    says, it's an administrative move done by the institution.

8    Disciplinary segregation is a housing assignment that's done

9    by the house itself, the Classification staff and the housing

10   unit itself, for a period of like time-out is what we would

11   call it.  Administrative segregation would be something that

12   would be of a more serious nature, that they were referred up

13   to the administrative staff and then it would be reviewed by

14   the deputy warden and then they would decide whether they were

15   going to hold them or not.

16   Q    Is administrative segregation considered to be

17   discipline?

18   A    No, sir.

19   Q    Why is it necessary to hold an inmate in administrative

20   segregation when that inmate is being investigated?

21   A    Well, usually it's because of the time frame, you know,

22   and for the safety and security of the institution.  We put

23   them in there so that we can find out exactly, you know, what

24   happened.  We put them in there for the safety of the staff,

25   the safety of the other offenders.  We put them in there for

 1   their own safety.  And then we look at time frame.  Sometimes

 2   investigations are pretty short, it's two or three days, and

 3   then sometimes they are quite lengthy.  And so, you know, a

 4   TASC order, which is a temporary administrative assignment,

 5   only has a few days where you can temporarily pull a person

 6   out of the population and separate them and then you have to

 7   formally do a hearing to justify whether or not you want to

 8   continue that and convert it to an administrative segregation

 9   and hold them pending the outcome of what you are looking into

10   or if you want to go ahead and release them back, the matter's

11   been resolved.

12   Q    Do inmates in administrative segregation receive three

13   meals a day?

14   A    Yes, sir.

15   Q    Do they receive any rec time?

16   A    Yes.

17   Q    Do they get their mail?

18   A    Yes, sir.

19   Q    Do they have any law library privileges?

20   A    Yes.

21   Q    Do they get to have visits?

22   A    Yes, sir.

23   Q    Phone calls?

24   A    Yes, sir.  The only thing on the phone call, it's

25   dependent on behavior.  The visits, they go from contact to

1    non-contact visits which is pretty much a guarantee.  But the

2    phone call, if their behavior is bad, then it's at the

3    discretion of the unit manager whether they want to allow a

4    phone call or not.  But as long as they have good behavior,

5    they do go ahead and allow them to have a phone call.

6    Q    All right.  Were Mr. Davis and the other suspect who were

7    assigned to administrative segregation early in the

8    investigation released at the same time?

9    A    No, sir.

10   Q    Which one of them was released first?

11   A    I don't know what he called him, S or J.

12   Q    Well, was it Mr. Davis or the other suspect?

13   A    Yeah, the other subject, I'm sorry.

14   Q    All right.  Why was the other suspect released from

15   administrative segregation?

16   A    When I spoke with the work supervisor, they said they did

17   not possess the skills to make this level of an instrument.

18   They said that they couldn't have made it.

19   Q    All right.  And Mr. Davis was not released from ad-seg at

20   that time; correct?

21   A    No.  They said that Mr. Davis, on the other hand, did

22   possess the skills necessary to produce this knife.

23   Q    All right.  You also mentioned speaking with people in

24   the metal factory.  When did you do that?

25   A    It was really short after they told me about the knife

1    being found.  We kind of deliberated a little bit.  We had a

2    plan.  We already knew that we were going to lock the housing

3    unit down.  We already knew that we were going to search them.

4    We already knew that we were going to search the factory down

5    and come in and search it, but I had a really good rapport

6    with those offenders down there, and I kind of wanted to go

7    down and walk around and see if I could get any information,

8    and if they had said nothing, you know, it may have been a

9    whole different story, but that's not what happened.

10   Q    And did you speak with those inmates before actually

11   telling Mr. Lancaster that he was assigned to the

12   investigation?

13   A    Oh, yeah, this was days before.  He wasn't there that

14   day.

15   Q    After speaking with the people in the metal factory, who

16   did you believe made the knife?

17   A    Mr. Davis.

18   Q    What did the people in the factory tell you that caused

19   you to have that belief?

20        MR. SABLEMAN:  Objection, Your Honor, hearsay.

21        THE COURT:  Overruled.

22        THE WITNESS:  I think it was just -- again, I've got

23   to preface this by saying when you are a warden, you've got to

24   know your offenders, you have got to know your offender

25   population, and it's very difficult to get offenders to agree

1  on anything, okay?  And I'm not trying to be disrespectful.

