1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION


FREDERICK P. DAVIS,                    )
                                       )
       Plaintiff,                      )
                                       )
       v.                              )No. 4:13-CV-01638 HEA
                                       )
TIMOTHY R. LANCASTER, et               )
al.,                                   )
                                       )
       Defendants.                     )


                         JURY TRIAL

                         **Volume 3**

          BEFORE THE HONORABLE HENRY E. AUTREY
             UNITED STATES DISTRICT JUDGE

                       MAY 23, 2018


APPEARANCES:

For Plaintiff:          Anthony G. Simon, Esq.
                        Brian Sableman, Esq.
                        THE SIMON LAW FIRM, P.C.
                        800 Market Street, Suite 1700
                        St. Louis, MO  63101

For Defendants:         Andrew D. Kinghorn, Esq.
                        Denise Garrison McElvein, Esq.
                        ATTORNEY GENERAL OF MISSOURI
                        P.O. Box 861
                        St. Louis, MO  63188

REPORTED BY:            ANGELA K. DALEY, CSR, RMR, FCRR, CRR
                        Official Court Reporter
                        United States District Court
                        111 South Tenth Street, Third Floor
                        St. Louis, MO  63102
                        (314) 244-7978
        PRODUCED BY COURT REPORTER COMPUTER-AIDED TRANSCRIPTION

<u>Volume 3</u>

2

INDEX

WITNESSES:                                              <u>Page</u>

TROY STEELE                                               4
     Cross Examination Cont'd By Mr. Kinghorn             4
     Redirect Examination By Mr. Sableman                 8

JAMES CRUMP                                              18
     Direct Examination By Mr. Kinghorn                  18
     Cross Examination By Mr. Simon                      22
     Redirect Examination By Mr. Kinghorn                29

3

1          **(PROCEEDINGS STARTED AT 9:50 A.M.)**

2   **(The Following Proceedings Were Held Outside the Hearing and**

3                      **Presence of the Jury.)**

4          THE COURT:  Good morning, all.  Mr. Simon.

5          MR. SIMON:  Yes, just two quick issues.  We have a

6   couple minor issues on jury instructions.  Wasn't sure if you

7   want to go ahead and get the jury in, let's get the evidence

8   done, and we can talk about it or if you want to do that now.

9          THE COURT:  Let's finish up the evidence and we will

10  talk about it.

11         MR. SIMON:  The only other thing I wanted to bring up

12  is, and I hate to have to do this, but in light of Mr. Steele

13  blurting out in a non-responsive answer a violation of your

14  order, I would just ask that Mr. Steele be reminded and

15  certainly Mr. Crump be reminded that they have to follow your

16  orders so I don't have to stand up and object because I don't

17  want to do that.

18         THE COURT:  All right.

19         MR. SIMON:  Thank you.

20         THE COURT:  Any questions about that, gentlemen?

21         MR. STEELE:  No, sir.  My mistake, I'm sorry.

22         THE COURT:  All right.  So are we ready?  All right.

23  Bring them out.

24  **(The Following Proceedings Were Held Within the Hearing and**

25                      **Presence of the Jury.)**

4

1      MR. KINGHORN:  Your Honor, I just have a few more

2  questions for Troy Steele.

3      THE COURT:  Warden, would you step back up please.

4  And since we recessed for the evening, I am going to have the

5  clerk re-swear you.

6                      **TROY STEELE,**

7  **Having Been First Duly Sworn, Was Examined and Testified As**

8  **Follows:**

9                  CROSS EXAMINATION CONT'D

10 BY MR. KINGHORN:

11 Q    Mr. Steele, can you hear me okay?

12 A    Yes, sir.

13 Q    Can you please tell us who George Lombardi is?

14 A    Now or?

15 Q    In October 2012.

16 A    He was the Director for the Department of Corrections.

17 Q    Okay.  And do you recall seeing a letter that Mr. Davis

18 sent to George Lombardi during the investigation?

19 A    Yes, sir.

20 Q    And was a copy of that letter sent to your office?

21 A    Yes, sir.

22 Q    Are you familiar with the contents of the letter?

23 A    Yes, sir.

24 Q    Did Mr. Davis talk about the knife investigation in that

25 letter?

1   A    Yes, sir.

2   Q    And that he felt the investigation was retaliatory?

3   A    Yes, sir.

4   Q    And he complained about the interview that Mr. Lancaster

5   had with him; is that right?

6   A    Yes, sir.

7   Q    And can you also tell us who Dwayne Kempker is?

8   A    He was the Deputy Director for the Division of Adult

9   Institutions.  He was my direct supervisor.

10  Q    And do you recall seeing a similar letter that Mr. Davis

11  sent to Dwayne Kempker during the investigation?

12  A    Yes, sir.

13  Q    And a copy of that letter was sent to your office as

14  well?

15  A    Yes, sir.

16  Q    And did Mr. Davis talk about the knife investigation in

17  that letter?

18  A    Yes, sir.

19  Q    And that it was retaliatory according to Mr. Davis?

20  A    Yes, sir.

21  Q    And did he also complain about the interview with

22  Mr. Lancaster in that letter?

23  A    Yes, sir.

24  Q    Did Mr. Davis say anything in either of those two letters

25  about Stanley Pruett allegedly being present during the

Volume 3

6

1    interview?

2            MR. SABLEMAN:  Objection, Your Honor, best evidence.

3            THE COURT:  Overruled.

4            THE WITNESS:  No, sir, there was nothing in there

5    about that.

6    Q    (By Mr. Kinghorn) Did Mr. Davis say anything in either of

7    those two letters about Stanley Pruett allegedly being present

8    during the interview?

9            MR. SIMON:  Your Honor, could we just have the

10   exhibit letters of the exhibits that he's referring to?  I

11   think it's M and N.

12           MR. KINGHORN:  I believe so.  It's either M, N, or O,

13   two of those three.

14           THE COURT:  So which is it, M and N?

15           MR. SABLEMAN:  Your Honor, the Mr. Kempker letter is

16   N.

17           MR. SIMON:  N like Nancy.

18           MR. SABLEMAN:  The letter to Mr. Lombardi is O,

19   Exhibit O.

20           THE COURT:  Okay.  All right.

21   Q    (By Mr. Kinghorn) Did he say anything -- did Mr. Davis

22   say anything in either of those two letters about Stanley

23   Pruett allegedly telling him to stop filing lawsuits?

24   A    No, sir.

25   Q    Did he say anything in either of those two letters about

7

1    Stanley Pruett allegedly saying "when will you guys realize we

2    run this prison"?

3    A    No, sir.

4    Q    Did he say anything in either of those two letters about

5    Timothy Lancaster allegedly telling him that he won't file

6    another lawsuit here?

7    A    No, sir.

8    Q    And did he say anything in either of those two letters

9    about anything Dan Bryan allegedly said to him?

10   A    No, sir.

11   Q    Mr. Steele, to your knowledge, have you ever treated

12   Mr. Davis unfairly in any way?

13   A    No, sir.

14        MR. KINGHORN:  No further questions at this time.

15        THE COURT:  Mr. Sableman?

16        MR. SABLEMAN:  Yes, Your Honor, I would like to

17   redirect.  I move the admission of Exhibits N and O, the

18   letters to Mr. Kempker and Mr. Lombardi.

19        MR. KINGHORN:  Your Honor, we'd object to the

20   admission of the exhibits because they are riddled with

21   references to claims that have been dismissed.

22        MR. SABLEMAN:  Your Honor, the witness just testified

23   to the contents of those letters.

24        MR. KINGHORN:  To the relevant contents regarding the

25   claims that still exist.

8

1          THE COURT:  Well, let's see, what's the phrase,

2   "having my cake and eating it, too."

3          MR. KINGHORN:  Perhaps, if I may, Your Honor, if

4   certain portions could just be redacted, we have no problem

5   with the letters being admitted.

6          MR. SABLEMAN:  Your Honor, the questions he asked

7   were with regard to things that were not in the letter.  The

8   entire letter should come in to give context to the statements

9   that were absent.  How could we know what statements should

10  have been in there without the whole letter.

11         THE COURT:  Context, yes, sir.  Your objection is

12  overruled.

13         MR. KINGHORN:  Thank you, Your Honor.

14                    REDIRECT EXAMINATION

15  BY MR. SABLEMAN:

16  Q    Mr. Steele.

17  A    Yes, sir.

18  Q    You testified yesterday about some evidence in the metal

19  factory regarding hand or footprints on the wall; is that

20  correct?

21  A    I don't know if you would call it evidence.

22  Q    Let me rephrase.  You testified yesterday about hand

23  prints or footprints found on the wall of the factory near Mr.

24  Davis's cubicle; correct?

25  A    Yeah, I don't know if they were hand prints or

1  footprints.  It was just areas where you could see where the

2  dust was scraped off where it looked like someone had kind of

3  like a rock climb had kind of went up the wall.

4  Q    Thank you.  You haven't shown this jury a single

5  photograph of those areas of dust; correct?

6  A    Yes, sir.

7  Q    And if you had shown the jury a photograph of those

8  prints, the jury would have seen that this hole in the wall

9  merely means that the wall is not flush with the ceiling;

10  correct?

11  A    Yes.  Yes, sir.

12  Q    And that, in fact, is not unique to Mr. Davis's cubicle.

13  That is true for all of the cubicles in the metal factory;

14  correct?

15  A    Along the one wall, yes, sir.

16  Q    You haven't shown the jury a memo or a document that

17  references those hand or footprints or dust impressions

18  whatsoever; correct?

19  A    No, sir.

20  Q    It wasn't in your letters to your direct supervisor,

21  Mr. Kempker, was it?

22  A    No, sir.

23  Q    And it wasn't in Mr. Lancaster's report?

24  A    No, sir.

25  Q    Your testimony is unclear to me regarding the CVSA truth

1    verification test.   Are CVSA truth verification tests

2    sometimes used during investigations of dangerous contraband

3    such as a knife?

4    A    Yes.

5    Q    Your testimony is also unclear to me with regard to the

6    kite.   That's the anonymous letter that you received.   Did you

7    use the kite as evidence against Mr. Davis in any way?

8    A    No.

9    Q    Finally, you testified yesterday you told your lawyer,

10   the Attorney General, that you first learned about Mr. Davis's

11   lawsuit against Mr. Lancaster when you appointed Mr. Lancaster

12   to investigate; is that correct?

13   A    Yes, that's when it was brought to my attention.

14   Q    And you answered written Requests for Admissions in this

15   case, didn't you?

16   A    Yes, sir.

17        MR. SABLEMAN:  Your Honor, I would like to publish

18   Exhibit 14.   It is admitted.

19        THE COURT:  Very well.

20   Q    (By Mr. Sableman) I am going to show you request number

21   4.   "Between October 25, 2012 and October 31, 2012, you knew

22   Davis had a lawsuit pending against Timothy Lancaster and

23   other prison officials from Potosi Correctional Center."   And

24   you said admit; is that correct?

25   A    Yes, that's what it says.

1  Q    And you appointed Mr. Lancaster on October 29th; is that

2  correct?

3  A    I don't know the exact date, but yeah, it was that Monday

4  or Tuesday when he came back, yes, sir.

5  Q    One last question.  The knife was found on October 26th;

6  correct?

7  A    Yes, sir.

8  Q    And you knew before the knife was found about the

9  lawsuit, correct, October 25th?

10  A    I wasn't really aware of the lawsuit until Mr. Lancaster

11  spoke with me face-to-face.

12             MR. SABLEMAN:  No further questions.

13             THE COURT:  Anything else of this witness?

14             MR. KINGHORN:  We have no further questions, Your

15  Honor.

16             THE COURT:  Thank you, sir.  You may step down.  Call

17  your next witness.

18             MR. SIMON:  Your Honor, we have no more witnesses.  I

19  did want to move the admission of Plaintiff's Exhibit 17.

20  This is an exhibit that was referenced with Mr. Bryan.  It

21  wasn't on our list because we hadn't intended before to admit

22  it, but it came in with Mr. -- with Defendant Bryan.  So we

23  move the admission of his affidavit filed in this case, 17.

24             MR. KINGHORN:  No objection, Your Honor.

25             THE COURT:  Plaintiff's Exhibit 17 will be admitted.

1    MR. SIMON:  And then all I had left, Your Honor, is I

2    just wanted to confirm what exhibits we had in.  Can we do

3    that before we close?

4    THE COURT:  Sure.

5    MR. SIMON:  Okay.  We had Plaintiff's Exhibits 3, 4,

6    5, 8, 9, 10, 11 through 17, and then for defendants' exhibits,

7    we had B, C, D, F, G, H, I, N, O, Q, R, S, V, X, CC, and EE.

8    THE COURT:  All right.  Very good.

9    MR. SIMON:  Thank you.  And with that, we close our

10    case, Your Honor.

11    THE COURT:  Side bar.

12    **(A Bench Conference Was Held On the Record and Outside of the**

13    **Hearing of the Jury As Follows:)**

14    THE COURT:  Motions.

15    MR. KINGHORN:  Yes, Your Honor.  At this time, the

16    defendants move for a directed verdict in their favor pursuant

17    to Rule 50.  Under the evidence submitted, no reasonable jury

18    would have a legally sufficient basis to find for the

19    plaintiff.  As to Defendant Bryan, there has been no evidence

20    that he was involved in investigating the knife, placing

21    plaintiff in ad-seg, approval or disapproval of the CVSA, or

22    transferring plaintiff from one ad-seg unit to another.

23    That's going to your summary judgment order.  Those are the

24    only theories of retaliation that plaintiff is proceeding on

25    at this time.

1           As to the allegation that after the plaintiff was

2    placed in ad-seg, Defendant Bryan sat on a committee that

3    recommended continuing him in ad-seg pending the

4    investigation, there's been no evidence that plaintiff's prior

5    lawsuit against Lancaster was a factor.  The evidence will

6    show that assigning an inmate to ad-seg is standard when he is

7    being investigated.  It is also standard when he is pending a

8    transfer; therefore, no reasonable jury could conclude that

9    but-for plaintiff's lawsuit, the committee would not have done

10   that.

11          As to Defendant Lancaster, there's been no evidence

12   that he was involved in placing plaintiff in ad-seg, approval

13   or disapproval of the CVSA, or transferring plaintiff from one

14   ad-seg unit to another.  The evidence has shown that plaintiff

15   was already in ad-seg when Lancaster was assigned to the

16   investigation.  The evidence has also shown that Lancaster did

17   not have the authority to approve or deny a CVSA test.  The

18   evidence also shows that plaintiff had already been identified

19   as a key suspect when Lancaster was assigned and that there

20   was at least some evidence suggesting his involvement in the

21   knife; therefore, no reasonable jury could conclude that

22   but-for plaintiff's lawsuit, he would not have been

23   investigated for the knife.

24          Also, as this Court held recently in McCauley versus

25   Fields, and I quote, "a prisoner cannot prevail if adverse

1    action was taken for both a legitimate reason and for a

2    retaliatory reason," and Your Honor cited numerous Eighth

3    Circuit and district court opinions in support of that

4    holding.  So even if there was evidence of a retaliatory

5    motive, the claim still fails because there was also a

6    legitimate reason for the investigation of plaintiff.

7            As to Defendant Pruett, there's been no evidence that

8    he was involved in the investigation of plaintiff, placing him

9    in ad-seg, or approval or disapproval of the CVSA.  As to the

10   allegation that Pruett was involved in plaintiff's transfer

11   from one ad-seg unit to another, there is no evidence that

12   this constitutes an adverse action.  The evidence has shown

13   that neither ad-seg unit at the prison was any better or worse

14   than the other and that ad-seg offenders in both housing units

15   were treated the same.  The evidence has also shown that

16   moving ad-seg offenders from housing unit 3 overflow to

17   housing unit 2 is standard.  No reasonable jury could conclude

18   that but-for the lawsuit plaintiff filed, he wouldn't have

19   been transferred to housing unit 2.

20           And finally as to Defendant Steele, the evidence has

21   shown that based upon the procedures used at Potosi

22   Correctional Center at that time, he did not have the

23   authority to approve or deny a CVSA test.  Only the Inspector

24   General could do that.  The evidence has also shown that

25   Defendant Steele had already spoken with informants in the

1   factory who identified plaintiff as a key suspect and placed

2   plaintiff in ad-seg under investigation and decided to assign

3   Lancaster all before learning about Davis's lawsuit against

4   Lancaster; thus, no reasonable jury could conclude that

5   but-for plaintiff's lawsuit against Lancaster, Defendant

6   Steele would not have done those things.  For those reasons,

7   each defendant moves for a directed verdict in their favor.