2  I'm just saying the obvious.  I mean, that's just the truth.

3  And so they had no clue that I was coming down that morning.

4  They had no clue what I called them over for, and when I, you

5  know, approached them and I kind of was very stern and said,

6  you know, enough, I want to know, and then with them across

7  the board getting it from all the different people that I got

8  it from, it just wasn't one guy, there was probably -- well,

9  there was a number let's put it that way who gave me the exact

10  same name, that was pretty credible.

11  Q    (By Mr. Kinghorn) At that time, were you aware of the

12  crime for which Mr. Davis was incarcerated?

13  A    Not at that time.  It was a little bit later once we went

14  back upstairs and we began to talk a little bit, then -- and I

15  don't remember which one of the team, but one of the team

16  members told me that he had been incarcerated for stabbing

17  someone to death with a knife.

18         MR. SIMON:  Objection, Your Honor.

19         THE COURT:  Sustained.

20         MR. SIMON:  This was an agreement.

21         THE COURT:  Sustained.  The last part of the

22  witness's response is stricken.  The jury is instructed to

23  disregard it.

24         THE WITNESS:  I'm sorry.

25  Q    (By Mr. Kinghorn) Was his murder in the first degree

1    conviction for a knife-related incident?

2    A    Yes, sir.

3    Q    Did learning that have any effect on your belief as to

4    the credibility of the information that you had received from

5    the factory?

6    A    In part.

7    Q    And how did it affect your belief about the credibility

8    of that information?

9    A    Well, I got the information from them, and again they

10   didn't know where we had found it or anything, and they put

11   the person, the suspect, in the exact same wing where it was

12   found.  You've got all of these different groups telling you

13   the exact same name, and then finding out that there was a

14   history with this person, and then there was some additional

15   evidence after the search from, you know, when we searched the

16   entire factory that came into play.

17   Q    All right.  So with the search of the metal factory, was

18   any evidence found in the metal factory?

19   A    Well, when we -- the only thing that was odd, when we

20   searched the metal factory, we didn't find any additional

21   knives.  We didn't find any additional anything that had been

22   made or modified or anything to that effect, but what we did

23   find is the one cubicle, the cubicle that was assigned to

24   Mr. Davis, someone had been climbing up the wall, and there

25   was a little hole next to a pipe that went into the room next

1    door that was actually where the laundry was, and you could

2    actually see where -- it had never been cleaned, okay, since

3    the factory had been started, so you had these thick dusts

4    that was all over the pipes the entire length of the wall

5    except when you opened that cubicle up, you could see where

6    someone had put their foot on and the dust was removed and it

7    was just like a perfect climb pattern that went all the way

8    up, and then when they examined it because I physically went

9    and saw it myself, and when they went to the top where the

10   hole was where the pipe ran through to the room on the other

11   side, you could see where someone as they pushed their hand in

12   or whatever had pushed all the dust off the top of the

13   concrete up there next to the pipe.

14   Q    So there was a hole all the way through the wall there?

15   A    Yes.  I actually went over to the laundry on the other

16   side and -- I mean, we actually had to have maintenance come

17   and repair this.  It was a security flaw because, yeah, it

18   actually opened over to the other side to where the laundry

19   was.

20   Q    What did you believe was the significance of this hole in

21   the wall in the factory?

22   A    I believed that either -- my feeling was is that

23   Mr. Davis while he was making the knife was either climbing up

24   and storing it there or had climbed up there and passed it

25   over to someone to the other side so that he could retrieve it

184

1   later.

2   Q    Did the metal factory have any precautions at that time

3   to prevent inmates from taking things out of the factory?

4   A    Yes.  We strip-searched everyone who left the factory,

5   plus we ran a handheld metal detector over there.

6   Q    Aside from the hole in the wall in Mr. Davis's work area,

7   did you find any other evidence in the factory as to how the

8   knife could have left the factory?

9   A    No, sir.

10  Q    All right.  Then at some point after this knife was

11  found, you assigned Timothy Lancaster to investigate; is that

12  right?

13  A    Yes.

14  Q    And why did you assign Timothy Lancaster?

15  A    That was his job at the institution was to do the

16  administrative inquiries.