8           THE COURT:  Response?

9           MR. SABLEMAN:  Your Honor, to start with, Mr. Davis

10  alone has proved every element of our case by taking the stand

11  and providing direct evidence of retaliatory motive and

12  comments made by each of the defendants, and that alone is

13  sufficient to show that defendants' supposedly legitimate

14  reasons are pretextual, and we are requesting a pretextual

15  instruction in our jury instructions.

16          With regard to Bryan, he was on the ad-seg committee.

17  He was responsible for keeping Mr. Davis in long-term.  With

18  regard to Mr. Davis's third adverse action, the transfer from

19  short-term to long-term, we are not arguing that one was worse

20  than the other.  We are arguing that Mr. Davis was not

21  returned to general population, and, in fact, in the jury

22  instructions, we would like that to read that he was kept in

23  long-term ad-seg, not just transferred.  We are not arguing

24  that it was materially adverse that he walked between cells

25  but that he was confined in long-term for most of those 86

1   days.

2          With regard to Mr. Lancaster, we have shown evidence

3   that his investigation was pretextual, that he didn't have

4   sufficient evidence to pursue Mr. Davis as long as he did,

5   that he singled out Mr. Davis, and that he was either

6   negligent in failing to inform others of his investigation

7   that ended or he purposely withheld that information.

8          With regard to Warden Steele, we presented evidence

9   that his -- he was motivated to retaliate against Mr. Davis

10  based on his initial actions with regard to the knife

11  incident, none of which he's given a legitimate reason for

12  other than to retaliate against Mr. Davis.  Given the

13  inconsistencies in his testimony and lies that we have shown,

14  we have submitted a submissible case that all of his reasons

15  are pretextual and that he likely did influence Mr. Lancaster

16  and Mr. Bryan with regard to the ad-seg hearings and

17  Mr. Pruett with regard to his adverse actions.  Mr. Pruett did

18  not testify to knowing anything about this case; however,

19  Mr. Davis testified that he was present during that initial

20  interview and he had a major role in the case.

21         The CVSA test, we have submitted a submissible claim

22  for Lancaster and Steele on the CVSA test.  They both have

23  many inconsistencies in their statements about whether they

24  could have administered it, and it's clear that their reasons

25  could be pretextual and the jury could find that their reasons

```
 1   were pretextual and were based on his filing of the lawsuit

 2   and but-for his filing of the lawsuit, they would have

 3   administered the test.

 4          THE COURT:  Anything else?

 5          MR. KINGHORN:  Just very briefly.  So the plaintiff

 6   testified when he was on the stand that he knew from the

 7   moment when the other suspect was released from ad-seg that he

 8   was being targeted.  He was not able to elaborate on that, and

 9   I would just make the final point that plaintiff's mere

10   speculation that they are being retaliated against is not

11   sufficient to show intent under the case law.

12          THE COURT:  All right.  Let the record then reflect

13   that based upon the arguments of counsel on the motion made by

14   defendant as to each defendant, the motion as to each

15   defendant is denied and overruled, and defendant will be given

16   an opportunity to file the written motion -- each defendant

17   will be given an opportunity to file a written motion should

18   it become necessary.

19          MR. KINGHORN:  I'm going to have my office file the

20   written copy of my motion so we will have it in the court

21   file.

22          THE COURT:  All right.  Any evidence on behalf of

23   defendants?

24          MR. KINGHORN:  One witness, Your Honor.

25          THE COURT:  All right.  Let's proceed.
```

18

1    **(The Following Proceedings Were Held Within the Hearing and**

2    **Presence of the Jury.)**

3         THE COURT:  Are you ready to proceed, Counsel?

4         MR. KINGHORN:  Yes, Your Honor.  At this time, the

5    defense would call James Crump.

6         THE COURT:  Very well.  Mr. Crump, step up please.

7    Step over to the clerk to be sworn in, sir.

8                         **JAMES CRUMP,**

9    **Having Been First Duly Sworn, Was Examined and Testified As**

10   **Follows:**

11                    DIRECT EXAMINATION

12   BY MR. KINGHORN:

13   Q    Mr. Crump, can you hear me okay?

14   A    Yes.

15   Q    And could you please introduce yourself to the jury.

16   A    My name is James Crump.  I'm the deputy warden at ERDCC

17   in Bonne Terre, Missouri.

18   Q    And in October and November 2012, where were you

19   employed?

20   A    Potosi Correctional Center as an assistant warden.

21   Q    Can you tell the jury what an IRR complaint is?

22   A    At the institution, there's two phases to a grievance

23   system.  The first phase is an Informal Resolution Response,

24   also known as an IRR.  So if an offender has a complaint or a

25   grievance, he fills that out, and that goes through the chain

1    in regard to filing the grievance.

2    Q    Do you recall seeing an IRR that Mr. Davis submitted

3    regarding the knife investigation?

4    A    Yes, I did.

5    Q    And did you review that IRR?

6    A    Yes, I did.

7    Q    Was reviewing IRRs a normal part of your job at Potosi

8    Correctional Center?

9    A    Yes, sir.

10   Q    And just generally, what did Mr. Davis say about the

11   investigation in his IRR?

12            MR. SIMON:  Your Honor, could we move the

13   admission -- could we get the IRR into evidence as opposed to

14   having the witness tell us what's in the document?

15            MR. KINGHORN:  I would have a similar objection to

16   what I had with the letters, that it's riddled with other

17   unrelated things to this lawsuit.

18            THE COURT:  Then why are we talking about it?

19            MR. KINGHORN:  Well, there are relevant things in it.

20   It's just got irrelevant things as well.  So that would just

21   be my objection to the document itself.  I only intend to ask

22   him about four or five relevant questions.

23            THE COURT:  Well, can't we redact those things that

24   are irrelevant?

25            MR. KINGHORN:  I assume so, yeah.  I have not looked

20

1   through the document to figure out what we would redact

2   specifically.

3         MR. SIMON:  Well, if he doesn't know what to redact,

4   I don't know how he knows there is irrelevant things in there.

5   It's improper to have a witness from memory say what's in a

6   document when we have the document.  If he wants to redact

7   things, which means block things out, it takes it totally out

8   of context.

9         THE COURT:  Well, I have a very simple solution to

10  this.  If the purpose of the examination is to inquire about

11  certain specific aspects from this document and those are the

12  only aspects that are the focus of inquiry, then from a very

13  simplistic perspective, everything else is irrelevant and

14  everything else would be redacted except for those things that

15  are deemed the subject of inquiry because that's the specific

16  relevance of the inquiry, not the general relevance that other

17  things might have in the case.

18        MR. SIMON:  I understand your ruling, Your Honor.  I

19  would just like to make one more point.  His point is the lack

20  of something in that document.  He's not saying there is

21  something in there that is relevant.  He is saying my client

22  didn't put certain things in it.  So he is talking about that

23  that document is missing certain things, and he wants to blot

24  out some of it.  That's fine, I understand your ruling.

25        THE COURT:  I know.  I gotcha.  Go ahead.

1    Q    (By Mr. Kinghorn) And in that letter, Mr. Davis

2    complained about the interview that Mr. Lancaster had with

3    him; is that correct?

4    A    Yes.

5    Q    And did he say anything in that IRR about Stanley Pruett

6    allegedly being present during the interview?

7    A    No, he did not.

8    Q    Did he say anything in his IRR about Stanley Pruett

9    allegedly telling him to stop filing lawsuits?

10   A    No, he did not.

11   Q    Did he say anything in his IRR about Stanley Pruett

12   allegedly saying "when will you guys realize we run this

13   prison"?

14   A    No, he did not.

15   Q    And did he say anything in his IRR about Timothy

16   Lancaster allegedly telling him he won't file another lawsuit

17   here?

18   A    No, he did not.

19   Q    And actually, one last question, did he say anything in

20   the IRR about anything Dan Bryan allegedly said to him?

21   A    No, he did not.

22        MR. KINGHORN:  Thank you.  No further questions at

23   this time.

24        THE COURT:  Mr. Simon.

25

22

CROSS EXAMINATION

BY MR. SIMON:

Q    We are going to look for that IRR.  Sir, I just have a
few questions in the meantime.  When you were at the -- are
you still at Potosi now?

A    No, sir.  I'm in Bonne Terre prison.

Q    When you were at Potosi, how long were you there?

A    Three years.

Q    Okay.  During that time, are you familiar with the term
"administrative segregation"?

A    Yes, sir, I am.

Q    Am I correct or incorrect that that is a form of
punishment for prisoners or discipline if not punishment to
put them in administrative segregation?

A    No, it is not.

Q    Okay.  Have there been instances that you are aware of
where a prisoner violates some policy in the prison?

A    Yes, sir.

Q    Okay.  And has there ever been a situation you are aware
of where as a result of violating the prison's policy, a
prisoner is moved to administrative segregation?

A    The conduct rules and sanctions are policy, so if there
is a violation of those policies, yes.

Q    Yes what?

A    They would go to administrative segregation.

23

1   Q    So as a consequence of violating a prison policy, a

2   prisoner at Potosi during the time period in question could be

3   sent to administrative segregation?

4   A    Yes, they could.

5   Q    And that's not because of discipline?

6   A    It'd be pending the hearing of the conduct violation

7   which would then change the administrative segregation into

8   disciplinary segregation.

9   Q    What is disciplinary segregation?

10  A    Like getting a conduct violation and part of that may be

11  that you get ten days in disciplinary segregation.

12  Q    Okay.  I understand now.  When I said administrative

13  segregation, that phrase means you are in segregation but not

14  for discipline, but you can also be put in segregation for

15  discipline and that's called disciplinary segregation?

16  A    Yes, sir.

17  Q    Is that the same place in the prison as administrative

18  segregation?

19  A    Yes, sir, it is.

20  Q    Okay.  What was your title during the knife

21  investigation?

22  A    Assistant warden.

23  Q    Did you ever see any evidence that linked Frederick Davis

24  to the knife that was found?

25  A    No, sir.

24

```
1   Q    And did you know of any evidence that linked Frederick

2   Davis to the knife that was found in 2012?

3   A    No, sir.

4   Q    Did the investigation into Frederick Davis in connection

5   with the knife produce any evidence of wrongdoing or rule

6   violation by Mr. Davis?

7   A    Not that I know of, no.

8   Q    Is the shower where the knife was found considered a

9   common area?

10  A    Yes, sir.

11  Q    Did you have knowledge of Mr. Steele, Warden Steele,

12  initiating the transfer of Mr. Davis due to the events

13  surrounding Mr. Davis and the knife?

14  A    Yes, sir.

15  Q    Why did Mr. Steele want you to initiate a transfer of

16  Mr. Davis?

17  A    Well, at the time, he was working in the metal factory,

18  and it caused a lot of discontent with other offenders, so

19  basically it was a protective move, move him to another

20  institution away from these offenders.

21  Q    So you are testifying that the reason my client was

22  transferred was to protect him?

23  A    Yes, sir.

24  Q    Okay.  Do you remember giving a deposition in this case?

25  A    Yes, sir.
```

25

1      MR. SIMON:  Your Honor, may I approach the witness

2  please?

3      THE COURT:  You may.

4  Q   (By Mr. Simon) And I'm on page 11 and I'm going to talk

5  about the question at line 9.  I will be right with you.  I'm

6  going to let your attorney catch up.  Sir, you remember the

7  deposition where you sat down and took an oath and there was a

8  court reporter to take down everything that everybody said?

9  A   Yes, sir.

10 Q   Okay.  And you were asked this question at line 9 and

11 gave this answer:

12      "QUESTION:  Why did Mr. Steele want you to initiate

13 the transfer of Mr. Davis?

14      "ANSWER:  I, to the best of my recollection, it was

15 just a statement from Mr. Steele to me requesting me to

16 transfer Davis."

17 A   Yes, sir.

18 Q   Okay.  And that statement that Mr. Steele gave you, did

19 it mention anything in regard to Mr. Davis and the knife?

20 A   No, sir.

21 Q   Okay.  So if Warden Steele took the stand and testified

22 part of it was because he was on suspicion for the knife, you

23 would dispute that?

24 A   No, sir.

25 Q   Well, you think it's to protect him; right?  That's why

1   Mr. Davis was transferred, it was to protect him?

2   A    Yes, sir.

3   Q    So if Warden Steele said it was because of the knife

4   investigation, you would disagree with that?  That's not your

5   recollection?

6   A    It was because of the investigation, and the knife is the

7   reason that he would need to be transferred for protection.

8   Q    Did you ever hear from other inmates that the knife

9   belonged to Frederick Davis?

10  A    No, sir.

11  Q    From October 26th of 2012 to January 22, 2015, do you

12  know of Mr. Davis violating any Missouri Department of

13  Corrections rule?

14  A    Not that I'm aware of, no.

15  Q    Are you aware of any actions by Mr. Davis that threatened

16  the safety and security of Potosi Correctional Center while he

17  was there?

18  A    No, sir.

19  Q    Did anyone other than Mr. Steele instruct you to submit

20  Frederick Davis for a transfer?

21  A    No, sir.

22  Q    Okay.  Let me just look at this IRR.  Okay.  Sir, you

23  said this IRR -- and I'm going to give it to you so you can

24  look at it.

25          MR. SIMON:  May I approach, Your Honor?

27

1    THE COURT:  You may.

2    Q    (By Mr. Simon) And this is Defendant's Exhibit AAA for

3    identification.  You were asked some questions about what

4    Mr. Davis didn't put in here; right?

5    A    Yes, sir.

6    Q    Like whether or not Mr. Pruett was present at an

7    interview?

8    A    Yes, sir.

9    Q    In an IRR, is an offender required to put all the

10   evidence that he would use at a trial like this in the IRR?

11   A    I would guess not.

12   Q    And you wouldn't want that, would you, because you've got

13   to review these; right?

14   A    It doesn't matter what they put in it.  I'd review it.

15   Q    Right.  But if he had to put every fact in it, he'd be

16   giving you a phone book; right?

17   A    Well, sometimes you get them that have several pages.

18   Q    Okay.  Turn to the fourth page.  At the bottom, it's got

19   a number 27 in the corner.  It's a litigation number, 00027.

20   Are you there?

21   A    Yes, sir.

22   Q    And this was submitted on -- can you tell when this was

23   submitted on the first page, I apologize?

24   A    It appears it was submitted on January 11 -- no,

25   December 11, 2012.

28

1    Q    Well, it says date Staff Received By was 11/21/12.

2    A    All I can say is he signed it on 12/11/2012 and --

3    Q    Show me where that signature is you are talking about.

4    Just look at the top left front page.

5    A    Yes, I'm sorry, it's November 21, 2012.

6    Q    Okay.  So that's when he submitted it, November 21st.

7    And if you could turn to the second to last page, do you see

8    in the second full paragraph it says "the fact the wing's

9    surveillance video shows evidence that exonerates me"?  Do you

10   see that?

11   A    Is that on 27 also?  I don't see it.

12   Q    It's page 27.  It's the paragraph that starts with "the

13   fact that there are wing workers who work on every shift."  Do

14   you see that?

15   A    Yes, sir.

16   Q    In there he talks about he wants to see the surveillance

17   video or have somebody look at it to clear his name; right?

18   A    Yes, sir.

19   Q    Okay.  And he also talks about it could have been one of

20   the factory workers who recently quit the factory in the next

21   paragraph; right?

22   A    Yes, sir.

23   Q    And he also says on the last page where he is talking

24   about he was put in administrative segregation and he was not

25   seen within five working days by the classification committee;

1  right?

2  A    Yes, sir, I see that.

3  Q    Is there a policy that says you've got to do that?

4  A    Yes, sir.

5  Q    Did that happen in this case?

6  A    I don't know right offhand.

7  Q    Okay.  We have looked at a lot of documents in this case,

8  including an investigation report by Mr. Lancaster.  I haven't

9  seen a single document that says Mr. Davis was transferred to

10  protect him.  Do you know if any such document exists to

11  support your testimony?

12  A    It could possibly be on the transfer itself, the written

13  transfer request.