17  Q    Did you have any other administrative inquiry officer?

18  A    No, sir.

19  Q    All right.  When did you first decide that you were going

20  to assign Timothy Lancaster?

21  A    When I saw the knife.

22  Q    All right.  And you actually spoke to him about that

23  assignment after speaking with the workers in the factory?

24  A    Yeah.  He wasn't there that day, so then we had the

25  weekend, and then when he came in, I think it was either the

1   Monday or Tuesday after the weekend was over, as soon as he

2   came back to work, I filled him in to where we were at and

3   assigned the investigation to Mr. Lancaster.

4   Q    You were asked by Mr. Davis's attorney if you were aware

5   of Mr. Davis's prior lawsuit, but he didn't ask you when you

6   became aware and so my question is specific.  When you first

7   heard about the knife and decided to assign Timothy Lancaster,

8   did you know at that time that Mr. Davis had a lawsuit pending

9   against Mr. Lancaster?

10  A    No.

11  Q    When did you first find out about the lawsuit Mr. Davis

12  had against Mr. Lancaster?

13  A    Mr. Lancaster told me when I told him that I was

14  assigning the case to him.  He was a little bit hesitant and

15  said, you know, this offender has this pending legal case with

16  me, and he asked me, he said, do you feel that this is a

17  conflict, and I told him absolutely not, I expect you to do

18  your job, to be professional.  At any given time, we have got

19  a series of things that are pending like this, and so that was

20  it.  He went out and did his job.

21  Q    Is it common in your experience for inmates to file

22  lawsuits against prison staff?

23  A    Oh, yes, sir.

24  Q    How common?

25  A    Very.

1    Q    In your experience as warden, is it feasible to keep

2    staff separated from inmates who have either filed lawsuits or

3    complained about them in the institution?

4    A    It would be impossible, absolutely impossible.

5    Q    Did Mr. Lancaster as the administrative inquiry officer

6    have authority to put people in administrative segregation?

7    A    No.  He only had the authority to request.

8    Q    And did he have the authority to remove them from

9    administrative segregation?

10   A    No.

11   Q    And who handles that sort of thing?

12   A    It would have been the classification team.

13   Q    Okay.  And does the administrative inquiry officer

14   participate in the classification hearings?

15   A    No, sir.

16   Q    All right.  I would like to ask you about the CVSA test.

17   Did Timothy Lancaster have the authority to administer a CVSA

18   test?

19   A    No, sir, he did not.

20   Q    Can he order that a CVSA test be done?

21   A    No, sir.

22   Q    Based on your knowledge in October 2012, could you order

23   that a CVSA test be done?

24   A    At that time, I did not feel -- at that time, I knew that

25   I didn't have the authority to order a CVSA.

1  Q    And you may have said this earlier, I forget.  How many

2  times have you requested a CVSA test in your career as the

3  warden?

4  A    I may have -- I don't remember ever, but I'm not going to

5  say ever.  I may have -- and I've been a warden for, I don't

6  know, 13, 14 years.  I may have early in my career.  Someone

7  may have asked with a staff-related incident when I was at

8  Charleston, but I can't ever really remember doing it.  So I

9  don't want to say never, but I don't remember ever doing it.

10 Q    How many times have you ever been asked to request a CVSA

11 test?  Actually, let me back up.  If you were going to try to

12 have a CVSA test administered, what process would you have

13 followed in October of 2012?

14 A    Well, the only -- back then, the only way that you could

15 do it was you request it through the Inspector General's

16 Office, and they had the only person who was trained to do it

17 at the time, and then it was at their discretion whether they

18 wanted to do it or not.

19 Q    All right.  How many times have you been asked to request

20 a CVSA test?

21 A    Thousands.

22 Q    How many times have inmates demanded or volunteered for a

23 CVSA test?

24 A    Same.  I mean, over my career, thousands.

25 Q    And how many times did you seek a CVSA test from the

1    Inspector General in one of those situations?

2    A    I don't remember ever doing it.

3    Q    All right.  In October 2012, who did you believe could

4    administer a CVSA test?