14  Q    Okay.

15  A    But I don't know that for a fact.

16       MR. SIMON:  Your Honor, I move the admission of

17  Defendant's Exhibit AAA.

18       MR. KINGHORN:  Your Honor, just a few very -- some

19  motion in limine stuff regarding offender names, and that's

20  it.

21       MR. SIMON:  So we can redact it offline and we will

22  put it in evidence.

23       THE COURT:  Very well.

24       MR. SIMON:  Thank you.  That's all I have.

25                        REDIRECT EXAMINATION

30

1   BY MR. KINGHORN:

2   Q    Mr. Crump, you were asked whether you were aware of

3   certain evidence during the investigation, and my question is

4   did you have any role in investigating the knife?

5   A    No, sir, I did not.

6         MR. KINGHORN:  I don't have anything further for this

7   witness.

8         MR. SIMON:  Nothing further, Your Honor.

9         THE COURT:  You may step down, sir.

10        THE WITNESS:  Thank you.

11        THE COURT:  Call your next witness.

12        MR. KINGHORN:  The defense rests.

13        THE COURT:  Side bar.

14  **(A Bench Conference Was Held On the Record and Outside of the**

15                **Hearing of the Jury As Follows:)**

16        THE COURT:  Motion.

17        MR. KINGHORN:  Your Honor, at this time the

18  defendants renew their motion for a directed verdict for the

19  same reasons stated previously on their motion at the close of

20  the plaintiff's case.

21        MR. SABLEMAN:  Your Honor, nothing has changed with

22  regard to our case.  If anything, Mr. Crump's testimony

23  supports our case.

24        THE COURT:  All right.  Any response?

25        MR. KINGHORN:  We'll stand on the arguments made in

1    our motion.

2            THE COURT:  All right.  Defendants' motion at the

3    close of the entire case is overruled and denied, and

4    defendant will be granted the opportunity to file a written

5    motion at a later time should it become necessary.  So any

6    rebuttal?

7            MR. SIMON:  No, Your Honor.

8            THE COURT:  Okay.  Well, it's too early to send them

9    to lunch, so I'm just going to have them do a temporary

10   recess, and while they are in recess, I guess we will do our

11   instruction conference, and hopefully we can get through that

12   fairly rapidly and be ready for them sometime soon.

13           MR. SIMON:  We're pretty close.

14   **(The Following Proceedings Were Held Within the Hearing and**

15   **Presence of the Jury.)**

16           THE COURT:  Ladies and gentlemen of the jury, the

17   evidence in this case has been concluded, and this provides

18   the necessity and opportunity for the lawyers and myself to

19   come together to do some final work with regard to certain

20   legal issues to make the case ultimately ready to be presented

21   to you by way of closing argument and for your deliberations.

22   To do that, it's going to take a little while.  I can't tell

23   you how long it's going to take other than to say that my hope

24   and desire is that it will not take us very long to get ready

25   for you.  So we are going to be in temporary recess.  While we

1   are working, you guys won't have to work, but we'll be working

2   during this temporary recess to get ready for you.

3            During the course of the recess, do not discuss the

4   case amongst yourselves or with anyone else.  Do not allow

5   anyone to discuss it within your hearing or presence.  Do not

6   form or express any opinions about the case until it is given

7   to you to decide.  During the course of the break, do not

8   read, view, or listen to any media accounts regarding the

9   trial and, of course especially as always, do not utilize your

10  cell phones or other web-enabled devices to access the

11  internet and especially those sites on the internet that are

12  social media type sites that might allow for a discussion of

13  the case or some posting regarding the case.  We will be in

14  temporary recess.  If you need to take a break from the floor,

15  feel free to do that.  Don't stay gone too long though,

16  whatever that might mean.  Use your best judgment.  I think

17  probably we will need about a half hour.  It might be a little

18  longer.  So if you have to leave the floor, you are good for a

19  half hour and cruise back up, okay?  All right.  Thank you

20  very much.

21            **(Court Recessed from 10:30 a.m. until 11:00 a.m.)**

22  **(The Following Proceedings Were Held Outside the Hearing and**

23                    **Presence of the Jury.)**

24            THE COURT:  You made reference, Mr. Sableman, to

25  document 382-1.  Is that what you are referring to?

1      MR. SABLEMAN:  Yes, Your Honor.  That's the challenge

2  to model instructions.

3      THE COURT:  All right.  And as I reviewed 382-1, each

4  of those instructions that were submitted as part of that

5  document filing reflected I believe verdict directors for the

6  claims as they relate to each defendant; is that correct?

7      MR. SABLEMAN:  That is correct, elements of the

8  claim.

9      THE COURT:  Okay.  And as I understand from looking

10  at those and comparing those with the submissions by defendant

11  as well as the Eighth Circuit Model Instructions which appear

12  to be the basis for the defendant submissions, the plaintiff's

13  submission make references to materiality I believe.

14      MR. SABLEMAN:  Your Honor, the one change we made was

15  from "determining factor" to "motivating factor", and we filed

16  docket entry 354 in support of that change.

17      THE COURT:  Right.

18      MR. SABLEMAN:  But again, we are happy with your

19  decision yesterday not to argue --

20      MR. SIMON:  We're not happy with your decision, but

21  we accept it.  We are just making our record.

22      THE COURT:  Which points out an interesting and

23  important lesson in life that I have been telling my son since

24  forever, which is this, Son, understand it doesn't matter to

25  me whether you like what I say or whether you're happy with

1    what I say.  All that matters is that you accept it and go

2    along with the program.  And you know what?  To this day, he

3    still furrows his eyebrow and gives me that look that from his

4    mouth is coming one thing, but there are all sorts of other

5    things that he is thinking in his head, and you know what they

6    are and you don't like them, but he never says them.  And I

7    guess that's called respect.  So anyway, thank you for the

8    respect.

9         That being said then, plaintiff's submissions that

10   are noted in document number 382 referencing the verdict

11   directors for each defendant will be shown as submitted but

12   not given.

13        MR. SIMON:  Your Honor, I think I need to correct

14   just to make sure we are clear.  The defendants submitted some

15   proposed instructions.  Last night we looked at those, and we

16   found some other things that we didn't think were just right,

17   so we submitted some alternatives that are in line with the

18   Eighth Circuit Model rule that the defendants have now agreed

19   to with the exception of some language.  So we just have that

20   little bit of language.  So we are not going to use the

21   defendants' proposals; we are going to use some of our other

22   proposals that are labeled in 382.

23        THE COURT:  Got it.  However, those have been

24   tweaked, the ones -- you have submitted some new ones?

25        MR. SIMON:  Yeah, the only one that has the

35

1   "motivating" as opposed to "determining" is A.

2            MR. SABLEMAN:  Correct.

3            THE COURT:  Okay.

4            MR. SIMON:  B, C, D, and on use the language right

5   out of the Eighth Circuit rule.  It tried to be tailored to

6   this case, and it's the tailoring to this case that we have

7   the dispute on.  It's really just one clause of the verdict

8   director for each defendant.

9            THE COURT:  All right.  So let's look at plaintiff's

10  submission, Proposed Jury Instruction Number A.

11           MR. SABLEMAN:  I'm sorry, could you repeat that?

12           THE COURT:  Plaintiff's Proposed Instruction A, and

13  that would be the verdict director for Defendant Troy Steele.

14           MR. SABLEMAN:  This is an example verdict director

15  with the motivating factor which we are not arguing today, so

16  we would like to start with the ones that we agreed on if

17  that's possible.

18           THE COURT:  All right.

19           MR. SABLEMAN:  So Exhibit B in plaintiff's docket

20  382, 382-1, instruction B is actual damages, and defendants

21  agreed with our changes to actual damages.

22           THE COURT:  Well, here's the problem.  I have two Bs,

23  and I think one is a copy that was just printed out.  It does

24  not have a reference to a docket number on it that I

25  understand was corrected or modified or an adjusted version.

1          MR. SIMON:  Is that the one that we e-mailed?  Your

2    Honor, what we did was in anticipation of having to change B,

3    once you rule, we wanted to have that so we could make

4    whatever change you rule on and conform Exhibit 382-B to

5    whatever you rule on.

6          THE COURT:  All right.  So then what is the

7    submission for jury instruction B with respect to damages?

8    What's that going to read?

9          MR. SABLEMAN:  Your Honor, may I hand you a copy of

10   docket entry 382 if that would help.

11         THE COURT:  I have 382, but I'm confused, so it would

12   be better off if you read it to me so I can read along.

13         MR. SABLEMAN:  Yes, Your Honor.  So the only thing we

14   changed was we added "emotional suffering".  So element 1,

15   "You should consider the following elements of damages:  The

16   physical pain and mental or emotional suffering."  Defendants

17   agreed to that change.  We also added element 2, "The wages or

18   reasonable value of the working time," which defendants also

19   agreed to.

20         THE COURT:  All right.

21         MR. SABLEMAN:  The next instruction is C, and that is

22   punitive damages which defendants contest.

23         THE COURT:  Mr. Kinghorn.

24         MR. KINGHORN:  Right, we object to a punitive damages

25   instruction being read in this case.  The plaintiff did not

1    plead for punitive damages.  We have not been on notice that

2    he was going to seek punitive damages, and we don't think the

3    evidence supports a punitive damages award.

4              MR. SABLEMAN:  Your Honor, we believe that the

5    testimony elicited in this case showed willful or malicious

6    conduct, in particular on the part of Warden Steele, and we

7    did give notice in the opening statement that we would be

8    seeking punitive damages.

9              THE COURT:  Well, what about his argument that

10   plaintiff did not plead in their pleadings a request for

11   punitive damages?

12             MR. SABLEMAN:  Your Honor, Mr. Davis was a pro se

13   plaintiff, and we believe that this Court can -- that the

14   defendants could have had notice given that pro se litigants

15   often do not include every element in their pleadings.

16             MR. SIMON:  Your Honor, I would just note that we

17   weren't in the case.  We were just brought in the case

18   recently, so he didn't have an opportunity of our advice at

19   the time.

20             THE COURT:  I understand.  Mr. Kinghorn, anything

21   else?

22             MR. KINGHORN:  Just that I have the case law in

23   support, Campbell versus Thornton, the relevant portion being

24   "defendants did not have fair notice of plaintiff's intention

25   to seek punitive damages and those punitive damages awarded in

1    the verdict would be set aside where the complaint did not

2    contain a prayer for punitive damages," and this was out of

3    the Western District of Missouri.

4            THE COURT:  All right.

5            MR. KINGHORN:  Just for the record, the cite is 644

6    F.Supp 103, 1986.

7            THE COURT:  All right.

8            MR. SABLEMAN:  Your Honor, just one point.  I am

9    looking at the second amended complaint, and Mr. Davis did

10   request attorney's fees, which we understand he cannot

11   receive.  The defendants could have been on notice that those

12   attorney's fees are punitive damages.

13           THE COURT:  Okay.  The objection to the punitive

14   damage instruction is noted but overruled.  I'm going to give

15   it, Mr. Kinghorn, and we'll see what happens, okay?  Next.

16           MR. SABLEMAN:  Your Honor, plaintiff's docket entry

17   382 --

18           MR. KINGHORN:  Your Honor, before we move on from

19   that, since that is being admitted, there is one paragraph

20   that we believe should be added to the bottom.  It's in the

21   model rule.

22           MR. SABLEMAN:  That's right, we agreed to add this

23   paragraph.

24           MR. KINGHORN:  I don't have the exact language in

25   front of me, but I can get it.  We have agreed to language

1    with regards to the "you can award different punitive damages

2    awards for each of the defendants."

3              THE COURT:  Right.  Are you going to prepare that?

4              MR. SABLEMAN:  Yes, Your Honor, we will add that

5    language.

6              THE COURT:  All right.

7              MR. SABLEMAN:  Your Honor, turning to instruction D,

8    these are the elements of the claim.  The dispute -- the

9    defendants agree to everything except for the use of the

10   language "kept in long-term administrative segregation" for

11   the third adverse action, which we are alleging against three

12   of the four defendants.

13             THE COURT:  And where is that language located?

14             MR. SABLEMAN:  If you look at Second -- it's actually

15   in Second, Third, and the final paragraph which begins

16   "the 1983 claim", and the reason that we are asking for this,

17   "kept in long-term administrative segregation", is we believe

18   that is the claim that Mr. Davis exhausted.  In your motion

19   for summary judgment, you noted the claim he exhausted was

20   that he was wrongfully transferred from one segregation unit

21   to another segregation unit, and the defendants have

22   interpreted that literally to mean that he was transferred I

23   believe from ordering that plaintiff be re-assigned from

24   administrative segregation housing unit 3 to administration

25   segregation housing unit 2; however, that's not the adverse

1  action that Mr. Davis suffered.  He is not complaining about

2  the literal transporting him between units or that the name of

3  the administrative segregation changed.  The adverse action

4  effect is that he was kept in administrative segregation,

5  whether short-term or long-term, wrongfully, and that he was

6  not released back to the general population.  And the two

7  alternatives we proposed to defendants when we were conferring

8  is that we would also agree to "kept longer than he should

9  have been" or that "he was not sent back to general

10 population."

11      THE COURT:  And where would that language be placed

12 if you agreed to that language?

13      MR. SABLEMAN:  So at the end of the paragraph Second

14 "or ordered that plaintiff be kept in long-term administration

15 segregation."  We would also agree "or plaintiff was kept

16 longer than he should have been" or "plaintiff was not sent

17 back to general population."

18      THE COURT:  Both of those?

19      MR. SABLEMAN:  We would agree to any of those;

20 however, defendants are not in agreement with that.

21      THE COURT:  Mr. Kinghorn.

22      MR. KINGHORN:  Your Honor, we believe that the

23 language used in your order on summary judgment is

24 appropriate.  The claim that you specifically said Mr. Davis

25 exhausted and can proceed to trial on, the relevant claim

1    stated -- and this is doc 142, page 12 -- and it says

2    "wrongfully transferred from one segregation unit to another

3    segregation unit."  In fact, Mr. Davis's claim has been the

4    transfer itself was adverse, and that is what was litigated

5    throughout this lawsuit, and in particular I think the theory

6    was that because he was transferred out of Stanley Pruett's

7    housing unit to another housing unit, he didn't get his

8    materials as quickly, and so he absolutely was claiming that

9    the transfer itself was the adverse action, so we think that's

10   what should remain in the instruction.

11        MR. SABLEMAN:  Your Honor, our theory in that regard

12   has been that anytime you were in ad-seg, whether it's TASC or

13   long-term, you faced more restrictions on access to your legal

14   materials than when you are in general population.  We never

15   made any argument with regard to how Stanley Pruett -- in

16   fact, he testified to knowing nothing in this case, so we

17   never argued that he specifically was the reason the legal

18   materials were denied and that had anything to do with the

19   transfer.

20        THE COURT:  Anything else, Mr. Kinghorn?

21        MR. KINGHORN:  I would just say that changing it to

22   what was suggested that they didn't move him back and that

23   they didn't do something, that's a passive action -- if that's

24   a term -- as opposed to an affirmative action, which is what

25   is set out in your order.  They then transferring him is

42

1  something that they have affirmatively done to him.  Them not

2  moving him back to general population as counsel suggests

3  would not be an affirmative action by the defendants.

4         THE COURT:  All right.

5         MR. SABLEMAN:  Your Honor, if I may, just one more

6  statement.  We would agree with if it's the affirmative act,

7  we could say "transferred to long-term and not sent back to

8  general population."  We just want to make it clear that the

9  long-term is not general population and that was Mr. Davis's

10 concern.

11        THE COURT:  What about that?

12        MR. KINGHORN:  I would also say that long -- the term

13 itself, "long-term segregation," isn't supported by the

14 evidence.  The evidence was that housing unit 2 was the

15 segregation unit.  Housing unit 3 is used as an overflow.  If

16 there were only so many inmates as needed that could all fit

17 in housing unit 2, then housing unit 3 wouldn't be used at all

18 for segregation.  It's just an overflow.

19        MR. SABLEMAN:  And, I'm sorry, just to clarify my

20 last instruction I have agreed to.

21        THE COURT:  Hold on, Mr. Sableman.  What if the last

22 line of the subject paragraphs read "ordered that plaintiff be

23 kept in administrative segregation" and "long-term" was

24 deleted?