5    A    I can't think of his name, but there was a guy up at -- I

6    think he was up at Bowling Green that worked for the Inspector

7    General's Office.  Mike Lozano I think was his name.

8    Q    All right.  And he was with the Inspector General's

9    Office?

10    A    Yes.

11    Q    Now earlier you were asked if the investigative unit had

12    the discretion to do a CVSA test.  Now is the investigative

13    unit something different or is it the same as the Inspector

14    General's Office?

15    A    At that time, it was the same.

16    Q    So the investigative unit that had discretion was the

17    Inspector General's Office?

18    A    Yes, sir.

19    Q    Was Mr. Lancaster at that time in the investigative unit?

20    A    No.  At that time, his title was administrative inquiry

21    officer.  It wasn't investigator until years later.

22        THE COURT:  Mr. Kinghorn, hold that thought.

23        MR. KINGHORN:  Sure.

24        THE COURT:  Are you going to be much longer do you

25    think?  Because in light of our discussions yesterday, I

1    really need to --

2            MR. KINGHORN:  Oh, yeah.

3            THE COURT:  -- take an early recess.

4            MR. KINGHORN:  Sure.  I probably have five, ten

5    minutes.  Let's say ten.

6            THE COURT:  That's attorney time.  In judge time,

7    that's really probably 30 minutes.  It's a professional joke,

8    folks.  Okay.  Under ordinary circumstances, I'd say go ahead,

9    but I really need to take that break.  We'll pick up your

10   testimony in the morning, sir.

11           THE WITNESS:  Yes, sir.

12           THE COURT:  During the course of the recess, ladies

13   and gentlemen, do not discuss the case amongst yourselves or

14   with anyone else.  Do not allow anyone to discuss it within

15   your hearing or presence.  Do not form or express any opinions

16   about the case until it is given to you to decide.  Do not

17   read, view, or listen to any media accounts regarding the

18   trial.  And again I remind you to not utilize your cell phones

19   or any other web-enabled devices to access the internet that

20   might allow for a discussion or viewing of something about the

21   case or of someone posing a question to you about the case or

22   possibly the posting of something about the case, and we will

23   reconvene tomorrow morning at 9:30, all right?  We will be in

24   recess.

25   **(The Following Proceedings Were Held Outside the Hearing and**

**Presence of the Jury.)**

1

THE COURT:  All right.  Counsel, if you haven't

already, if you guys possibly could get together sometime

before you leave this afternoon and talk about instructions a

little bit, and if there are any specific objections that

either side has to something, make note of it so we will

already have and know what is going on with that.  If there

aren't any objections to any instructions that anybody is

offering, well, that makes life a lot simpler for everybody.

MR. SIMON:  We only have one issue.  It's a simple

issue.  We think the Eighth Circuit Model Instruction is

wrong, but it's the Eighth Circuit Model Instruction, so I

don't know how you want to handle that, make new law now or

keep it the way it is and we can appeal.

MR. KINGHORN:  In addition to that, there is one

other thing to talk about, so just the two things.

MR. SIMON:  We'll get together.

THE COURT:  On the issue of making new law, I'm just

a foot soldier in the trenches of the justice system.  I defer

to those folks up there in the Eighth Circuit.

MR. SIMON:  That was the answer I expected, Your

Honor.

THE COURT:  And also those folks on the instruction

committee who are not necessarily on the Eighth Circuit but

they are with folks on the Eighth Circuit.  See you all in the

1    morning.

2              **(PROCEEDINGS CONCLUDED AT 3:50 P.M.)**

<u>CERTIFICATE</u>

I, Angela K. Daley, Registered Merit Reporter and
Certified Realtime Reporter, hereby certify that I am a duly
appointed Official Court Reporter of the United States
District Court for the Eastern District of Missouri.

I further certify that the foregoing is a true and
accurate transcript of the proceedings held in the
above-entitled case and that said transcript is a true and
correct transcription of my stenographic notes.

I further certify that this transcript contains
pages 1 through 191 inclusive and that this reporter takes no
responsibility for missing or damaged pages of this transcript
when same transcript is copied by any party other than this
reporter.

Dated at St. Louis, Missouri, this 18th day of July,
2018.

_____
/S/Angela K. Daley
Angela K. Daley, CSR, RMR, FCRR, CRR
Official Court Reporter