25        MR. SABLEMAN:  Your Honor, absolutely we would get

<u>Volume 3</u>

43

```
 1   rid of "long-term", that's fine.

 2            THE COURT:  Mr. Kinghorn.

 3            MR. KINGHORN:  I think that we still have the problem

 4   that the claim that has been litigated throughout this entire

 5   lawsuit has been that his transfer from 3 house to 2 house

 6   harmed him somehow, and so that's what the discovery was based

 7   on, that's what all the litigation up to this point was based

 8   on, that's what the summary judgment motions were based on.

 9   Now since the evidence at trial doesn't support that, the

10   theory has changed at the eleventh hour to this him not being

11   released back to general population is now the claim.  We have

12   not been on notice of that until this point.  And I would just

13   for the record, the language that we suggested, which tracks

14   very similarly to the language in your order which we would

15   also be okay with, is that "ordered that plaintiff be

16   reassigned from administrative segregation in housing unit 3

17   to administrative segregation in housing unit 2 during that

18   investigation."

19            THE COURT:  All right.  Anything else?

20            MR. SABLEMAN:  Yes, Your Honor -- no, we'll let you

21   decide.

22            THE COURT:  All right.  So the verdict director with

23   respect to Timothy Lancaster and I guess that language is in

24   -- is that language in the other verdict directors as well?

25            MR. SABLEMAN:  Yes, Your Honor.  That language is in
```

1   Bryan and Pruett's as well but not Steele's.

2          THE COURT:  Okay.  So the proposed verdict directors

3   by the plaintiff will be given with the exception of the

4   deletion of the word "long-term" preceding "administrative

5   segregation" wherever it might appear, okay?

6          What about the verdict director for Defendant Troy

7   Steele, any issues with that one?

8          MR. KINGHORN:  No, Your Honor, we were fine with

9   their instruction on that one.

10         THE COURT:  Okay.  And Stanley Pruett?

11         MR. SABLEMAN:  Your Honor, the changes we just agreed

12  to apply to Lancaster, Bryan, and Pruett unless the defendants

13  have any further objections.

14         MR. KINGHORN:  We don't agree to the striking of

15  "long-term", but I understand that that is your ruling on

16  Timothy Lancaster's instruction.

17         THE COURT:  All right.  So those are the verdict

18  directors for all of the defendants; correct?

19         MR. KINGHORN:  Yes, Your Honor.

20         THE COURT:  All right.  Any issues with any other

21  submissions?

22         MR. SABLEMAN:  Your Honor, the plaintiffs withdraw

23  their docket entry 379 to add an instruction.

24         THE COURT:  What was 379?

25         MR. SABLEMAN:  It was to add that the filing of a

1   lawsuit is a protected activity; however, the verdict director

2   does not require the jury to find it was a protected activity,

3   merely that he filed a lawsuit, so there was no need for that

4   instruction.

5       THE COURT:  All right.  So you are withdrawing that

6   submission.  All right.  And that's the one that cites Goff

7   versus Burton and Sanders versus St. Louis County; right?

8       MR. SABLEMAN:  Your Honor, I don't have it in front

9   of me.  It's docket entry 379.

10      MR. KINGHORN:  Yes, Your Honor, that's correct.

11      THE COURT:  All right.  Thank you.  What about the

12  verdict form?

13      MR. KINGHORN:  I believe that defendants are the

14  only -- we have filed one.  I don't believe the plaintiffs

15  have, so I guess we're in agreement with that form.

16      MR. SABLEMAN:  Yes.

17      THE COURT:  Okay.

18      MR. SABLEMAN:  Your Honor, one oversight.  We may

19  have to add a verdict form for punitive damages.  I don't

20  believe we submitted one.

21      THE COURT:  I didn't see one, so yes, you will.

22  Anybody have any preference with respect to the order of the

23  verdict forms for each defendant?

24      MR. KINGHORN:  We don't, Your Honor.

25      MR. SABLEMAN:  No, Your Honor.

46

1          THE COURT:  All right.

2          MR. SIMON:  Your Honor, do you want us to send you a

3    revised without "long-term" and adding the paragraph to C, the

4    damages instruction?

5          THE COURT:  Please do, yes.  That will be great and

6    quicker.

7          MR. SIMON:  Did you want us to get a form on

8    punitives or did you say you had one?

9          THE COURT:  Yes, get a form on punitives.

10         MR. SIMON:  May we be excused to make a call?

11         THE COURT:  Yeah.

12      **(Court Recessed from 11:20 a.m. until 11:30 a.m.)**

13         THE COURT:  Okay.  Back on the record for purposes of

14   our instruction conference.  I have received those corrected

15   instructions, Mr. Simon.  Subject to the objections by the

16   defendant, they look consistent with the discussions that we

17   had earlier as well as the clean verdict form.  I do have a

18   question though with respect to the damages instruction.

19   The 471 instruction, the nominal damages instruction submitted

20   by defendants that I think plaintiff is in agreement with,

21   reads, If you find in favor of the plaintiff under instruction

22   number, whatever, for each defendant, but you find that the

23   plaintiff's damages have no monetary value, then you must

24   return a verdict for the plaintiff in the nominal amount of

25   one dollar.  Now there are four defendants?

1          MR. SIMON:  Yes, Your Honor.

2          THE COURT:  Four remaining defendants.  That being

3    the case, there would be -- would you not agree that there

4    should be a nominal damage instruction relative each verdict

5    director, each defendant?

6          MR. SIMON:  That's what we would request, Your Honor.

7          THE COURT:  And likewise with 470 submitted by

8    defendants, If you find in favor of the plaintiff, you must

9    award him an amount of money that will fairly compensate him

10   for any damages you find he sustained as a direct result of

11   defendants as submitted in instruction numbers {blank} and

12   {blank}.  Would you agree also that there would be one of

13   those for each defendant?

14         MR. SIMON:  That is an interesting question, Your

15   Honor.  I hadn't thought of that.  He certainly has one amount

16   of damage.  The question is, is it divided up or is it total.

17   I have never faced that before in one of these cases.

18         THE COURT:  I never thought about it before in one of

19   these cases.  It occurred to me as I was in the back

20   collecting them together.  I'm just asking.  What do you

21   think, Mr. Kinghorn?

22         MR. KINGHORN:  Well, as I read it, I don't know that

23   it will cause an issue, especially given that the verdict

24   forms themselves have, you know, separate lines for each

25   defendant, so I don't see a problem with it.

```
 1              THE COURT:  So you would give one for each defendant

 2   or just the one instruction itself?

 3              MR. KINGHORN:  I think the one instruction is

 4   sufficient.

 5              MR. SIMON:  So one instruction but four verdict

 6   forms?

 7              MR. KINGHORN:  That's what I would say.

 8              MR. SIMON:  That's okay with us.  Otherwise, we might

 9   end up having four amounts and having to try to decide -- you

10   know, it might be inconsistent.

11              THE COURT:  Right.

12              MR. SIMON:  Thank you, Your Honor.

13              THE COURT:  All right.  One other question.  Does

14   anyone have any objection if the lead paragraph for

15   instruction 470 as read to the jury and as given to the jury

16   would reflect in the following fashion:  If you find in favor

17   of the plaintiff, you must award him an amount of money that

18   will fairly compensate him for any damages you find he

19   sustained as a direct result of the defendants.  You should

20   consider the following elements of damages?

21              MR. SIMON:  Plaintiffs agree to that, Your Honor.

22              THE COURT:  Mr. Kinghorn?

23              MR. KINGHORN:  As do we, Your Honor.

24              THE COURT:  All right.

25              MR. SIMON:  Your Honor, did you prepare your own
```

1    preliminary instructions before the verdict directors or are

2    you going on the defendants'?  I noted there's one correction

3    in what the defendants submitted on the preliminary

4    instructions.  It had 12 defendants.

5                THE COURT:  Right.

6                MR. SIMON:  And it should just say four.  And then

7    the word lawyer is misspelled one time, it's layer.

8                THE COURT:  Right.  Okay.  Let me go back and get

9    these resolved and then we're almost there.

10                MR. SIMON:  Are you going to plan that we close and

11    then they go to lunch?

12                THE COURT:  Actually probably by the time we actually

13    start arguing, there is a good chance they will have finished

14    their lunch because their lunch is being delivered to them

15    now.  And while I am getting these, think about how much time

16    you guys want for argument and how you want your time divided

17    up for the plaintiff and what kind of warning you want at the

18    end of each section and what kind of warning you want at the

19    end of your section.

20                **(Court Recessed from 12:40 p.m. until 1:00 p.m.)**

21                THE COURT:  All right.  So on the record for the

22    formal instruction conference.  One through seven have already

23    been given and will not be re-read.  The first instruction to

24    be read to the jury will be instruction number 8, Members of

25    the jury, the instructions I gave you at the beginning;

1   instruction number 9, In deciding what the facts are, you may

2   have to decide what testimony you believe; instruction number

3   10, You will have to decide whether certain facts have been

4   proved by the greater weight of the evidence; instruction 11,

5   You have heard evidence that Frederick Davis was previously

6   convicted of crimes; instruction 12, Although there is more

7   than one defendant in this action, it does not follow from

8   that fact alone; 13, The fact that I will instruct you on the

9   proper measure of damages; 14, the verdict director for

10  Timothy Lancaster; 15, the verdict director for Troy Steele;

11  16, the verdict director for Dan Bryan; 17, the verdict

12  director for Stanley Pruett; 18, damages; 19, nominal damages

13  for 14; 20, nominal damages for instruction number 15; 21,

14  nominal damages for instruction number 16; 22, nominal damages

15  for instruction number 17; instruction number 23, punitive

16  damages regarding instruction number 14; 24, punitive damages

17  regarding instruction number 15; 25, punitive damages

18  regarding instruction number 16; 26, punitive damages

19  regarding instruction 17; and 27, verdict mechanics; and then,

20  of course, the verdict form.

21         Other than the objections as previously noted to

22  certain instructions, does anybody have any objections as the

23  Court has delineated the order of the instructions as well as

24  the instructions that it will give?

25         MR. SIMON:  No other objections for the plaintiff.

51

1    Just to make clear, docket 382-1, we gave a proposed

2    instruction for the motivating factor.  We understand it's

3    been rejected.  We only proposed one, but we would repeat that

4    for all four defendants, but we just gave one example for the

5    reasons stated in docket 354.

6              THE COURT:  Response, Mr. Kinghorn?

7              MR. KINGHORN:  Well, as far as a response to that

8    instruction he is referring to, we used the Eighth Circuit

9    Model rule and we also think that the language tracks with the

10   relevant elements of retaliation.

11             THE COURT:  The instruction tendered and submitted by

12   the plaintiff as noted will be shown as offered and submitted

13   but refused as to each submission for each defendant.  Anybody

14   have any objection to the verdict form as to each plaintiff?

15             MR. KINGHORN:  No, Your Honor.

16             THE COURT:  Or each defendant rather.

17             MR. SIMON:  No, Your Honor.

18             THE COURT:  Okay.  How much time do you guys want for

19   argument?  Mr. Simon?

20             MR. SIMON:  Your Honor, I reluctantly -- I'm willing

21   to do 30 and 10, but I think I will use 20 and 5.

22             MR. KINGHORN:  I am going to say 25.

23             THE COURT:  All right.

24             MR. KINGHORN:  I will probably use 20.

25             THE COURT:  So you want 25 minutes, Mr. Simon; is

52

1    that right?

2            MR. SIMON:  Sure, Your Honor, that would be fine.

3    Can I get a warning at 20.

4            THE COURT:  You know, we only have actual one and a

5    quarter day of testimony.

6            MR. SIMON:  I understand, Your Honor.  I really think

7    I can get it done in 20 minutes.  Do you want me to do it in

8    20 and 5?  I will do it in 20 and 5, Your Honor, no problem.

9    You know me, I talk kind of fast.

10           THE COURT:  You do.  So you really only want 20

11   minutes?

12           MR. SIMON:  No, I need 25, Your Honor.

13           THE COURT:  All right.  So you want 20 minutes for

14   your first portion and five minutes for rebuttal?

15           MR. SIMON:  Yes, with a two-minute warning please.

16           THE COURT:  For each section?

17           MR. SIMON:  Yes, Your Honor.

18           THE COURT:  What kind of warning do you want, Mr.

19   Kinghorn?

20           MR. KINGHORN:  Two minutes please.

21           THE COURT:  Two-minute warning also?

22           MR. KINGHORN:  Yes, Your Honor.

23           THE COURT:  All right.

24   **(The Following Proceedings Were Held Within the Hearing and**

25   **Presence of the Jury.)**

1          THE COURT:  Good afternoon, ladies and gentlemen.

2  Counsel, are you ready to proceed?

3          MR. SIMON:  Yes, Your Honor.

4          MR. KINGHORN:  Yes, Your Honor.

5          THE COURT:  Members of the jury, the instructions I

6  gave you at the beginning of the trial and during the trial

7  are still in effect.  I will give you some additional

8  instructions at this time.  You have to follow all of my

9  instructions, the ones I gave you earlier as well as those I

10  give you now.  Do not single out some instructions and ignore

11  others because they are all important.  This is true even

12  though I am not going to repeat some of the instructions I

13  gave you at the beginning of the trial and during the trial.

14  You will have copies of the instructions I am about to give

15  you now in the jury room.  You will have copies of some of the

16  instructions with you in the jury room; others you will not

17  have copies of.  This does not mean some instructions are more

18  important than others.  Remember, you have to follow all

19  instructions no matter when I give them and whether or not you

20  have written copies.

21          Instruction number 9, In deciding what the facts are,

22  you may have to decide what testimony you believe and what

23  testimony you do not believe.  You may believe all of what a

24  witness said or only part of it or none of it.  You may

25  consider a witness's intelligence, the opportunity the witness

1   had to see or hear the things testified about, the witness's

2   memory, knowledge, education, and experience, any reasons a

3   witness might have for testifying a certain way, how a witness

4   acted while testifying, whether a witness said something

5   different at another time, whether a witness's testimony

6   sounded reasonable, and to what extent a witness's testimony

7   is consistent with other evidence you believe.  In deciding

8   whether to believe a witness, remember that people sometimes

9   hear or see things differently and sometimes forget things.

10  You will have to decide whether a contradiction is an innocent

11  misrecollection or a lapse of memory or an intentional

12  falsehood, and that may depend on whether it has to do with an

13  important fact or only a small detail.

14        Instruction number 10, You will have to decide

15  whether certain facts have been proved by the greater weight

16  of the evidence.  A fact has been proved by the greater weight

17  of the evidence if you find that it is more likely true than

18  not true.  You decide that by considering all the evidence and

19  deciding what evidence is more believable.  You have probably

20  heard the phrase "proof beyond a reasonable doubt".  That is a

21  stricter standard than "more likely true than not true."  It

22  applies only in criminal cases and not in a civil case such as

23  this.  Put that out of your mind.

24        Instruction number 11, You have heard evidence that

25  Frederick Davis was previously convicted of crimes.  You may

1   use that evidence only to help you decide whether to believe

2   his testimony and how much weight to give it.

3        Instruction number 12, Although there is more than

4   one defendant in this action, it does not follow from that

5   fact alone that if one defendant is liable to the plaintiff,

6   all defendants are liable.  Each defendant is entitled to a

7   fair consideration of the evidence.  None of the defendants

8   are to be prejudiced should you find against one defendant.

9        Instruction number 13, The fact that I will instruct

10  you on the proper measure of damages should not be considered

11  as an indication of any view of mine as to which party is

12  entitled to your finding in this case.  Instructions as to the

13  measure of damages are given only for your guidance and for

14  your use only in the event that you should find in favor of

15  the plaintiff by a greater weight of the evidence on the

16  question of liability and in accord with the other

17  instructions.

18       Instruction number 14, Your verdict must be for

19  Plaintiff Frederick Davis and against Defendant Timothy

20  Lancaster on plaintiff's retaliation claim if all the

21  following elements have been proved:  First, Plaintiff

22  Frederick Davis filed a Section 1983 claim against Defendant

23  Timothy Lancaster on November 1, 2011; and second, Defendant

24  Timothy Lancaster ordered that plaintiff be held in

25  administrative segregation under investigation regarding a

56

knife found in the shower, or ordered that plaintiff not be

given a truth verification test during the investigation, or

ordered that plaintiff be kept in administrative segregation;

and third, plaintiff's being held in administrative

segregation under investigation regarding the knife found in

the shower, being denied a truth verification test, or being

kept in administration segregation might well dissuade a

reasonable person in the same or similar circumstances from

filing a Section 1983 claim; and fourth, plaintiff's

Section 1983 claim was a determining factor in the defendant's

decision to order that plaintiff be held in administrative

segregation under investigation regarding the knife found in

the shower or refusing to give plaintiff a truth verification

test.  If any of the above elements has not been proved, your

verdict must be for defendant and you need not proceed further

in considering this claim.

     The Section 1983 claim against Defendant Timothy

Lancaster was a "determining factor" only if Defendant Timothy

Lancaster would not have ordered that plaintiff be held in

administrative segregation under investigation regarding the

knife found in the shower, ordered that plaintiff not be given

a truth verification test during the investigation, or ordered

that plaintiff be kept in administrative segregation but-for

plaintiff's filing a Section 1983 claim.  It does not require

that the Section 1983 claim was the only reason for the

decision made by Defendant Timothy Lancaster.  You may find
that plaintiff's Section 1983 claim was a determining factor
in defendant's actions if it has been proved that defendant's
stated reasons for his actions are a pretext to hide
retaliation.

Instruction number 15, Your verdict must be for
Plaintiff Frederick Davis and against Defendant Troy Steele on
plaintiff's retaliation claim if all the following elements
have been proved:  First, Plaintiff Frederick Davis filed a
Section 1983 claim against Defendant Timothy Lancaster on
November 1, 2011; and second, Defendant Troy Steele ordered
that plaintiff be held in administrative segregation under
investigation regarding the knife found in the shower, or
ordered that plaintiff not be given a truth verification test
during the investigation; and third, plaintiff being held in
administrative segregation under investigation regarding the
knife found in the shower or being denied a truth verification
test might well dissuade a reasonable person in the same or
similar circumstances from filing a Section 1983 claim; and
fourth, plaintiff's Section 1983 claim was a determining
factor in the defendant's decision to order that plaintiff be
held in administrative segregation under investigation
regarding the knife found in the shower or ordered that
plaintiff not be given a truth verification test.  If any of
the above elements has not been proved, your verdict must be

58

1   for defendant, and you need not proceed further in considering

2   this claim.

3          The Section 1983 claim against Defendant Timothy

4   Lancaster was a "determining factor" only if Defendant Troy

5   Steele would not have ordered that plaintiff be held in

6   administrative segregation under investigation regarding the

7   knife found in the shower or would have given plaintiff a

8   truth verification test but-for plaintiff's filing a

9   Section 1983 claim.  It does not require that the Section 1983

10  claim was the only reason for the decision made by Defendant

11  Troy Steele.  You may find that plaintiff's Section 1983 claim

12  was a determining factor in defendant's actions if it has been

13  proved that defendant's stated reasons for his actions are a

14  pretext to hide retaliation.

15         Instruction number 16, Your verdict must be for

16  Plaintiff Frederick Davis and against Defendant Dan Bryan on

17  plaintiff's retaliation claim if all the following elements

18  have been proved:  First, Plaintiff Frederick Davis filed a

19  Section 1983 claim against Defendant Timothy Lancaster on

20  November 1, 2011; and second, Defendant Dan Bryan ordered that

21  plaintiff be held in administrative segregation under

22  investigation regarding the knife found in the shower or

23  ordered that plaintiff be kept in administrative segregation;

24  and third, plaintiff being held in administrative segregation

25  under investigation regarding the knife found in the shower or

1    being kept in administrative segregation might well dissuade a

2    reasonable person in the same or similar circumstances from

3    filing a Section 1983 claim; and fourth, plaintiff's

4    Section 1983 claim was a determining factor in the defendant's

5    decision to order that plaintiff be held in administrative

6    segregation under investigation regarding the knife found in

7    the shower or ordering that plaintiff be kept in

8    administrative segregation.  If any of the above elements has

9    not been proved, your verdict must be for defendant, and you

10   need not proceed further in considering this claim.

11        The Section 1983 claim against Defendant Timothy

12   Lancaster was a "determining factor" only if Defendant Dan

13   Bryan would not have ordered that plaintiff be held in

14   administrative segregation under investigation regarding the

15   knife found in the shower or ordered that plaintiff be kept in

16   administrative segregation but-for plaintiff's filing a

17   Section 1983 claim.  It does not require that the Section 1983

18   claim was the only reason for the decision made by Defendant

19   Dan Bryan.  You may find that plaintiff's Section 1983 claim

20   was a determining factor in defendant's actions if it has been

21   proved that defendant's stated reasons for his actions are a

22   pretext to hide retaliation.

23        Instruction number 17, Your verdict must be for

24   Plaintiff Frederick Davis and against Defendant Stanley Pruett

25   on plaintiff's retaliation claim if all the following elements

60

1    have been proved:  First, Plaintiff Frederick Davis filed a

2    Section 1983 claim against Defendant Timothy Lancaster on

3    November 1, 2011; and second, Defendant Stanley Pruett ordered

4    that plaintiff be held in administrative segregation under

5    investigation regarding the knife found in the shower or

6    ordered that plaintiff be kept in administrative segregation;

7    and third, plaintiff being held in administrative segregation

8    under investigation regarding the knife found in the shower or

9    being kept in administrative segregation might well dissuade a

10   reasonable person in the same or similar circumstances from

11   filing a Section 1983 claim; and fourth, plaintiff's

12   Section 1983 claim was a determining factor in the defendant's

13   decision to order that plaintiff be held in administrative

14   segregation under investigation regarding the knife found in

15   the shower or ordering that plaintiff be kept in

16   administrative segregation.  If any of the above elements has

17   not been proved, your verdict must be for defendant, and you

18   need not proceed further in considering this claim.

19          The Section 1983 claim against Defendant Timothy

20   Lancaster was a "determining factor" only if Defendant Stanley

21   Pruett would not have ordered that plaintiff be held in

22   administrative segregation under investigation regarding the

23   knife found in the shower or ordered that plaintiff be kept in

24   administrative segregation but-for plaintiff's filing a

25   Section 1983 claim.  It does not require that the Section 1983

1    claim was the only reason for the decision made by Defendant

2    Stanley Pruett.  You may find that plaintiff's Section 1983

3    claim was a determining factor in defendant's actions if it

4    has been proved that defendant's stated reasons for his

5    actions are a pretext to hide retaliation.

6             Instruction number 18, If you find in favor of the

7    plaintiff, you must award him an amount of money that will

8    fairly compensate him for any damages you find he sustained as

9    a direct result of the defendants.  You should consider the

10   following elements of damages:  One, the physical pain and

11   mental suffering the plaintiff has experienced and is

12   reasonably certain to experience in the future, the nature and

13   extent of the injury, and whether the injury is temporary or

14   permanent.  Remember, throughout your deliberations, you must

15   not engage in speculation, guess, or conjecture, and you must

16   not award any damages under this instruction by way of

17   punishment or through sympathy.

18            Instruction number 19, If you find in favor of the

19   plaintiff under instruction number 14, but you find that the

20   plaintiff's damages have no monetary value, then you must

21   return a verdict for the plaintiff in the nominal amount of

22   one dollar.

23            Instruction number 20, If you find in favor of the

24   plaintiff under instruction number 15, but you find that the

25   plaintiff's damages have no monetary value, then you must

1  return a verdict for the plaintiff in the nominal amount of

2  one dollar.

3        Instruction number 21, If you find in favor of the

4  plaintiff under instruction number 16, but you find that the

5  plaintiff's damages have no monetary value, then you must

6  return a verdict for the plaintiff in the nominal amount of

7  one dollar.

8        Instruction number 22, If you find in favor of the

9  plaintiff under instruction number 17, but you find that the

10  plaintiff's damages have no monetary value, then you must

11  return a verdict for the plaintiff in the nominal amount of

12  one dollar.

13        Instruction number 23, In addition to the damages

14  mentioned in other instructions, the law permits the jury

15  under certain circumstances to award punitive damages.  If you

16  find in favor of the plaintiff under instruction number 14 and

17  if it has been proved that the conduct of that defendant as

18  submitted in instruction number 14 was malicious or recklessly

19  indifferent to the plaintiff's First Amendment right to file a

20  civil rights lawsuit, then you may but are not required to

21  award the plaintiff an additional amount of money as punitive

22  damages for the purposes of punishing the defendant for

23  engaging in misconduct and discouraging the defendant and

24  others from engaging in similar misconduct in the future.  You

25  should presume that a plaintiff has been made whole for his

1    injuries by the damages awarded under instruction number 18.

2         If you decide to award punitive damages, you should

3    consider the following in deciding the amount of punitive

4    damages to award:  One, how irreprehensible the defendant's

5    conduct was.  In this regard, you may consider whether the

6    harm suffered by the plaintiff was physical or economic or

7    both, whether there was violence, deceit, intentional malice,

8    reckless disregard for human health or safety, whether the

9    defendant's conduct that harmed the plaintiff also posed a

10   risk of harm to others, whether there was any repetition of

11   the wrongful conduct and past conduct of the sort that harmed

12   the plaintiff.  Two, how much harm the defendant's wrongful

13   conduct caused the plaintiff and could cause the plaintiff in

14   the future.  You may consider harm to others in deciding the

15   amount of punitive damages to award.  Three, what amount of

16   punitive damages in addition to the other damages already

17   awarded is needed, considering the defendant's financial

18   condition, to punish the defendant for his wrongful conduct

19   toward the plaintiff, and to discourage the defendant and

20   others from similar wrongful conduct in the future.  Four, the

21   amount of fines and civil penalties applicable to similar

22   conduct.

23        The amount of any punitive damages award should bear

24   a reasonable relationship to the harm caused to the plaintiff.

25   You may award punitive damages against any or all of the

1    defendants or you may refuse to award punitive damages.  If

2    punitive damages are awarded against more than one defendant,

3    the amounts awarded against those defendants may be the same

4    or they may be different.

5            Instruction number 24, In addition to the damages

6    mentioned in the other instructions, the law permits the jury

7    under certain circumstances to award punitive damages.  If you

8    find in favor of the plaintiff under instruction number 15 and

9    if it has been proved that the conduct of that defendant as

10   submitted in instruction number 15 was malicious or recklessly

11   indifferent to plaintiff's First Amendment right to file a

12   civil rights lawsuit, then you may but are not required to

13   award the plaintiff an additional amount of money as punitive

14   damages for the purpose of punishing the defendant for

15   engaging in misconduct and discouraging the defendant and

16   others from engaging in similar misconduct in the future.  You

17   should presume that a plaintiff has been made whole for his

18   injuries by the damages awarded under instruction number 18.

19           If you decide to award punitive damages, you should

20   consider the following in deciding the amount of punitive

21   damages to award:  One, how irreprehensible the defendant's

22   conduct was.  In this regard, you may consider whether the

23   harm suffered by the plaintiff was physical or economic or

24   both, whether there was violence, deceit, intentional malice,

25   reckless disregard for human health or safety, whether the

1   defendant's conduct that harmed the plaintiff also posed a

2   risk of harm to others, whether there was any repetition of

3   the wrongful conduct and past conduct of the sort that harmed

4   the plaintiff.  Two, how much harm the defendant's wrongful

5   conduct caused the plaintiff and could cause the plaintiff in

6   the future.  You may not consider harm to others in deciding

7   the amount of punitive damages to award.  Three, what amount

8   of punitive damages in addition to the other damages already

9   awarded is needed, considering the defendant's financial

10  condition, to punish the defendant for his wrongful conduct

11  toward the plaintiff and to discourage the defendant and

12  others from similar wrongful conduct in the future.  Four, the

13  amount of fines and civil penalties applicable to similar

14  conduct.

15          The amount of any punitive damages award should bear

16  a reasonable relationship to the harm caused to the plaintiff.

17  You may award punitive damages against any or all defendants

18  or you may refuse to award punitive damages.  If punitive

19  damages are awarded against more than one defendant, the

20  amounts awarded against those defendants may be the same or

21  they may be different.

22          Instruction number 25, In addition to the damages

23  mentioned in the other instructions, the law permits the jury

24  under certain circumstances to award punitive damages as

25  noted.  If you find in favor of the plaintiff under

1  instruction number 16 and it has been proved that the conduct

2  of that defendant as submitted in instruction number 16 was

3  malicious or recklessly indifferent to the plaintiff's First

4  Amendment right to file a civil rights lawsuit, then you may

5  but are not required to award the plaintiff an additional

6  amount of money as punitive damages for the purposes of

7  punishing the defendant for engaging in misconduct and

8  discouraging the defendant and others from engaging in similar

9  misconduct in the future.  You should presume that a plaintiff

10  has been made whole for his injuries by the damages awarded

11  under instruction number 18.

12         If you decide to award punitive damages, you should

13  consider the following in deciding the amount of punitive

14  damages to award:  One, how irreprehensible the defendant's

15  conduct was.  In this regard, you may consider whether the

16  harm suffered by the plaintiff was physical or economic or

17  both, whether there was violence, deceit, intentional malice,

18  reckless disregard for human health or safety, whether the

19  defendant's conduct that harmed the plaintiff also posed a

20  risk of harm to others, whether there was any repetition of

21  the wrongful conduct and past conduct of the sort that harmed

22  the plaintiff.  Two, how much harm the defendant's wrongful

23  conduct caused the plaintiff and could cause the plaintiff in

24  the future.  You may not consider harm to others in deciding

25  the amount of punitive damages to award.  Three, what amount

1    of punitive damages in addition to the other damages already

2    awarded is needed, considering the defendant's financial

3    condition, to punish the defendant for his wrongful conduct

4    toward the plaintiff and to discourage the defendant and

5    others from similar wrongful conduct in the future.  Four, the

6    amount of fines and civil penalties applicable to similar

7    conduct.

8           The amount of any punitive damages awarded should

9    bear a reasonable relationship to the harm caused to the

10   plaintiff.  You may award punitive damages against any or all

11   defendants or you may refuse to award punitive damages.  If

12   punitive damages are awarded against more than one defendant,

13   the amounts awarded against those defendants may be the same

14   or may be different.

15          Instruction number 26, If you find in favor of the

16   plaintiff under instruction number 17 and if it has been

17   proved that the conduct of that defendant as submitted in

18   instruction number 17 was malicious or recklessly indifferent

19   to the plaintiff's First Amendment right to file a civil

20   rights lawsuit, then you may but are not required to award the

21   plaintiff an additional amount of money as punitive damages

22   for the purposes of punishing the defendant for engaging in

23   misconduct and discouraging the defendant and others from

24   engaging in similar misconduct in the future.  You should

25   presume that a plaintiff has been made whole for his injuries

by the damages awarded under instruction number 18.

If you decide to award punitive damages, you should consider the following in deciding the amount of punitive damages to award:  One, how irreprehensible the defendant's conduct was.  In this regard, you may consider whether the harm suffered by the plaintiff was physical or economic or both, whether there was violence, deceit, intentional malice, reckless disregard for human health or safety, whether the defendant's conduct that harmed the plaintiff also posed a risk of harm to others, whether there was any repetition of the wrongful conduct and past conduct of the sort that harmed the plaintiff.  Two, how much harm the defendant's wrongful conduct caused the plaintiff and could cause the plaintiff in the future.  You may not consider harm to others in deciding the amount of punitive damages to award. Three, what amount of punitive damages in addition to the other damages already awarded is needed, considering the defendant's financial condition, to punish the defendant for his wrongful conduct toward the plaintiff and to discourage the defendant and others from similar wrongful conduct in the future.  Four, the amount of fines and civil penalties applicable to similar conduct.

The amount of any punitive damages award should bear a reasonable relationship to the harm caused to the plaintiff. You may award punitive damages against any or all defendants

1    or you may refuse to award punitive damages.  If punitive

2    damages are awarded against more than one defendant, the

3    amounts awarded against those defendants may be the same or

4    they may be different.

5         Instruction number 27, There are rules you must

6    follow when you go to the jury room to deliberate and return

7    with your verdict.  First, you will select a foreperson.  That

8    person will preside over your discussions and speak for you

9    here in court.  Second, it is your duty as jurors to discuss

10   this case with one another in the jury room.  You should try

11   to reach agreement if you can do so without going against what

12   you believe to be the truth because all jurors have to agree

13   on the verdict.  Each of you must come to your own decision

14   but only after you have considered all the evidence, discussed

15   the evidence fully with your fellow jurors, and listened to

16   the views of your fellow jurors.  Do not be afraid to change

17   your mind if the discussion persuades you that you should, but

18   do not come to a decision just because other jurors think it

19   is right or just to reach a verdict.  Remember, you are not

20   for or against any party.  You are judges, judges of the

21   facts.  Your only job is to study the evidence and decide what

22   is true.

23        Third, if you need to communicate with me during your

24   deliberations, send me a note signed by one or more of your

25   jurors, give the note to the marshal or CSO, and I will answer

1  you as soon as I can either in writing or here in court.

2  While you are deliberating, do not tell anyone, including me,

3  your numbers regarding votes in your deliberations.  Fourth,

4  your verdict has to be based only on the evidence and on the

5  law that I have given to you in my instructions.  Nothing I

6  have said or done was meant to suggest what I think your

7  verdict should be.  The verdict is entirely your decision.

8          Finally, the verdict form is your written decision in

9  this case.  The verdict forms read as follows:  Verdict.

10  Note:  Complete this form by writing in the name required by

11  your verdict.  On Plaintiff Frederick Davis's claim against

12  Defendant Timothy Lancaster as submitted in instruction number

13  14, we find in favor of Plaintiff Frederick Davis or Defendant

14  Timothy Lancaster.  Note:  Complete the following paragraphs

15  only if one or more of the above findings is in favor of the

16  plaintiff.  We find Plaintiff Frederick Davis's damages to

17  be -- there is a line for an amount -- parentheses, state the

18  amount or if you find that the plaintiff's damages had no

19  monetary value, state the nominal amount of one dollar.  We

20  assess punitive damages against Defendant Timothy Lancaster as

21  follows -- with a line for a dollar amount if you find

22  punitive damages.  There is also a signature line for the

23  foreperson and a date for the verdict.

24          Verdict.  Note:  Complete this form by writing in the

25  name required by your verdict.  On Plaintiff Frederick Davis's

1    claim against Troy Steele as submitted in instruction number

2    15, we find in favor of Plaintiff Frederick Davis or Defendant

3    Troy Steele.  Note:  Complete the following paragraphs only if

4    one or more of the above findings is in favor of the

5    plaintiff.  We find the Plaintiff Frederick Davis's damages to

6    be -- a line for an amount -- parentheses, state the amount or

7    if you find that the plaintiff's damages had no monetary

8    value, state the nominal amount of one dollar.  We assess

9    punitive damages against Defendant Troy Steele as follows --

10   with a line for a dollar amount.  There is a signature

11   provision for the foreperson and a date for the rendition of

12   the verdict.

13        Verdict.  Complete this form by writing in the name

14   required by your verdict.  On Plaintiff Frederick Davis's

15   claim against Defendant Dan Bryan as submitted in instruction

16   number 16, we find in favor of Plaintiff Fred Davis or

17   Defendant Dan Bryan.  Note:  Complete the following paragraphs

18   only if one or more of the above findings is in favor of the

19   plaintiff.  We find Plaintiff Frederick Davis's damages to

20   be -- a dollar amount, line for a dollar amount -- and

21   parentheses, state the amount or if you find that plaintiff's

22   damages had no monetary value, state the nominal amount of one

23   dollar, closed parentheses.  We assess punitive damages

24   against Defendant Dan Bryan as follows -- with a line for a

25   dollar amount.  There is a signature line for the foreperson

72

1    and a place for the date.

2         Verdict.  Note:  Complete this form by writing in the

3    name required by your verdict.  On Plaintiff Frederick Davis's

4    claim against Defendant Stanley Pruett as submitted in

5    instruction number 17, we find in favor of Plaintiff Frederick

6    Davis or Defendant Stanley Pruett.  Note:  Complete the

7    following paragraphs only if one or more of the above findings

8    is in favor of the plaintiff.  We find Plaintiff Frederick

9    Davis's damages to be -- a line for a dollar amount --

10   parentheses, state the amount or if you find that the

11   plaintiff's damages had no monetary value, state the nominal

12   amount of one dollar, closed parentheses.  We assess punitive

13   damages against Defendant Stanley Pruett as follows -- with a

14   line for a dollar amount.  There is also a provision for the

15   foreperson's signature and the date.

16        You will take this form, this form or these forms, to

17   the jury room, and when you have all agreed on the verdict,

18   your foreperson will fill in the form, sign and date it, and

19   tell the marshal or CSO that you are ready to return to the

20   courtroom.

21        Counsel, the Court's instructions will be available

22   for your use during closing arguments.  Alicia will have them,

23   and she will also be the timekeeper for you.

24        MR. SIMON:  May we approach?

25        THE COURT:  Yes.

73

1    **(A Bench Conference Was Held On the Record and Outside of the**

2    **Hearing of the Jury As Follows:)**

3    THE COURT:  Did I forget something?

4    MR. SIMON:  I'm sorry, Your Honor, number 18, did it

5    have mental or emotional damages?  As long as it says it in

6    writing, we're good.  If we could just put it in writing

7    before you send it back.

8    THE COURT:  It says physical pain and mental

9    suffering.

10   MR. SIMON:  Yeah, we agreed to mental or emotional

11   suffering.

12   THE COURT:  Okay.  And this is the last copy.

13   MR. SIMON:  That's fine.  If we could just put that

14   in and send it back.  You don't need to re-read anything.  I

15   don't want to highlight it.

16   THE COURT:  All right.  So you want physical pain and

17   mental or emotional.

18   MR. SIMON:  I believe that was agreed to.  Again,

19   thank you for doing all that.

20   THE COURT:  All right.

21   **(The Following Proceedings Were Held Within the Hearing and**

22   **Presence of the Jury.)**

23   THE COURT:  You may proceed, Mr. Simon.

24   MR. SIMON:  Thank you.  Ladies and gentlemen, first I

25   just want to say thank you very much on behalf of my

1   co-counsel, Bryan Sableman, and my client, Mr. Davis.  I know

2   it's been a long week and even sitting here listening to all

3   those instructions.  You will get them in writing, so I am not

4   going to go over all of them again.  I just want to point out

5   a few things in the context of the instructions because the

6   judge is the judge.  The judge provides us with the law, His

7   Honor.  You all are judges of the facts and apply the law to

8   the facts.

9        One instruction I want to point out is instruction

10  number 10.  That was the instruction that talked about the

11  burden of proof.  We as the plaintiff have the burden of

12  proof.  We have to prove to you our case, and as Mr. Sableman

13  said in the beginning, we will prove it to you.  I just want

14  to point out, we started out and I asked in jury selection if

15  everybody could start us out on equal level.  That's because

16  all we have got to prove is more likely than not.  If the

17  scales tip slightly in our favor, we win.  That's the burden.

18  We don't have to prove beyond a reasonable doubt.  We don't

19  have to prove clear and convincing evidence, just more likely

20  than not.

21       The other thing I want to point out and I am going to

22  put this one up here is you are going to have four of these,

23  one for each defendant, and I'm going to pull out instruction

24  number 15, and the lawyers always refer to this as the verdict

25  director, okay, because this says -- this is basically what we

1   have to prove beyond a reasonable doubt -- I'm sorry, what we

2   have to prove more likely than not.  I just messed that up

3   myself.  So it says your verdict must be for the plaintiff,

4   Frederick Davis -- and there is one of these for each

5   defendant; this one is for Mr. Steele -- if we prove first,

6   that he filed a 1983 claim.  That is not disputed.  We showed

7   you the case management order in the case.  That is not a

8   disputed fact in this case.  Second, Defendant Troy Steele

9   ordered that plaintiff be held in administrative segregation

10  under investigation regarding the knife found in the shower or

11  ordered that plaintiff not be given a truth verification test

12  during the investigation.  Again, I submit to you that is not

13  disputed.  Third, that being held in administrative

14  segregation under investigation regarding the knife found in

15  the shower or being denied the test will dissuade a reasonable

16  person in the same or similar circumstances from filing a 1983

17  action; so whether or not 86 days in the hole is going to tend

18  to dissuade somebody in similar circumstances from filing a

19  claim in the future.  I am going to talk about how we proved

20  that.  I believe we have proven that.  And then fourth,

21  the 1983 claim was a determining factor in the defendant's

22  decision to order that Mr. Davis be held in administrative

23  segregation.

24          Now I want to talk about that because at the bottom,

25  there is another paragraph, and as His Honor said, all of the

1    instructions are important and all of the evidence is

2    important, every one of these instructions.  When you get back

3    there, if you think somebody is asking a question or saying we

4    should do this or that and you think it is contrary to an

5    instruction, look at the instructions, you will have them.

6    That's why I asked if anybody was real shy about speaking up,

7    because we want you to follow the instructions.  What this

8    says here is that it does not require that the claim was the

9    only reason and that you can find that our claim was a

10   determining factor if it has been proved that the stated

11   reasons for their actions are a pretext to hiding retaliation,

12   and that's what I think this case is about, ladies and

13   gentlemen.  I think everything you heard was that it was a

14   pretext, and I'm going to explain that in more detail later as

15   well.  So that's the verdict director.  It's instruction

16   number 15.  You have one for each of the defendants.

17           Now I want to talk about damages.  There is three

18   types of damages in the instruction.  It's instruction

19   number -- there is a damage instruction, number 18.  I'm not

20   going to pull it up and go through it, but basically it says

21   physical pain, mental or emotional suffering.  I told you at

22   the beginning of this case we are not claiming he was injured,

23   we're not, so it's mental or emotional suffering that he has

24   experienced.  He was in a prison within a prison, and he had a

25   case deadline, and remember all the evidence of the hoops he

1    had to jump through in order to meet that case deadline

2    because he couldn't get his legal materials?  Exhibit N,

3    Exhibit O, those are letters he wrote.  He had his lawyer

4    write a letter.  That was Exhibit 8.  Again, I'm not going to

5    pull all these up.  You will have access to them all.  And his

6    only recourse, Mr. Davis's only recourse, when he is in prison

7    after an IRR is denied or a grievance is to be here in front

8    of you, is to file a lawsuit.  So when he feels he is being

9    mistreated, his only recourse is to file that.  He is locked

10   up in solitary confinement.  He gets a case management order

11   on October 18th, and eight days later they lock him up and he

12   can't get his legal file, and that order says, hey, you have

13   got to respond by November 19th.  So this is someone who is

14   suffering mental and emotional suffering writing everybody he

15   can going, hey, I just need access to my legal file and

16   they've got me locked up and they won't give it to me.

17           The other thing it talks about is wages, lost wages.

18   He was making $85 a week.  That's not a lot of money, I

19   understand, but to him it was a lot of money.  What I told you

20   in the beginning, this isn't a high dollar case, and for the

21   damages we are going to ask for is $8,600, a hundred dollars

22   for every day he was put in the hole.  And here is the thing,

23   in his complaint in this case, Mr. Davis wrote it himself and

24   he asked for $8,600.  He didn't ask for a million.  He didn't

25   ask for a hundred thousand.  He didn't ask for ten thousand.

 1   He thought, Look, I was locked up for 86 days, I don't think

 2   it was right, 8600 bucks.  And that's what we're asking, but

 3   you give him what you think is fair.  It's your decision.  I'm

 4   sorry, $8,500 a month.  I'm corrected here.  I'm sorry, what?

 5          MR. SABLEMAN:  85 per month.

 6          MR. SIMON:  That's what I said, $85 per month.  Okay,

 7   sorry about that.  I'm just trying to get the case to you.

 8   The other thing is punitive damages.  The judge read the

 9   instruction I think four times, and you will have copies, and

10   if you think that is warranted, you do what you think is fair.

11   I am not going to stand here and tell you anything about that.

12   We leave that in your hands.

13          Ladies and gentlemen, what this case is about is

14   credibility.  I told you that in the beginning, and that's

15   what I was so concerned, that just because he had a murder

16   conviction 25 years ago, that you wouldn't believe him no

17   matter what.  But this case is about credibility.  There is an

18   instruction, it's number 11, that the judge just gave you, and

19   it says you can use that conviction only to determine his

20   credibility, and so if somebody is trying to say anything

21   other than does it make him tell the truth or not, please look

22   at instruction 11 and use it, because again that's not what

23   this case is about.  Mr. Davis is paying for that the rest of

24   his life in the general population.  This case is about him

25   being retaliated against for doing the only thing he had.

1          Now you are the judges of the facts.  Instruction

2   number 9, credibility of a witness, His Honor read it to you.

3   Take a look at it.  There is a few things you can look at:

4   Reasons that a witness may be testifying a certain way, how a

5   witness acted on the stand.  Who looked you in the eye when

6   they sat in that stand?  Who seemed like they were making up

7   evidence as they went along?  Who seemed like they were giving

8   testimony that was inconsistent with other testimony they had

9   given?  I will submit to you and I will challenge my opposing

10  counsel to come up here and give you one statement, one

11  inconsistent statement, that Mr. Davis gave when he gives you

12  his closing argument because I'm going to go through a list of

13  what I call lies and inconsistencies that happened in this

14  courtroom, and with Mr. Davis, there is not a single

15  inconsistent statement he can point to.  The best he could do

16  was say, well, he wrote nine letters asking for his legal

17  file, and he didn't by the way say that Mr. Pruett attended a

18  meeting.  Okay.  He was worried about his legal file.  Maybe

19  he didn't put every detail in a letter, but he didn't say,

20  hey, you said this in your deposition, you said this in

21  affidavit.  So you are the judges of credibility and the

22  judges of who is telling the truth or not.

23          Again, all the instructions are important, including

24  the instructions given at the beginning of the case, and one

25  of those instructions said what is and what isn't evidence,

1   and what isn't in evidence are documents and things talked

2   about but not received as exhibits in this court, like the

3   hole in the wall that we don't have a picture of, like the

4   paper that somebody wrote Mr. Davis's name on and then on the

5   way out of the room from receiving it, Mr. Steele dropped it

6   in the trash can, not evidence.

7           Statements made by each defendant, I just want to

8   refresh your recollection here.  Mr. Lancaster, "you won't

9   file another lawsuit here;" "whether or not you're involved,

10  this will at least get you out of here;" "you're still here,

11  ugh."  Mr. Pruett, Mr. Pruett said "stop filing lawsuits";

12  "when will you guys realize we run this prison."  Mr. Pruett

13  couldn't remember anything about anything on the stand, but he

14  remembered he didn't say that.  So we have one witness saying

15  this was said and one witness saying I don't remember, I don't

16  remember, I don't remember, I didn't say that.  You are the

17  judges of that issue.  Mr. Bryan, "Lancaster wants you off the

18  yard," made in reference to Mr. Davis's legal activities;

19  "just drop the lawsuit."

20          Knowledge of the suit.  Warden Steele, I know he said

21  different things today, different things yesterday, but he had

22  a request for admission in this case, it's Exhibit 14, you'll

23  have it, he admitted that he knew about the lawsuit.

24  Mr. Bryan, you know, he tried to say that he didn't know about

25  the lawsuit.  He initialed the QLVC, and on the QLVC form it

1   said here is my lawsuit, here is the case number, and I have a

2   response due November 19th, and when I pushed him, he said

3   yeah, I did review it, I would have reviewed that before I

4   initialed it, and his initials were on it.  He knew about the

5   lawsuit.  Again, Mr. Pruett didn't remember anything.

6   Mr. Lancaster was a defendant, and at first he tried to say,

7   well, my lawyer handled everything, I don't really remember,

8   maybe there was a lawsuit, and when we showed him the answer

9   that he filed that said I admit this, I deny this, he said,

10  oh, yeah, I knew about that.

11          Now what didn't you see in evidence?  You didn't see

12  a video of any surveillance.  You didn't see pictures of any

13  hole in the wall.  That picture of that knife, I don't know

14  how it was taken.  We didn't see the knife, but we got some

15  black and white picture, so they showed you that.  We didn't

16  see the note, this so-called note that the warden threw away

17  on his way out of this very serious investigation where they

18  were worried whether there was one knife, ten knives, we

19  didn't know what was going to happen, but I get a note and

20  then I just throw it in the trash, and I interview other

21  informants and I don't take any notes.

22          I want to talk about lies and inconsistencies because

23  that's what I think this case is about.  Mr. Lancaster, he

24  said there was evidence of footprints and hand prints on the

25  wall in the factory.  What did we find out from Warden Steele

82

1    today?  It's not a hole in the wall over here.  It's the wall

2    doesn't meet the ceiling all the way across the whole back of

3    the wall.  And again, this is a serious investigation.  The

4    Attorney General stood up here and said this was important,

5    this was the first time they found a homemade knife made in

6    that factory, we were worried about this, this was a big deal,

7    people could get killed.  No pictures of the hole in the wall,

8    no interview.  It didn't make it into Mr. Lancaster's

9    investigative report.  It didn't make it to Warden Steele's

10   letter to his boss.  Nobody mentioned that.  Defendant's

11   Exhibit X is the investigative report.  Look in the

12   investigative report that Mr. Lancaster wrote.  See what he

13   put in there and what he didn't put in there.  That's just as

14   important.

15           Mr. Steele, Mr. Steele told you that he lacked

16   authority to order a CVSA, and then he told you he did have

17   authority.  Request for Admissions, look at Exhibit 14, number

18   22, he says the policies prevent me from giving that test.

19   What did he say on the stand?  He could have given the test,

20   the policies don't prevent it.  He submitted an affidavit,

21   Plaintiff's Exhibit 4, an affidavit signed under oath that was

22   submitted to this Court in this case and said the opposite.

23   And we showed him that, and again you have it.  It's

24   Plaintiff's Exhibit 4, paragraph 17.  Request for Admission

25   22, that's Plaintiff's Exhibit 14.  He admitted on the stand

1   that in his deposition he said, oh, yeah, I did have

2   authority.  What did he say today?  Yesterday he said, well,

3   we never used them looking for contraband.  And we got his

4   deposition and we asked him and read the question, and he knew

5   he was ready, and he said, yeah, sometimes CVSAs are used for

6   contraband.  You know why?  Because if he made another

7   misstatement, we would have corrected him and he knew it, so

8   he got ready last night.

9        Request for legal materials.  In his affidavit that

10  he submitted to this Court, he said Davis brought to my

11  attention he wanted legal materials, and they were given to

12  him.  Yeah, they were eventually.  Again, that's Plaintiff's

13  Exhibit 4, paragraph 18, look at that affidavit.  There is

14  numerous other Requests for Admissions that Mr. Steele gave,

15  but here is something else.  Mr. Steele wrote a letter to his

16  boss and said we got a letter, a kite, from somebody that said

17  Mr. Davis made the knife.  No, he didn't.  Do you remember we

18  showed him the letter and what he admitted was the letter said

19  somebody else made the knife and gave it to Davis, but this

20  serious investigation where they had to shut everything down

21  and they were worried, they never even got the other guy who

22  was going to kill somebody with the knife.  They never locked

23  him up.  They didn't even put him in ad-seg for two days.

24  They never even looked at who he was.  Oh, that letter was

25  unreliable.  When did Mr. Steele know about the case?  He

1  already admitted that today when we showed him his Request for

2  Admission.

3         Ms. Shawver, now I've got to tell you, Ms. Shawver --

4  Exhibit E we submitted.  I am not going to show it to you, you

5  will have it.  It was a motion for an injunction because he's

6  in and he says in his other case, hey, they won't give me

7  access to my legal files, please, order them, Court -- another

8  judge in this court -- order them to give me my legal files.

9  Ms. Shawver signs an affidavit that says he never asked me for

10  his legal file, and then in this case when it comes up -- her

11  exhibits are Exhibits 6 and 7, look at those two affidavits --

12  she at least admitted, yeah, I was wrong, he did ask me for

13  his legal file.  But take a look at Exhibit S.  That's the

14  QLVC form, November 1, November 15, at one point it is stamped

15  Received March 13, 2013.  I don't know where that stuff came

16  from.  Those two pages, second two pages, of Exhibit S my

17  client never even saw.  I don't know where they came from.

18  Take a look at them.  So we have Shawver Exhibit 6, Shawver

19  Exhibit 7.  Exhibit Q, she received a property request form.

20  She approved it five days before she received it.  That's

21  Mrs. Shawver and she submitted affidavits to this Court in

22  both cases.

23         Now Mr. Bryan, whether he was still under

24  investigation, it was an exhibit we admitted today,

25  Exhibit 17.  Paragraph 7 says "we recommend continuing

1  assignment for the safety and security of the institution

2  because he was under investigation."  He was under

3  investigation until November 29th and then he was no longer

4  under investigation.  Nobody told him that.  He is on the

5  committee to decide if he is released, and I think at one

6  point he said, you know, I purposely don't want to know

7  anything because I want to be fresh.  So he thinks the guy is

8  under investigation, Mr. Davis, but he doesn't know and he is

9  not under investigation.

10       Mr. Pruett, again he's the "I-don't-remember man,"

11  and he told us that ad-seg is not a punishment right after he

12  said if somebody's got too much stuff from the canteen in

13  their cell, we put them in there.  And you see, it's playing

14  with words.  When I said today to Mr. Crump, I said, is

15  administrative segregation a punishment.  No.  But then when I

16  asked the right exact question, oh, there's disciplinary

17  segregation and administrative segregation, and they're in the

18  same cells but we just call it something different.  So if

19  Mr. Simon asks the exact right question, then we will tell the

20  truth.  Not credible.

21       Ladies and gentlemen, these defendants want you to

22  believe that there is no way they would retaliate against

23  Mr. Davis.  What you saw in this courtroom the last two days

24  from that witness stand is concerning.  Anybody that can come

25  in here, take an oath, and lie to a Court, I mean, I think we

1   have proven to you -- well, two of the three defendants

2   admitted they lied before in an affidavit, but if you can come

3   in here and lie under oath as a witness, is it a stretch to

4   say you might retaliate against somebody suing you?  And they

5   didn't lie to me, ladies and gentlemen.  They lied to you, the

6   judges of the facts.  They lied to this Court in their

7   affidavits, not to me.

8          Now what it comes down to the end of it in this case

9   is about using our justice system properly.  Prison is part of

10  the justice system.  Lawsuits are part of the justice system.

11  I'm honored to be part of the justice system.  I am honored to

12  have represented Mr. Davis in this case.  He exercised one of

13  his rights under the justice system.  He filed suit.  He

14  survived a motion to dismiss.  A case management order was

15  issued that gave him a deadline.  Eight days later, he is

16  locked up in the hole for 86 days.  Now the defendants in that

17  case, Mr. Lancaster and the others, they had attorneys.  They

18  had the Attorney General representing them.  Mr. Davis was

19  representing himself.  And they eventually won the case, but

20  that isn't enough.  They did what they could.  This knife

21  investigation is a pretext because of that lawsuit, ladies and

22  gentlemen, and I think we have proven that.

23         Now in the opening statement, it was argued that we

24  had some big conspiracy we had to prove.  We don't have to

25  prove there was a conspiracy.  We don't have to prove who hid

1   the knife or that the prisoners hid the knife or the guards

2   hid the knife.  It's not what we have to prove.  We don't even

3   have to prove that what they did hurt his other lawsuit

4   because we didn't argue that.  It didn't.  He got an extension

5   of time.  All we have to prove is that they used the knife as

6   a pretext to retaliate against Mr. Davis for his prior

7   lawsuit, and they kept him in the hole for 86 days.  That's

8   all we have to prove.  Remember, it doesn't have to be the

9   only reason.  And if it's a pretext, that's enough.

10          Okay.  Now again, it's not a stretch to think that

11  somebody who would come in here and do the things they did in

12  front of you would retaliate.  Now there is one thing we agree

13  on.  In opening statement, the Attorney General said -- I

14  wrote it down -- sometimes the simplest explanation is often

15  correct, and he said that our theory was some elaborate plot.

16  Wrong.  Our theory is simple, personal spite.  You sued me and

17  I'm going to get back at you.  That's our theory.

18          Now did they investigate seriously enough?  I don't

19  know.  They claim that they did.  They didn't do any voice

20  test.  You look at the surveillance video footage by

21  rewinding.  They didn't check on other people with welding

22  experience.  They let go of the very guy who was in the same

23  housing unit and had been in the welding shop for 20 years; in

24  three days, out of ad-seg.  Yeah, they clearly didn't take it

25  seriously enough.  Why?  Because they wanted to get back at

1    Mr. Davis.  If they took it too seriously and found that he

2    didn't do it, they couldn't use this as a pretext.  They may

3    have even convinced themselves that he made the knife.  Maybe

4    they did.  They did a poor job.  But it was nothing more than

5    an attempt to retaliate against him.  That's all.  There was a

6    knife found in a prison, not a big surprise.  Whoever did it,

7    they used that and the investigation about it to retaliate.

8    He was the only one that had that lawsuit against them.

9    That's the only one you heard about that sued.  It's pretty

10   simple, ladies and gentlemen.  It's spite.  Thank you.

11          THE COURT:  Mr. Kinghorn.

12          MR. KINGHORN:  May it please the Court.  Good

13   afternoon, ladies and gentlemen.  As I said at the outset,

14   this case is about a serious deadly weapon.  A knife,

15   especially one as meticulously crafted as this one, isn't made

16   for no purpose at all.  It's made for a reason.  Prison

17   personnel know that.  That is why when any knife is found in

18   the prison, it is automatic that there will be an

19   investigation.  It is absolutely critical that the prison look

20   into these matters thoroughly for the safety and security of

21   the prison including all of its residents and staff.

22          It is clear that Mr. Davis did not like being

23   investigated, but that was unavoidable.  It would have been

24   extremely reckless for prison personnel to ignore Mr. Davis as

25   a suspect.  Remember some of the evidence that you heard.  He

1    was one of only two inmates who both lived in the housing unit

2    and wing where the knife was found and also worked in the

3    metal factory where the knife was made.  He was the only one

4    of those two inmates who was believed to possess the necessary

5    skills on the factory's grinding and welding machines to

6    actually make the knife.  Informants in the metal factory were

7    provided information -- they provided information to prison

8    staff which convinced the prison staff that Mr. Davis was

9    involved in making the knife.  In Mr. Davis's work area, there

10   were scuff marks leading up the wall to the hole through which

11   the knife could have been passed.  Now Mr. Davis's attorney

12   mentioned that the space along the top of the wall was open,

13   but remember what you heard during the trial, that the dust

14   was only pushed aside in this one space where the scuff marks

15   were in Mr. Davis's work area.  The prison personnel could

16   find no other way for the knife to have gotten out of the

17   factory.

18         Faced with this evidence, what was Timothy Lancaster

19   supposed to do?  He could not simply ignore Mr. Davis as a

20   suspect.  It does not make sense to suggest that it was

21   somehow improper to investigate Mr. Davis or that the

22   investigation was somehow a ploy to target him.  This

23   investigation disrupted practically the entire prison.  The

24   factory was shut down, dozens of people were interviewed.  All

25   of the inmates who worked in the metal factory were

1    strip-searched.  The factory was searched from top to bottom.

2    The computers were searched.  Every cell belonging to a metal

3    factory worker was searched and informants were questioned.

4    It is simply not plausible that so many people would have gone

5    to such great and elaborate length and would have disrupted

6    the operations of the prison so substantially for no reason

7    other than to mess with Mr. Davis.  To believe that staff

8    would do so, you would first have to believe that they didn't

9    care who actually made this knife, even though their own lives

10   and the lives of everybody else were at stake.

11           Now, ladies and gentlemen, this is a lawsuit filed by

12   Mr. Davis.  He is claiming retaliation, and it is his burden

13   to convince you that the elements of retaliation have been

14   satisfied by the greater weight of the evidence.  The judge

15   has told you what those elements are.  For each defendant, you

16   will have to decide whether Mr. Davis has met his burden.  If

17   he has failed to meet his burden as to even a single one of

18   the elements, your verdict should not be in his favor.  For

19   instance, let's look at Dan Bryan.  You heard about him during

20   the trial that he was the functional unit manager in one of

21   the housing units where Mr. Davis was assigned during the

22   investigation.  Did Dan Bryan investigate Mr. Davis?  No.  Did

23   Dan Bryan order that Mr. Davis be investigated?  No.  Did Dan

24   Bryan order that Mr. Davis be placed into temporary

25   administrative segregation?  No.  Mr. Davis has not presented

1  any evidence whatsoever to suggest that Dan Bryan was involved

2  in any of those things in any way.  For that reason alone,

3  your verdict should be for Dan Bryan.

4         So how does Dan even fit into the big picture here?

5  Well, first the knife was found, then an investigation began,

6  then Mr. Davis was placed into temporary administrative

7  segregation under investigation, and then after all of those

8  things had already occurred, Dan Bryan enters the picture.

9  Dan was a member of a three-person committee that periodically

10  reviews offenders in administrative segregation.  The

11  committee reviewed Mr. Davis, saw that he was under

12  investigation, and recommended continuing him in ad-seg

13  pending the investigation.  And after the investigation

14  closed, the committee -- Mr. Davis remained in ad-seg pending

15  a transfer to another facility.  Dan Bryan did not make these

16  recommendations by himself.  It was the committee's

17  recommendation.

18         Did the committee treat Mr. Davis any differently

19  than they would treat any other inmate under investigation?

20  No.  You heard during the trial that it is standard for an

21  inmate to remain in ad-seg when they are under investigation.

22  Did the committee treat Mr. Davis any differently than they

23  would treat any other offender who has got a pending transfer?

24  No.  You also heard during the trial that it is standard for

25  an inmate to remain in ad-seg or in whatever cell they are

1    currently assigned to pending their transfer.  Dan Bryan did

2    his job exactly as he was supposed to.

3          Before I move on to Stanley Pruett, I need to talk

4    about Mr. Davis's Qualified Legal Claim forms.  Now you heard

5    evidence that Dan Bryan signed off on Mr. Davis's Qualified

6    Legal Claim form, and that on that form Mr. Davis indicated

7    that he had a lawsuit titled Davis versus Webb.  Now at most,

8    someone reviewing that form might understand it to mean that

9    Mr. Davis has a lawsuit against somebody named Webb.

10   Mr. Davis suggests that Dan Bryan retaliated against him not

11   because he had a lawsuit against Timothy Lancaster but instead

12   because Dan saw on a Qualified Legal Claim form that Mr. Davis

13   was suing somebody named Webb.  You heard from Mr. Bryan that

14   inmates filing Qualified Legal Claim forms is exceedingly

15   common, and staff routinely sign these forms so that inmates

16   can spend additional time in the law library.  There has been

17   no evidence that Mr. Bryan cared what case title Mr. Davis

18   wrote on his Qualified Legal Claim form.  In addition, there

19   has been no evidence that Mr. Bryan even knows who Webb is,

20   much less that he would for some reason go out of his way to

21   retaliate against Mr. Davis on Mr. Webb's behalf.  To suggest

22   that one of the very people who allowed Mr. Davis to spend

23   additional time in the law library to work on his Davis versus

24   Webb case somehow treated him unfairly because of that case

25   defies common sense.  So for that reason as well, your verdict

1    should be in favor of Dan Bryan.

2            I will talk next about Stanley Pruett.  You heard he

3    was a case manager in housing unit 3.  Did Stanley Pruett

4    investigate Mr. Davis?  No.  Have you heard any evidence from

5    Mr. Davis that Mr. Pruett ordered the investigation?  No.  Did

6    you hear any evidence that Mr. Pruett ordered Mr. Davis's

7    transfer from housing unit 3 over to housing unit 2?  No.  For

8    the sake of argument, what if he had been involved in those

9    things.  Has Mr. Davis shown you any evidence that his prior

10   lawsuit against Timothy Lancaster was a determining factor in

11   any of Mr. Pruett's actions?  Absolutely not.  Mr. Davis has

12   tried to rope Stanley into this case and show that he had a

13   retaliatory motive by stating that for some unknown reason,

14   Stanley Pruett decided to attend the interview between Timothy

15   Lancaster and Mr. Davis even though Mr. Pruett never takes

16   part in such interviews.  Then, Mr. Davis says Stanley made

17   some kind of statement during the interview about how

18   Mr. Davis should stop filing lawsuits.  There is a huge

19   problem with that story, and Mr. Davis's attorney was correct

20   that this case is about the credibility of the witnesses you

21   heard.  Here, not only do Stanley Pruett and Timothy Lancaster

22   state unequivocally that Stanley was not in the interview, but

23   Mr. Davis himself left those huge details out of his story

24   when he wrote letters and a grievance during the investigation

25   where he complained about the investigation.

1    Remember the letter that Mr. Davis sent to

2  Mr. Lancaster during the investigation and remember the

3  letters that Mr. Davis sent to the director and deputy

4  director which Troy Steele testified about and Mr. Davis's IRR

5  complaint which James Crump testified about?  In all of those

6  letters and the grievance, Mr. Davis complained about the

7  investigation and about the interview that Mr. Lancaster had

8  with him, but he did not in even a single one of those mention

9  anything about Stanley Pruett being in the interview room or

10  telling him to stop filing lawsuits nor did he mention any of

11  the quotes from any of the other defendants.  What possible

12  reason could Mr. Davis have had for leaving those details out

13  of his letters and grievance?  He was trying to convince the

14  administrators of the Department of Corrections that he was

15  being treated unfairly because of a lawsuit he had filed; yet,

16  he doesn't think to mention the guy allegedly standing in the

17  interview room who told him to stop filing lawsuits.  If these

18  details had actually occurred as Mr. Davis alleges them now,

19  they would be possibly the most important facts in his entire

20  case because they speak to the motive of the prison staff.

21    Now it's very convenient for Mr. Davis that when he

22  decided to file this lawsuit, he suddenly remembered those

23  details for the very first time.  I don't know about you, but

24  the way my memory works is that right after something happens,

25  I remember it much more vividly than I will months or years

1    down the road.  Mr. Davis apparently wants you to believe that

2    his memory works differently than ours.  During and

3    immediately after the investigation when Mr. Davis was sending

4    out all those letters and grievances, he apparently didn't

5    remember a man standing in the interview room who told him to

6    stop filing lawsuits but then down the road when he decided to

7    file this lawsuit, he had the great fortune of remembering

8    those details.  I will leave it at that for Mr. Pruett.  I am

9    confident that when you deliberate, you will reach the correct

10   decision on that issue.

11           Now I would like to talk about Troy Steele and

12   Timothy Lancaster.  What evidence have we heard about them?

13   Well, we heard that after the knife was found, Troy Steele

14   spoke with supervisors and workers in the metal factory and

15   that they provided information which Mr. Steele felt was

16   credible.  The supervisors informed Mr. Steele that Mr. Davis

17   possessed the skills necessary to make the knife.  The inmate

18   workers specifically identified Mr. Davis as the person who

19   was responsible for the knife.  And remember, Mr. Steele

20   testified that this information did not come from just a

21   single inmate.  It came from several inmates, and he testified

22   that these inmates came from a variety of groups and that the

23   different groups of inmates in the prison often segregate or

24   don't get along or disagree.  Thus, when a diverse group of

25   inmates came together and jointly provided the name of

1   Mr. Davis, Troy Steele found this to be very convincing

2   evidence.

3          This being a very serious matter, Troy Steele tasked

4   his experienced investigator, Timothy Lancaster, then Timothy

5   Lancaster being entirely transparent informed Troy Steele

6   about Fred Davis's case against them.  Let's stop there.  Troy

7   Steele had already spoken with informants in the factory, had

8   already identified Mr. Davis as a key suspect, and he had

9   already decided to assign Timothy Lancaster to the

10  investigation before he knew about Frederick Davis's lawsuit.

11  Now this is entirely consistent with Warden Steele's Request

12  for Admissions that Mr. Davis's attorney mentioned a moment

13  ago.  He did, in fact, learn about the case between

14  October 26th and October 30th.  Remember, he assigned

15  Lancaster on the 29th.  So when he admitted within his Request

16  for Admissions that he knew about it between those dates, that

17  is entirely accurate.  Mr. Davis's lawsuit could not possibly

18  have been a determining factor in Troy Steele's actions

19  because at the time when Troy Steele took those actions, he

20  didn't know about it yet.  For that reason alone, your verdict

21  should be in favor of Troy Steele.

22         Just because Mr. Steele did not decide to change his

23  mind about who should do the investigation after learning

24  about the lawsuit does not mean that Troy Steele was out to

25  get Mr. Davis in any way.  As I said, this was a very

1   dangerous weapon, and it needed to be investigated thoroughly.

2   Troy Steele felt confidently that Timothy Lancaster was the

3   best person for the job, and so he told him to get to work.

4   We're professionals, get to work.  And remember, there are

5   only so many staff in the prison.  They are far out-numbered

6   by the inmates.  Troy Steele testified that at that time,

7   there were approximately 900 inmates at the prison and only

8   250 officers.  It is vital to a prison that staff be able to

9   continue working with offenders even if an offender doesn't

10  like them or complains about them.

11          Where does that leave us with Timothy Lancaster?

12  Well, at that time, he was the only administrative inquiry

13  officer assigned to the prison.  If prisoners could avoid

14  being investigated by the prison investigator simply by

15  complaining about him, there would be nothing to prevent

16  prisoners from making complaints just to manipulate that

17  system.  Again, there is only one investigator, and there were

18  900 inmates.  It is essential that the investigator be able to

19  do his job even if an inmate doesn't like him or complains

20  about him.  Just as importantly, I urge you to think about

21  what I just mentioned moments ago.  When Troy Steele told

22  Timothy Lancaster to handle the investigation, did

23  Mr. Lancaster stay silent and think to himself now is my

24  chance to get back at Mr. Davis?  No.  Timothy Lancaster was

25  transparent and he brought Mr. Davis's case to Mr. Steele's

1    attention.  Why on earth would Timothy Lancaster have done

2    that if he had some secret motive to retaliate against

3    Mr. Davis?  He wouldn't.  And when Troy Steele still felt

4    Timothy Lancaster was the best person for the job,

5    Mr. Lancaster investigated the situation just as he would any

6    other.

7            You heard about Timothy Lancaster's report, and you

8    can ask for that in the jury room if you wish.  His report

9    showed that among many other things, he interviewed 26

10   suspects and two witnesses.  Now Timothy Lancaster did not go

11   through all that trouble as an elaborate ruse just to annoy

12   Mr. Davis.  He did those things because it was his job and he

13   was following the evidence.  He followed every lead he had.

14   Remember the letter, for instance, that he investigated which

15   turned out to be a dead end, and remember the second suspect

16   who he interviewed in ad-seg who was eventually released

17   because he was not believed to possess the skills necessary to

18   make the knife?

19           You are not here to decide whether you think in

20   hindsight Mr. Lancaster could have done something more or

21   different in his investigation.  You are tasked with deciding

22   whether the investigation that was conducted was retaliation.

23   This was a thorough investigation, and although Mr. Davis has

24   offered his own speculation, there is no actual evidence

25   whatsoever that Mr. Davis's prior lawsuit was a determining

1    factor in anything that Timothy Lancaster did.  The evidence

2    has shown that Mr. Lancaster's report notes facts both

3    favorable and unfavorable to Mr. Davis and that Mr. Davis was

4    not ultimately issued a conduct violation.  These are not the

5    actions of someone who is trying to retaliate.  They are

6    indicative of somebody who is being impartial.

7          Before I end my remarks, I need to address a few

8    final points.  First, Mr. Davis has complained because he was

9    transferred from ad-seg in housing unit 3 to ad-seg in housing

10   unit 2.  This is irrelevant because the evidence has shown

11   that neither of those housing units was any better or worse

12   than the other.  Inmates who were in ad-seg in both housing

13   units were treated exactly the same.  There is also no

14   evidence that Mr. Davis's lawsuit was a determining factor in

15   the transfer.  To the contrary, we heard during the trial that

16   it is standard to move ad-seg offenders from housing unit 3,

17   which is overflow, to housing unit 2 when beds become

18   available.

19         Next, Mr. Davis has complained that he did not

20   immediately receive a TASC order when he was first placed in

21   temporary administrative segregation by Officer Pashia and

22   Officer Hall.  Now neither of those folks are on trial today.

23   In any event, even if this allegation were true, it caused Mr.

24   Davis absolutely no harm whatsoever.  A TASC order simply

25   provides the inmate with a brief explanation as to why they

1    are being placed in ad-seg.  Here, one of the officers who

2    escorted Mr. Davis to ad-seg specifically told him that he was

3    being moved there because he was being investigated.  And, in

4    fact, the very next day, Mr. Lancaster interviewed him about

5    the knife investigation.  So Mr. Davis knew full well why he

6    was in administrative segregation.  Whether he received that

7    information from a piece of paper or directly from an officer

8    is immaterial.

9          And last, Mr. Davis has complained because he was not

10   administered a CVSA truth verification test.  This is a

11   distraction.  Mr. Davis makes this argument because it sounds

12   good.  The reality is, first, there is no evidence that

13   Mr. Davis has any right to a truth verification test.  Second,

14   Timothy Lancaster told you that he only asked Mr. Davis if he

15   would be willing to take the test because seeing how an inmate

16   responds to that question can itself be a tool during an

17   investigation.  Third, Timothy Lancaster was not authorized to

18   administer a CVSA test nor did he have the authority to

19   approve or deny a request for a CVSA test.  Fourth, based on

20   the procedures used at Potosi Correctional Center at that

21   time, even Troy Steele did not have the authority to approve

22   or deny the request for a CVSA test.  Only the Inspector

23   General's Office could do that.  Fifth, Troy Steele told you

24   what he thinks of CVSA tests.  He doesn't like them.  He

25   doesn't think they are credible.  He never asks the Inspector

1   General for one, and in any event, there is no guarantee that

2   the Inspector General will approve the request.

3           This was not something unique to Mr. Davis.

4   Remember, Troy Steele testified that throughout his career,

5   he's been asked thousands of times to seek a CVSA test from

6   the Inspector General, but that he cannot remember ever having

7   done so even a single time.  You may agree or disagree that

8   CVSA tests are unreliable, but one thing is for sure.

9   Mr. Steele did not treat Mr. Davis any differently than he

10  treated the thousands of other people that requested CVSA

11  tests.  And last, both Timothy Lancaster and Troy Steele told

12  you that a CVSA test would not have changed anything in this

13  case.  If the test suggested that Mr. Davis was lying, prison

14  staff could still not have issued a conduct violation against

15  him based on that result.  And if the CVSA test suggested that

16  he was telling the truth, the investigator would still not be

17  able to rule him out as a suspect because of the other

18  evidence they had against him.

19          In closing, like I have said, prison staff take these

20  issues very seriously, and a knife in a level 5 maximum

21  security prison is a very dangerous thing.  It is not a time

22  to be petty or to round up a bunch of people to come up with a

23  plot to target Mr. Davis.  Investigating a weapon is a grave

24  responsibility, and in this case it was handled

25  professionally.  No one was out to get Mr. Davis.  No one has

1  retaliated against Mr. Davis.  So on behalf of my clients, we

2  thank you for your service on this jury, and we ask that you

3  return a verdict in our favor.  Thank you.

4        THE COURT:  Mr. Simon.

5        MR. SIMON:  So I will start with what he said at the

6  end.  We don't have to prove a plot.  We don't have to prove a

7  conspiracy.  Having a CVSA test may not have changed their

8  results, they probably would have still kept him locked up,

9  but it might have changed the evidence we'd be able to present

10  to you.  He said Mr. Davis was treated like everybody else.

11  No, he wasn't.  That's the problem.  He wasn't.  There were

12  two other offenders.  They were locked up for two to three

13  days.  If he would have been in ad-seg for two to three days

14  while they investigated or maybe even until November 29th when

15  the investigation ended, we probably wouldn't be here, but

16  they kept him locked up for 80 days past everybody else, and

17  they ended the investigation November 29th.

18        Not a single inconsistent statement by Mr. Davis,

19  none.  What he told you was exactly what I thought.  Well, he

20  didn't say everything in his letters that he wrote.  I agree

21  with something else he said.  If we failed to prove a single

22  element on any defendant, you should find in their favor.  I

23  agree because I think we did prove it, but if you think we

24  didn't, you should find in their favor.  We want you to follow

25  the instructions and look at all the evidence.  Look at

1    Exhibits N and O and AAA, the ones he talked about, the ones

2    that they don't want to put in evidence that we insisted if

3    you are going to talk to a witness about them, let's put it in

4    evidence, let's give it to the jury, we are not afraid of the

5    evidence.

6           Mr. Steele, Mr. Steele on this serious violation, he

7    said on the stand we didn't know if it was one knife or many

8    knives, and what's the first thing he did?  He runs right down

9    there to the metal factory and covertly starts talking to

10   people.  He doesn't lock down the prison.  He doesn't lock

11   down the factory.  If he is really worried that there is a

12   bunch of knives, why didn't he take other action?  Again, the

13   defendants may have conducted a thorough investigation, I

14   don't think they did.  And they may have tried to find the

15   culprit.  We think they did a poor job.  But that's not the

16   point.  The point is that they used the investigation as an

17   opportunity to retaliate.  That's the point and that's why

18   we're here.  Thank you.

19          THE COURT:  Very well.  Madam clerk, will you swear

20   in the CSO.

21                        (CSO sworn)

22          THE COURT:  All right.  Ladies and gentlemen, if you

23   will go with Alicia and the CSO to your jury room.

24                 **(JURY OUT AT 2:25 P.M.)**

25          THE COURT:  There was a note received by the jury at

1    2:38.  They are requesting to receive all of the exhibits

2    admitted into evidence.  Neither party has an objection.  The

3    exhibits will be taken back to the jury.

4         **(Court Recessed from 2:40 p.m. until 5:50 p.m.)**

5    **(The Following Proceedings Were Held Within the Hearing and**

6                    **Presence of the Jury.)**

7              THE COURT:  Ladies and gentlemen, because of the hour

8    and because of the way the building is managed in terms of its

9    HVAC system, we are going to call it a day and recess for the

10   evening and we will reconvene tomorrow morning.  Since you

11   have begun your deliberations, you are now to suspend those

12   deliberations.  Don't discuss it with each other.  Certainly

13   don't discuss it with anyone else.  Do not read, view, or

14   listen to any media accounts regarding the trial, not that

15   there necessarily will be.  Do not utilize the internet in any

16   way, shape, or form that would allow for discussion of the

17   trial or perhaps even viewing something that might be posted

18   in a blog or otherwise or on some social media type site.  We

19   will reconvene tomorrow morning at -- is 9:00 good for you,

20   folks?  9:30?  You want to make it 9:30?  We will reconvene

21   tomorrow morning at 9:30.  And again when you come back, go

22   directly to your jury room.  Alicia will be here and she will

23   have the exhibits and the instructions for you, and you can

24   begin your deliberations then.

25             So we will see you back here at 9:30 tomorrow

105

1   morning.  Thank you.  Oh, as an aside, the other thing about

2   the mechanics is this.  You know, it's a federal building.

3   Even though it's the courts, they want to say they're in

4   charge of it, and they are to the extent that GSA controls

5   everything in the building, which is the heating and the

6   cooling.  So at 5:30, whether it's winter or summer, whether

7   it's air conditioning or heating, those systems get turned

8   off.  And in the summertime when it's 88 degrees outside or

9   90, it gets really hot in here really fast, and in the

10  wintertime when it's 20 degrees or 10 degrees, it gets really

11  cold in here really really fast when they do that.  So unless

12  you have some special arrangements, which almost requires an

13  act of Congress to do, we don't typically go beyond 5:30 or

14  6:00 for that reason because it's just not fair to anybody

15  that's in the building at that time, especially folks that

16  might be pregnant.  So we'll see you tomorrow morning at 9:30.

17  Thank you.

18            **(PROCEEDINGS CONCLUDED AT 6:00 P.M.)**

19

20

21

22

23

24

25

1                        CERTIFICATE

2

3        I, Angela K. Daley, Registered Merit Reporter and

4   Certified Realtime Reporter, hereby certify that I am a duly

5   appointed Official Court Reporter of the United States

6   District Court for the Eastern District of Missouri.

7        I further certify that the foregoing is a true and

8   accurate transcript of the proceedings held in the

9   above-entitled case and that said transcript is a true and

10  correct transcription of my stenographic notes.

11       I further certify that this transcript contains

12  pages 1 through 105 inclusive and that this reporter takes no

13  responsibility for missing or damaged pages of this transcript

14  when same transcript is copied by any party other than this

15  reporter.

16       Dated at St. Louis, Missouri, this 18th day of July,

17  2018.

18

19

20       _____
         /S/Angela K. Daley
21       Angela K. Daley, CSR, RMR, FCRR, CRR
         Official Court Reporter
22

23

24

25